IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CASE NO. |
| | : | |
| vs. | : | |
| | : | INDICTMENT |
| **MICHAEL E. PEPPEL** | : | 15 U.S.C. § 78j(b)  **3 : 06 cr 0196** |
| | : | 15 U.S.C. § 78m(a) |
| Defendant. | : | 15 U.S.C. § 78ff  WALTER HERBERT RICE |
| | : | 18 U.S.C. § 2 |
| | : | 18 U.S.C. § 371 |
| | : | 18 U.S.C. §1341 |
| | : | 18 U.S.C. §1343 |
| | : | 18 U.S.C. §1349 |
| | : | 18 U.S.C. §1350 |
| | : | 18 U.S.C. §1956(h) |
| | : | 18 U.S.C. §1957 |
| | : | |
| | : | FORFEITURE |

THE GRAND JURY CHARGES THAT:

## INTRODUCTION

### I.    Background

### A.    MCSi, Inc.

1.    MCSi, Inc. ("MCSi") was initially formed in 1980 under the laws of the State of
Maryland as Miami Computer Supply Corporation. At all times relevant to this Indictment, its
principal place of business was located at 4750 Hempstead Station Road, Dayton, Ohio 45429.
MCSi described itself as North America's premier reseller, and advanced professional systems
integrator, of computer technology and visual communications products for businesses, government
agencies and educational institutions.

1

2. In 1996, MCSi became a publicly traded corporation. Its common stock was quoted under the symbol MCSI in the National Association of Securities Dealers Automated Quotations System (NASDAQ), which is part of the National Market System. MCSi shareholders were located throughout the United States, including the Southern District of Ohio.

3. Throughout the relevant period of this Indictment, MCSi used a computerized software accounting system referred to as "JD Edwards." When a sales transaction was input into JD Edwards, the system could automatically generate a series of corresponding documents to include invoices and packing lists. The system also recorded revenue, receivables, cost of goods sold, and relieved inventory. Certain non-routine transactions, however, required manual inputs into JD Edwards. At MCSi, journal entries for these non-routine transactions were first handwritten on sheets titled "journal voucher." These transactions were then manually keyed into JD Edwards, by the company's Controller or a member of his staff. The manual journal voucher sheets were then permanently filed in the Controller's office in three-ring binders, together with all the associated backup documentation.

4. Between the spring of 1996 and the end of 2000, MCSi acquired 26 companies. At the peak of its business, MCSi maintained offices at 160 locations and had over 50,000 clients, 2,000 vendors and 1,300 employees. Throughout 2001, and continuing into 2002, MCSi generally met or exceeded stock market analysts' earning per share expectations. Its annual sales for fiscal year 2001 exceeded \$800 million. MCSi's fiscal year ran from January 1 until December 31.

5. On December 18, 2001, MCSi carried out a public offering of its common stock. This offering was oversubscribed, and the underwriters exercised their over allotment option. Ultimately, the company sold 4.7 million shares at an offering price (before underwriting commissions) of \$22.875 per share. MCSi realized over \$107 million from this stock offering.

2

6. In 2003, the company moved its main offices from Dayton, Ohio to Atlanta, Georgia. In April 2003, NASDAQ delisted the stock. In June 2003, MCSi filed for Chapter 11 Bankruptcy protection. It is presently in liquidation.

**B.   Certain Relevant Accounting Principles**

7. As a publicly traded company, MCSi was required to comply with various rules and regulations promulgated by the United States Securities and Exchange Commission (the "SEC"). The SEC's rules and regulations are designed to protect the investing public by, among other things, ensuring that a company's financial information is accurately recorded and properly disclosed.

8. Under the SEC's rules and regulations, MCSi and its officers, were required to: (1) make and keep books, records and accounts which, in reasonable detail, fairly and accurately reflect the company's business transactions, including its revenue and expenses; (2) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurance that the company's transactions were recorded as necessary to permit preparation of financial statements in conformity with Generally Accepted Accounting Principles ("GAAP"); and (3) file with the SEC quarterly reports (on Form 10-Q) and annual reports (on Form 10-K) which include financial statements that accurately presented MCSi's financial condition, and the results of its business operations in accordance with GAAP.

9. The GAAP criterion as set forth in the December 1984, Statement of Financial Accounting Concepts No. 5, Recognition and Measurement in Financial Statements, paragraph 83, provides certain guidance for recognition of revenue. According to this statement, "[r]evenues and gains generally are not recognized until realized or realizable . . . "; they are not realized until "products . . . are exchanged for cash or claims to cash"; and they are not realizable until "related assets received or held are readily convertible to known amounts of cash or claims to cash."

3

10.     According to the June 1953, Research Bulletin No. 43, Chapter 1A, it states that a profit is deemed to be realized when there is a sale in the ordinary course of business, unless collection of the sales price is not reasonably assured.

11.     SEC Staff Accounting Bulletin 101 ("SAB 101") discusses situations where the substance of a transaction is that of a consignment or a financing. Even if title to the product has passed to the buyer, such an arrangement precludes revenue recognition and the consigned inventory should be reported separately from other inventory in the consignor's financial statements as "inventory consigned to others" or another appropriate caption with the sale being recognized when payment is received.

12.     SAB 101 also sets forth criteria to be met in order to recognize revenue when delivery has not occurred. These conditions are the important conceptual criteria which should be used in evaluating any purported bill and hold sale. These include: (1) The risks of ownership must have passed to the buyer; (2) The customer must have made a fixed commitment to purchase the goods, preferably in written documentation; (3) The buyer, not the seller, must request that the transaction be on a bill and hold basis; (4) There must be a fixed schedule for deliver of the goods. The date of delivery must be reasonable and consistent with the buyer's business purpose (e.g., storage periods are customary in the industry); (5) The seller must not have retained any specific performance obligations such that the earning process is not complete; (6) The ordered goods must have been segregated from the seller's inventory and not be subject to being used to fill orders; and (7) The equipment [product] must be complete and ready for shipment. In some circumstances, a transaction may meet all facts listed above, but not meet the requirements for revenue recognition.

4

13.     GAAP requires that revenue from the sale of software be recognized consistent with American Institute of Certified Public Accountants (AICPA) Statement of Position (SOP) 97-2. SOP 97-2 specifies that the following four criteria must be met for the sale of software to be recognized as revenue: (I) persuasive evidence of an arrangement must exist, (ii) delivery of the software has to occur, (iii) the vendor's fee must be fixed or determinable, and (iv) collectibility of the payment must be probable.

C.     **The Defendant and Co-Conspirators**

14.     The defendant, **MICHAEL E. PEPPEL** joined MCSi in 1996. He served as the Chairman of the Board, President and Chief Executive Officer (CEO). He left the company in March 2003.

15.     Unindicted co-conspirator I.H.S. joined MCSi in 1998. He served as Vice President and Chief Financial Officer (CFO). From July 2000 through April 2003, he also acted as a Director of MCSi. He left the company in April 2003.

16.     Unindicted co-conspirator, J. R.A., joined MCSi in 1999. He served as Controller until June 2003 at which time the firm filed for Chapter 11 bankruptcy protection.

17.     Unindicted co-conspirator, M.S., joined MCSi in 1989. She initially served as Vice President of Operations.

18.     Unindicted co-conspirator, S.R., joined MCSi in 1999. She initially served as Director of Communications, and later as Vice President for Corporate Communications through May 2003.

19.     Unindicted co-conspirator, D.J.W., founded a computer and audio-visual wholesale supply company in Leeds, England named Mercatum, Ltd., ("Mercatum") in 1996. Eventually Mercatum would open another office in Dublin, Ireland, and an affiliate with CEM Overseas, Ltd.

5

("CEM") based in Dubai, United Arab Emirates.

## D.   Consensus Estimates

20.    MCSi regularly issued public revenue and earnings predictions. Based in part on these predictions, professional stock analysts estimated what they believed would be MCSi's total revenue and earnings per share for a particular fiscal quarter. The average of various professional stock analysts' estimates is referred to as the "consensus estimate."

21.    The defendant, **MICHAEL E. PEPPEL** and I.H.S. understood that MCSi's failure to meet or exceed the consensus estimate for any quarter, would likely result in a substantial decrease in the price of the company's stock.

22.    On October 24, 2001, MCSi conducted its third quarter 2001 earnings "telephone conference call" with stock analysts. During this call, defendant, **MICHAEL E.  PEPPEL** and I.H.S., claimed MCSi was "on track" to report annual revenues of $1 billion for calendar year 2001. During this call, an analyst inquired if the company "gave fourth quarter guidance." Defendant, **MICHAEL E. PEPPEL** responded, that he was comfortable with the analysts' projections that were then "out on the street." He further added that he believed that these ranged from $.27 to $.30 earnings per share.

## E.   The Scheme to Defraud

23.    Defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi's financial statements to be falsified through a series of sham transactions, false journal entries, and improper applications of GAAP.

6

24.     For the year ending December 31, 2001, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to report income from continuing operations (pre-tax) of $18,690,000, while GAAP dictated that MCSi actually lost $24,755,630. For the quarter ending March 31, 2002, MCSi overstated its income from continuing operations (pre-tax) by approximately $11.6 million by reporting income of $10,246,000, instead of an actual loss of $1,433,112. Income for the quarter ending September 30, 2002 was also overstated by $1.3 million.     This pattern of recording fabricated revenue was accomplished through separate sham transactions and journal entries involving Federal Express Corporation ("FedEx"), Skytron Corporation ("Skytron"), ClearOne Communications ("ClearOne"), Mercatum, "Major Projects," "Major Project 2" and rebates.

25.   During calendar years 2000 and 2001, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to fraudulently recognize $12.4 million and $3.9 million respectively in revenue from FedEx.

26.     Beginning in mid-2000, and continuing through early 2002, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to record various fraudulent journal entries that prematurely recognized and otherwise fabricated revenue from its business relationship with FedEx.

27.     During the second quarter of 2001, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to fraudulently recognize $12 million in revenue from Skytron.

28.     In December 2001, defendant, **MICHAEL E. PEPPEL** caused MCSi to fraudulently recognize $2 million in revenue from ClearOne.

29.     In late 2001, defendant, **MICHAEL E. PEPPEL** caused MCSi to fraudulently recognize $37.1 million in revenue from Mercatum, Ltd.

7

30.     I.H.S. caused false and fabricated journal entries to be recorded in MCSi's books concerning: FedEx, Skytron, ClearOne, Mercatum, "Major Projects," "Major Project 2" and rebates. Invoices were backdated involving transactio ns with Mercatum in order to create the false impression that said transactions occurred before the end of 2001.

31.     Defendant, **MICHAEL E. PEPPEL** and I.H.S. engaged in a pattern, scheme and artifice to fr audulently cover-up and conceal manual journal entries from MCSi's auditors, PricewaterhouseCoopers ("PwC").

32.     Beginning with the first quarter of 2001 and continuing through the third quarter of 2002, MCSi's financial statements were materially falsified at the direction of its CEO, defendant, **MICHAEL E. PEPPEL** and its CFO, I.H.S. The defendant **MICHAEL E. PEPPEL** instituted these fraudulent actions for the express purpose of meeting or exceeding analysts' expectations, and ultimately for their individual personal gain.

33.     These materially misstated and fraudulent financial statements were filed with the SEC as part of the Form 10-Q periodic reports concerning quarters ending March 31, 2001, June 30, 2001, September 30, 2001, March 31, 2002, June 30, 2002 and September 30, 2002; and as part of the Form 10-K annual report for the year ending December 31, 2001.

34.     On December 18, 2001, MCSi carried out a public offering of its common stock. In this offering, MCSi sold 4.7 million shares at an offering price (before underwriting commission) of $22.875 a share. In this offering, defendant, **MICHAEL E. PEPPEL** sold 300,000 of his personally owned shares thereby generating personal proceeds (before expenses) of approximately $6,862,500.

8

35. By materially and fraudulently overstating MCSi's earnings, defendant, **MICHAEL E. PEPPEL** and l.H.S. successfully manipulated MCSi's financial statements in order to meet or exceed the stock analysts' consensus estimate. Without the addition of this fraudulent revenue, MCSi would have fallen well short of the consensus estimates, thereby negatively impacting the overall price of MCSi stock.

## (1) THE FEDEX *"POWERSHIP"* TRANSACTION

36. In the summer of 2000, FedEx, a global delivery company, began ordering personal computers from MCSi. These computers were in-turn sold to FedEx business customers who wished to weigh, ship and track their own FedEx shipments. Under this so-called "Powership" program, MCSi put together a package of equipment consisting of: a scale, bar code scanner, printer, central processing unit ("CPU"), and computer monitor. The CPU was loaded with proprietary FedEx software.

37. Each time FedEx received an order under the Powership program, MCSi was electronically notified. MCSi would load the FedEx software into the individual computer prior to it being picked up by a FedEx courier for eventual delivery to FedEx's customer. FedEx would pay MCSi within 30 days of the date of each order. Legal title to each of the "Powership" packages of equipment would pass from MCSi to FedEx upon retrieval by the FedEx courier from the MCSi warehouse facilities. Each of these FedEx transactions were processed through JD Edwards.

38. Despite the fact each of the individual Powership sales were automatically booked through JD Edwards, I.H.S. directed that additional fraudulent manual accrual journal entries be made beginning in the quarter ending June 30, 2000 and continuing through the quarter ending

9

March 31, 2002.

39.    These journal entries were fraudulent, premature, improper and contrary to GAAP.

40.    In December 2001, FedEx terminated its business relationship with MCSi.   As of December 22, 2001, all of the Powership equipment inventory had been purchased by FedEx and removed from the MCSi warehouses.

41.    Despite the fact that MCSi's relationship with FedEx had ceased, I.H.S.  caused  a subsequent, fraudulent manual journal entry to be booked for the quarter ending March 31, 2002. This entry artificially inflated MCSi's overall first quarter of 2002 revenue and income figures by $14.2 million.

42.    In the third quarter ending September 30, 2001, I.H.S. instructed J.R.A., MCSi's Controller, to make a fraudulent $1.25 million entry designed to record income from a purported "FedEx rebate." This rebate represented more than 27% of MCSi's reported net income for the third quarter of 2001.

43.    FedEx and MCSi never had any rebate relationship whatsoever.

**(2)    THE SKYTRON TRANSACTION**

44.    The Skytron Corporation ("Skytron") was a startup company formed in 1997 in the State of California by two brothers identified to the Grand Jury as "J.S." and "W.S.."   Skytron originally installed large video screens also known as "trons" at trade shows. Eventually their business evolved into installing large, three-sided video screen systems  in food courts located in commercial shopping malls. Skytron's goal was to install these trons in approximately 150 upscale shopping malls across the country.

10

45.     Beginning in the late 1990s, Skytron began ordering the components used top build the trons from MCSi. Eventually Skytron's owners began discussing with defendant, **MICHAEL E. PEPPEL** the possibility of entering into a different business relationship.

46.     The parties eventually negotiated an agreement whereby Skytron would locate and rent mall space, sell advertising services, and obtain all necessary permits and certificates to install these systems. MCSi in-turn would assemble, install and service the trons.

47.     During these negotiations, Skytron clearly indicated that it lacked the ability to independently secure the necessary financing for this deal. The defendant, **MICHAEL E. PEPPEL** agreed to have MCSi guarantee all necessary financing required by Skytron. Ultimately, MCSi and Skytron entered into a "pay as you install" arrangement, meaning that Skytron would only be required to pay MCSi if and when it installed trons.

48.     The average installed per unit cost for each tron was estimated to be $85,000. The aggregate installed cost for the entire 150 trons was approximately $12 million.

49.     At MCSi's request, Skytron prepared and datafaxed to MCSi, a purchase order dated June 30, 2001 in the amount of $12,035,247. This purchase order purportedly was for the manufacture and installation of 150 trons. As of the date of this purchase order, Skytron had secured none of the necessary financing required to complete this transaction.

50.     MCSi did not receive Skytron's purchase order until on or about August 7, 2001.

51.     Neither J.S., W.S. nor the defendant, **MICHAEL E. PEPPEL** ever intended or contemplated this purchase order to then represent a legally binding obligation between Skytron and MCSi. To confirm this understanding, Skytron insisted that the following restrictive language appear on the face of the purchase order, to wit: "purchase order requires appropriate approvals to

11

be valid."

52.    Skytron's owners were aware that said purchase order could be used by MCSi to assist in negotiating volume discounts and necessary pricing terms to complete this deal.

53.    On or about August 7, 2001, S.R., MCSi's Vice President for Corporate Communications prepared and issued a press release which contained the headline: "Skytron Grants MCSi $12 Million Exclusive Integration Services Contract."   This press release was materially deceptive in that it indicated MCSi was expected to install and maintain trons at "over 500" shopping malls across the country, and failed to indicate: (1) the underlying Skytron purchase order was not considered to be binding by the respective parties; (2) that Skytron then had secured only 130 tentative contracts to install trons; and (3) that MCSi had agreed to guarantee the financing necessary for Skytron to participate in this deal.

54.    On August 7, 2001, both defendant, **MICHAEL E. PEPPEL** and I.H.S. were well aware of the material misleading nature of this release.

55.    Both defendant, **MICHAEL E. PEPPEL** and I.H.S., were fully aware that Skytron was unable to independently finance the associated $12 million cost of the said purchase order without securing outside financing guarantees from MCSi.

56.    I.H.S. personally assisted defendant, **MICHAEL E. PEPPEL** in negotiating a lease/financing guarantee for Skytron's benefit.

57.    After MCSi received Skytron's purchase order, I.H.S. directed J.R.A. to create a fraudulent MCSi manual journal entry recording revenue and a receivable in the amount of $12,035,247 for the quarter ended June 30, 2001. Corresponding entries for cost of goods sold and a payable were recorded in the amount of $7,822,911.

12

58.     The net effect of these entries were to fraudulently add \$4,212,336 to MCSi's second quarter of 2001 income. This amount equated to more than 60% of MCSi's reported net income for this quarter.

59.     This fraudulent \$4,212,336 net income was also included in MCSi financial statements filed with the SEC as part of the Form 10-Q for the quarter ending September 30, 2001.

60.     This form was electronically filed and transmitted in interstate commerce via the Electronic Data Gathering, Analysis and Retrieval (EDGAR) System. This is the computer system utilized by the SEC for the receipt, acceptance, review and dissemination of documents submitted in electronic format.

61.     In early October 2001, I.H.S. caused another manual journal entry to be made in JD Edwards. This entry reduced the previous \$12 million Skytron revenue and receivable journal entry to \$9,078,196 by the end of 2001.

62.     In late December 2001, I.H.S. fabricated a corresponding invoice to Skytron in the amount of \$9,078,196. He thereafter instructed M.S. to backdate this invoice to October 2, 2001, and enter it into JD Edwards. No such invoice was ever received by Skytron.

63.     MCSi never attempted to collect either the \$12 million or \$9 million receivable from Skytron. Despite this fact, defendant, **MICHAEL E. PEPPEL** and I.H.S. continued to mislead PwC auditors by claiming these Skytron receivables were collectible.

64.     The net effect of this year-end Skytron journal entry was to fraudulently overstate revenue and receivables by \$9,078,196. This correspondingly overstated MCSi's net income (before taxes) by \$3,177,368. This equated to nearly 17% of MCSi's reported net income for fiscal year 2001.

65.     In May 2002, Skytron filed for bankruptcy. As of that date it had only installed 72 trons.

66.     In the summer of 2002, MCSi paid $2,828,891 in Skytron related financing costs pursuant to its prior guarantee commitments.

## (3)    THE MERCATUM, LTD. TRANSACTION

67.     In 1996, D.J.W. established Mercatum in Leeds, U.K. as a computer and audio-visual supply wholesale company.

68.     Mercatum's business revenues totaled approximately £1 million ($1,620,000) in 2000; £2.5 million ($3,725,000) in 2001; and £5.5 million ($8,030,000) in 2002. Due to a chronically tight cash flow, Mercatum factored all its receivables in order to meet business cash flow requirements.

69.     In the fourth quarter of 2001, defendant, **MICHAEL E. PEPPEL** approached D.J.W. with a proposal that MCSi consign to Mercatum certain inventory for overseas sales.

70.     D.J.W. indicated an interest in the proposal provided that the MCSi inventory was of a merchantable quality suitable for overseas markets, and an appropriate price advantage was extended.

71.     Defendant, **MICHAEL E. PEPPEL** was fully aware that Mercatum lacked the ability to pay "up front" for any of the consigned MCSi inventory. He additionally was aware that Mercatum lacked the independent ability to secure adequate financing for this deal. As a result, D.J.W. and defendant, **MICHAEL E. PEPPEL** agreed to structure this transaction on a strictly "pay as you go" basis. This meant that Mercatum would only be required to pay MCSi if and when it sold product.

14

72. On November 30, 2001, the parties formally entered into a letter of agreement. According to the terms of this agreement, Mercatum was to purchase $5 million of unspecified MCSi product per quarter.

73. During December 2001, defendant, **MICHAEL E. PEPPEL** recontacted D.J.W. and informed him that the total transaction amount was to be increased to $13 million. D.J.W. agreed.

74. Shortly thereafter, defendant, **MICHAEL E. PEPPEL** again recontacted D.J.W. and informed him the total transaction amount needed to be increased once again to $37.1 million. D.J.W. again agreed because of the perceived "riskless" nature of the consignment deal Mercatum had entered into.

75. Defendant, **MICHAEL E. PEPPEL** thereafter caused MCSi to fraudulently record $37.1 million in revenue for 2001.

76. After reaching this agreement, the defendant, **MICHAEL E. PEPPEL** specifically requested that D.J.W. provide MCSi with three purchase orders, with the date and dollar amount sections left intentionally blank.

77. D.J.W. generated three blank purchase orders, one each from three locations: Mercatum (U.K.), Mercatum Ireland and CEM Overseas. None of these purchase orders specified what MCSi product was supposedly purchased. Upon receipt of these three blank purchase orders, the $37.1 million transaction was divided between the purchase orders in the following amounts: $12,750,000, $12,750,000 and $11,600,000.

78. On or about February 1, 2002, I.H.S. directed M.S. to generate and record three corresponding Mercatum invoices totaling $37.1 million. Each were entered into JD Edwards.

15

79.    I.H.S. further instructed M.S. to backdate these three invoices with the respective dates of December 4, December 4 and December 7, 2001.

80.    I.H.S. provided M.S. with the Mercatum office addresses from which these three purchase orders purportedly originated.

81.    M.S. placed fabricated purchase order numbers on the respective invoices. M.S. was provided no description of the MCSi product purportedly sold to Mercatum.

82.    On or about February 1, 2002, M.S. completed the preparation of these three back dated Mercatum invoices.

83.    There were no entries for cost of goods sold or inventory relieved made as a result of this transaction.

84.    In mid-March 2002, MCSi shipped an assortment of inventory from its Erlanger, Kentucky warehouse to Mercatum's affiliate CEM located in Dubai, United Arab Emirates.

85.    The shipped inventory consisted of product that turned out to be generally obsolete, stale, surplus, and incompatible for overseas sales.

86.    Between July and August 2002, D.J.W. directed that approximately half of the MCSi inventory be returned to MCSi. In late 2002, the balance of the inventory was ultimately returned back to MCSi.

87.    Defendant, **MICHAEL E. PEPPEL** and I.H.S. fraudulently portrayed this transaction to PwC as a "bill and hold."

88.    Mercatum never requested nor intended that this transaction be treated as a "bill and hold." Mercatum likewise never requested that MCSi retain possession of the product past December 31, 2001. Mercatum was fully prepared to accept delivery of the MCSi inventory as of

16

mid-December 2001.

89.     MCSi paid all shipping, storage, insurance, and marketing costs associated with this Mercatum transaction.

90.     On or about February 22, 2002, defendant, **MICHAEL E. PEPPEL** prepared and datafaxed a draft letter for D.J.W.'s signature concerning this transaction. This letter was addressed to PwC and contained a series of factual misstatements to include: (1) $37.1 million was currently due and payable by Mercatum to MCSi; (2) Mercatum held title to all the MCSi inventory that had yet to be shipped from MCSi's Erlanger, Kentucky warehouse; (3) Mercatum had requested MCSi to hold and store the product; and (4) the product was scheduled to be shipped prior to February 28, 2002. D.J.W. signed this draft letter and returned it to defendant, **MICHAEL E. PEPPEL** via regular mail.

91.     In June 2002, Mercatum was acquired by MCSi. It was subsequently renamed MCSi Europe.

92.     MCSi's fraudulent recording of this $37.1 million in revenue was contrary to GAAP.

93.     In October 2003, D.J.W. repurchased Mercatum from MCSi, for $650,000 and other consideration.

(4)     **THE CLEARONE TRANSACTION**

94.     In December 2001, defendant, **MICHAEL E. PEPPEL** contacted a person identified to the Grand Jury as F.F. who was the then CEO of a Salt Lake City, Utah-based computer software company named ClearOne (formerly known as Gentner Communications Corp.). The defendant, **MICHAEL E. PEPPEL** indicated that AV Associates (a wholly owned subsidiary of MCSi based out of Connecticut) had developed a proprietary "Quoter Scheduler Tracker" (QST) software system that was designed to track price and systems integration orders. Despite the fact that MCSi and

17

ClearOne were competitors in the audio integration field, defendant, **MICHAEL E. PEPPEL** suggested that ClearOne might be interested in purchasing the QST software package for $2 million. F.F. agreed to review the software, but warned that only ClearOne's board of directors had the authority to approve such a large purchase.

95.     Prior to shipping this software to ClearOne, defendant, **MICHAEL E. PEPPEL** required that ClearOne issue a purchase order in the amount of $2 million. F.F. directed that Purchase Order R12846 in the amount of $2 million, dated December 28, 2001, be datafaxed to MCSi's Dayton, Ohio offices. This datafax bore a Gentner Communications Corp. fax data strip. Both F.F. and defendant, **MICHAEL E. PEPPEL** were fully aware that ClearOne had yet to determine whether it was going to purchase this software.

96.     During the last week of 2001, defendant, **MICHAEL E. PEPPEL** instructed AV Associates to ship ClearOne the QST software.

97.     On or about December 29, 2001, AV Associates shipped the QST software from its Connecticut offices to ClearOne's Utah offices via FedEx.

98.     The QST software AV Associates shipped to ClearOne did not include the necessary source codes to operate it.

99.     In mid-January 2002, after receiving and inspecting the QST software, F.F. informed defendant, **MICHAEL E. PEPPEL** that ClearOne was not interested in purchasing the QST software, and immediately returned it back to MCSi.

100.     Defendant, **MICHAEL E. PEPPEL** caused MCSi to improperly record the purported $2 million software sale as revenue prior to the end of fiscal year 2001. No corresponding cost of goods sold entry was ever made for this transaction.

18

101.    ClearOne had no further communications with MCSi or defendant, **MICHAEL E. PEPPEL** concerning this transaction.

102.    Ultimately no invoice was ever issued by MCSi to ClearOne concerning this transaction. No other efforts were ever made by either AV Associates or MCSi to collect the $2 million purchase price associated with this transaction.

103.    During the third quarter of 2002, 1.H.S. fraudulently instructed J.R.A. to enter a manual journal entry into JD Edwards for a purported $1.3 million rebate receivable from ClearOne. At no time did ClearOne and MCSi ever have any rebate relations.

104.    By October 26, 2001, MCSi reported third quarter 2001 per share earnings of $.32. This reflected a 10% increase over the same period for 2000. MCSi's integration business reported a 49% gain over the prior year. Based on these results, one of the primary stock analysts following the company raised his 12-month estimate for the stock to $30 a share, while forecasting per share earnings of $1.24 for 2001.

**(5)    ADDITIONAL FRAUDULENT JOURNAL ENTRIES**

105.    During the first quarter of 2002, defendant, **MICHAEL E. PEPPEL** instructed I.H.S. to become "more aggressive" on making certain percentage-of-completion quarterly entries in MCSi's books.

106.    For the first quarter of 2002, I.H.S. instructed J.R.A. to make two manual journal entries recording $30,203,901 of revenue and $16,432,341 of cost of goods sold. This resulted in additional net revenue (before taxes) of $13,771,560. These fraudulent entries were annotated as "Major Projects" and "Major Project 2."

107.    J.R.A. complied with these instructions and recorded these fraudulent entries in the MCSi general ledger.

19

108.    On or about February 14, 2003, I.H.S. created false reports of perpetual inventory that overstated MCSi inventories as of December 31, 2002, by approximately $8 million. This was accomplished to avoid possible inquiries from PwC auditors.

109.    Between 2001 and 2003, I.H.S. routinely instructed MCSi employees to never provide any documentation to PwC without first obtaining his personal authorization.

110.    During 2003, PwC began conducting audit procedures of MCSi's financial status for the year ending December 31, 2002. As part of this audit, PwC requested access to all 2002 manual journal entries. Upon being advised of this request, I.H.S. fraudulently removed manual journal entries concerning "Major Projects" and "Major Project 2".

111.    I.H.S. fraudulently removed similar manual journal entries from MCSi's books during previous 2000 and 2001 PwC audits.

112.    Defendant, **MICHAEL E. PEPPEL** and I.H.S. signed the MCSi management representation letters required by PwC for the audits completed for the years 2000 through 2001.

113.    Between 2000 and 2003, both I.H.S. and defendant, **MICHAEL E. PEPPEL** closely monitored the consensus estimates for MCSi stock prices. Both individuals routinely discussed how MCSi's quarterly earnings and revenues compared with the consensus estimates. Both individuals were also committed to meeting or exceeding the "consensus estimates" at all costs.

114.    MCSi ultimately reported an end of year 2001 revenue of $810.3 million. This proved 15% below consensus estimates. Nonetheless, MCSi managed to post a per share annual earnings of $1.30. This exceeded analysts' projected earnings of $1.24 per share.

20

115.   On December 18, 2001, MCSi instituted a public offering of its common stock. Ultimately 4.7 million shares were sold to the investing public which generated approximately $107 million for the company.

116.   Defendant, **MICHAEL E. PEPPEL** and I.H.S. signed the MCSi registration statement related to this public offering.

117.   On December 21, 2001, defendant, **MICHAEL E. PEPPEL** sold 300,000 shares from his personal MCSi stock portfolio generating gross proceeds (before commissions and expenses) of $6,862,500. He thereafter deposited $6,519,375 of these proceeds into his personal account # XXX-X6381 held with William Blair & Co. of 222 West Adams Street, Chicago, Illinois

118.   In June 2003, PwC resigned from its audit engagement with MCSi.

**(6)     MATERIAL MISSTATEMENTS IN MCSi's FINANCIAL STATUS**

119.   MCSi improperly recognized revenue from the aforesaid FedEx, Skytron, Mercatum, ClearOne, "Major Projects" and Major Projects 2" transactions. It further falsified journal entries, fabricated rebates, backdated invoices and otherwise manufactured fraudulent revenue. MCSi's financial statements materially overstated revenue, income and accounts receivable contrary to GAAP.

120.   The actions of defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to materially overstate revenue, and to either overstate net income, or understate net loss (before taxes), in each quarter of 2001, and in the first through third quarters of 2002.

121.   For the year 2001, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to fraudulently report net income (before taxes) from continuing operations of approximately $18,690,000. If GAAP had been complied with, MCSi would have actually reported a loss of approximately $24,755,630.

122. For the quarter ending March 31, 2002, MCSi overstated its revenue by approximately $28 million, and reported net income before taxes from continuing operations of $10,246,000, instead of an actual loss of approximately $1,433,112. These misstatements were material.

123. Materially misstated financial statements were contained in the following SEC filings: MCSi's Form 10-Q periodic reports filed with the SEC for the quarters ended March 31, 2001, June 30, 2001, September 30, 2001, March 31, 2002, June 30, 2002 and September 30, 2002, and in MCSi's Form 10-K annual report for the year ending December 31, 2001. MCSi also incorporated by reference materially misstated financial statements into a Form S-3 registration statement filed December 4, 2001 and an amendment thereto filed December 18, 2001. Each of these reports were filed in an electronic format in interstate commerce via the Electronic Data Gathering, Analysis and Retrieval (EDGAR) System. This is the computer system utilized by the SEC for the receipt, acceptance, review and dissemination of documents submitted in electronic format.

## COUNT 1
### (Conspiracy to Commit Securities Fraud, Mail Fraud and Wire Fraud)

The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

124. Between on or about and between January 1, 2000 and April 30, 2003, both dates being approximate and inclusive, within the Southern District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S. together with other known and unknown co-conspirators and others, did unlawfully, knowingly, willfully, directly and indirectly, combine, conspire, confederate and agree between themselves, to commit certain offenses against the United States as follows:

(a) to employ certain devices, schemes and artifices to commit fraud in connection with the purchase and sale of securities issued by MCSi, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Section 240.10b-5;

22

(b)     to make and cause to be made false and misleading statements of material fact in applications, reports and documents required to be filed under the Securities Act of 1933, the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, in violation of Title 15, United States Code, Sections 77q(a), 78m(a) and 78ff; 17 Code of Federal Regulations, Sections 13a-1, 13a-13;

(c)     to falsify MCSi's books, records and accounts, the making and keeping of which was required by Title 15, United States Code, Section 78m(b)(2)(A) and Title 17, Code of Federal Regulations, Section 240.13b2-1, in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff;

(d)     to circumvent MCSi's internal accounting controls as required by Title 15, United States Code, Section 78m(b)(2)(B) in violation of Title 15, United States Code, Sections 78m(b)(5) and 78ff; and

(e)     to devise a scheme and artifice to defraud MCSi shareholders, and to obtain money and property from MCSi shareholders, by means of materially false and fraudulent pretenses, representations and promises, and for the purpose of executing such scheme and artifice, and attempting to do so, to cause certain documents sent in the U. S. Mails, and to cause writings, signs, signals, pictures and sounds to be transmitted by means of wire communication in interstate and foreign commerce, in violation of Title 18, United States Code, Sections 1341 and 1343

(f)     to devise a scheme and artifice to defraud MCSi shareholders by having MCSi pay certain performance based loans, bonuses and salaries to the defendant, **MICHAEL E. PEPPEL** and I.H.S. and other known and unknown co-conspirators to increase their personal wealth.

23

125. In furtherance of the conspiracy and to effect its objects, within the Southern District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S., together with other known and unknown co-conspirators and others, committed and caused to be committed, among others, the following:

## OVERT ACTS

a.  On or about June 30, 2000, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting software system for the quarter ending June 30, 2000 which falsely recorded revenue relating to the FedEx Powership program.

b.  On or about September 30, 2000, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending September 30, 2000 which falsely recorded revenue relating to the FedEx Powership program.

c.  On or about December 31, 2000, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending December 31, 2000 which falsely recorded revenue relating to the FedEx Powership program.

d.  On or about March 31, 2001, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending March 31, 2001 which falsely recorded revenue relating to the FedEx Powership program.

e.  On or about June 30, 2001, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending June 30, 2001 which falsely recorded revenue relating to the FedEx Powership program.

f.  On or about September 30, 2001, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending September 30, 2001 which falsely recorded revenue relating to the FedEx Powership program.

g.  On or about December 31, 2001, I.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending December 31, 2001 which falsely recorded revenue relating to the FedEx Powership program.

24

h.  On or about March 31, 2002, l.H.S. made or caused to be made separate manual revenue accrual entries on MCSi's JD Edwards accounting system for the quarter ending March 31, 2002 which falsely recorded revenue relating to the FedEx Powership program.

1.  On or about September 30, 2001, l.H.S. instructed MCSi's controller to make a journal entry for $1.25 million to fraudulently record income from a "FedEx rebate." This rebate was fabricated to increase MCSi's income reflected in the third quarter of 2001.

j.  On or about December 31, 2001, l.H.S. made or caused to be made a year-end manual journal entry in MCSi's corporate books recording revenue of $16,810,280 relating to the FedEx Powership program.

k.  On or about March 31, 2002, l.H.S. made or caused to be made a fictitious second quarter journal entry relating to the FedEx Powership program recording revenue of $14.2 million.

l.  During calendar year 2001, defendant, **MICHAEL E. PEPPEL** negotiated with Skytron officials about securing certain financing arrangements associated with the MCSi/ Skytron transaction.

m.  On or about June 30, 2001, defendant, **MICHAEL E. PEPPEL** and l.H.S. requested that Skytron prepare and forward a fictitious purchase order to MCSi dated June 30, 2001, for the manufacture and installation of 150 " trons," having an aggregate price of $12,035,247.

n.  On or about August 7, 2001, after receiving the aforesaid fictitious $12,035,247 Skytron purchase order, defendant, **MICHAEL E. PEPPEL** and S.R., MCSi's Vice President for Corporate Communications, authorized, prepared, reviewed and caused to be issued a materially misleading MCSi press release regarding the Skytron transaction. This release contained a headline: "Skytron Grants MCSi $12 Million Exclusive Integration Services Contract" and stated that MCSi was to install and maintain trons at "over 500" shopping malls located across the country.

o.  At the time of this press release set forth in Overt Act n. described above, Skytron had reached tentative agreements with only 130 shopping malls as opposed to the professed 500.

p.  On or about June 30, 2001, I.H.S. caused J.R.A., MCSi's Controller to make a fictitious manual journal entry recording revenue and a receivable in the amount of $12,035,247 relating to the aforesaid Skytron transaction for the quarter ending June 30, 2001.

q.     On or about June 30, 2001, I.H.S. caused J.R.A. to make a fictitious corresponding manual journal entry recording cost of goods sold and a payable, in the amount of $7,822,911 relating to the aforesaid Skytron transaction for the quarter ending June 30, 2001.

r.     On or about December 31, 2001, I.H.S. made or caused to be made a manual journal entry on MCSi's books which reduced a previous Skytron revenue and receivable journal entry of $12,035,247 to $9,078,196 at year end. This entry had the effect of overstating MCSi's revenue and receivables by $9,078,196 and understating MCSi's net loss (before taxes) by $3,177,368.

s.     In late December 2001, I.H.S. instructed M.S., MCSi's Vice President of Operations, to enter, and backdate to October 2, 2001, an invoice to Skytron for $9,078,796 which was never received by Skytron.

t.     In the fall of 2001, defendant, **MICHAEL E. PEPPEL** telephoned D.J.W., owner of Mercatum, Ltd. for the purpose of initiating discussions about the possible sale of certain MCSi products in overseas markets.

u.     In the fall of 2001, defendant, **MICHAEL E. PEPPEL**, entered into negotiations with D.J.W. of Mercatum concerning the possible shipment and consignment of certain MCSi product.

v.     On or about late 2001, defendant, **MICHAEL E. PEPPEL** and D.J.W. entered into an agreement whereby Mercatum agreed to purchase $5 million of unspecified product from MCSi on a consignment, or "pay-as-you-go" basis.

w.     On or about late 2001, defendant, **MICHAEL E. PEPPEL** requested D.J.W. prepare and forward to MCSi three purchase orders with the dates and dollar amounts left intentionally blank.

x.     On or about late 2001, as a result of defendant, **MICHAEL E. PEPPEL**'s aforesaid request, D.J.W. caused to be generated and forwarded three blank purchase orders to MCSi from the following entities: Mercatum (U.K.), Mercatum Ireland and CEM Overseas.

y.     On or about December 2001, defendant, **MICHAEL E. PEPPEL** contacted D.J.W. to inform him that the total value of the MCSi - Mercatum transaction needed to be increased to $13 million.

z.     Subsequent to Overt Act y described above, defendant, **MICHAEL E. PEPPEL** re-contacted D.J.W. to inform him that the total value of the MCSi - Mercatum transaction needed to be increased once again to $37.1 million.

aa.    In early February, 2002, I.H.S. instructed M.S. to create and backdate the three fictitious invoices relating to the aforesaid Mercatum transaction. The backdated dates were within calendar year 2001.

bb.    In early February, 2002, M.S. in fact backdated the three aforesaid invoices as instructed which related to the Mercatum transaction to: December 4, December 4, and December 7, 2001 respectively.

cc.    In early February, 2002, in response to co-conspirator "I.H.S.'" instructions, M.S. manually entered the three backdated fictitious invoices representing the $37.1 million purchase from the Mercatum transaction into MCSi's JD Edwards accounting system.

dd.    In mid-March, 2002, defendant, **MICHAEL E. PEPPEL** directed MCSi to ship obsolete, unmarketable and otherwise damaged product from its Erlanger, Kentucky warehouse to an overseas Mercatum facility located in Dubai, United Arab Emirates.

ee.    By the end of 2002, Mercatum returned all of the MCSi product shipment back to MCSi because it proved to be obsolete, unmarketable and otherwise damaged.

ff.    In December 2001, defendant, **MICHAEL E. PEPPEL** contacted F.F., the CEO of ClearOne, in order to attempt to sell her company the "Quote, Scheduler, Tracker" (QST) proprietary software system developed by a subsidiary, AV Associates.

gg.    In December 2001, defendant, **MICHAEL E. PEPPEL** requested that F.F. provide him with a fictitious $2 million purchase order from ClearOne for the QST software. On December 28, 2001, a fictitious $2 million purchase order, bearing number R12846, was electronically transmitted interstate commerce via datafax from ClearOne to MCSi.

hh.    On or about the last week of December 2001, defendant, **MICHAEL E. PEPPEL** telephoned a representative of AV Associates and instructed him to immediately ship the QST software to ClearOne. During this discussion, defendant, **MICHAEL E. PEPPEL** informed AV Associates that the price for this transaction would be $2 million.

ii.    In response to instructions received from defendant, **MICHAEL E. PEPPEL** on or about the last week of December 2001, AV Associates shipped the QST software without the associated and necessary source codes to ClearOne.

jj.    Soon thereafter, defendant, **MICHAEL E. PEPPEL** caused to be recorded in MCSi's corporate books a fictitious $2 million revenue entry based on the purported sale of QST software to ClearOne for the fiscal year ending December 31, 2001. No corresponding cost of goods was ever recorded.

kk.    Defendant, **MICHAEL E. PEPPEL** caused MCSi not to send ClearOne either an invoice or statement relevant to this purported $2 million sale of proprietary software.

ll.    On or about September 30, 2002, I.H.S. instructed J.R.A. to manually enter a journal entry into the JD Edwards system for a fictitious "ClearOne rebate" in the amount of $1.3 million. At no time did ClearOne ever actually owe or issue MCSi such a rebate.

mm.    During the first quarter of 2002, defendant, **MICHAEL E. PEPPEL** instructed I.H.S. to "be more aggressive," or words to that effect, on certain percentage-of-completion entries to be made during that quarter on MCSi's books.

nn.    On or about March 31, 2002, I.H.S. instructed J.R.A. to make two fraudulent manual journal entries on the books of MCSi that resulted in the recording of $30,203,901 of revenue, and $16,432,341 of cost of goods sold, for additional net revenue (before taxes) of $13,771,560 for the quarter ending March 31, 2002. These entries were fictitious and referenced as "Major Projects" and "Major Project 2."

oo.    J.R.A. made the requested manual journal entries as described in Overt Act nn.

pp.    During and in conjunction with a 2002 audit of MCSi, I.H.S. instructed J.R.A. not to provide PwC auditors with any MCSi manual journal entries without his prior permission.

qq.    In conjunction with a 2002 audit of MCSi, I.H.S. physically removed certain manual journal entries concerning "Major Projects" and "Major Project 2" from a master 3-ring binder of MCSi manual journal entries maintained in J.R.A.'s office. I.H.S. retained the said deleted manual journal entries, and then instructed J.R.A. to provide the master 3-ring binder to PwC.

rr.    Defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to report net income for the year 2001 (before taxes) from continuing operations of $18,690,00 instead of an actual loss of approximately $24,755,630.

ss.    Defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to overstate its reported gross revenue by approximately $28 million for the quarter ending March 31, 2002.

28

tt.     Defendant, **MICHAEL E. PEPPEL** and l.H.S. caused copies of the 2001 MCSi
Annual Report to Shareholders to be mailed via the U.S. Mail to all shareholders of
recorder on or about April 26, 2002.

uu.     Defendant, **MICHAEL E. PEPPEL** and l.H.S. caused the Form 10-Q for MCSi, for
fiscal quarter ended June 30, 2002, to be electronically filed with the SEC via the
EDGAR system on or about August 14, 2002.

vv.     Defendant, **MICHAEL E. PEPPEL** and l.H.S. caused the Form 10-Q for MCSi, for
fiscal quarter ended September 30, 2002, to be electronically filed with the SEC via
the EDGAR system on or about November 14, 2002.

In violation of Title 18, United States Code, Sections 371 and 1349.

## COUNT 2
### (Securities Fraud)

126.    The allegations contained in paragraphs 1 through 123 are realleged and incorporated
as if fully set forth in this paragraph.

127.    Between on or about January 1, 2001 and December 31, 2002, both dates being
approximate and inclusive, within the Southern District of Ohio and elsewhere, the defendant,
**MICHAEL E. PEPPEL** and I.H.S. together with other known and unknown co-conspirators and
others, did knowingly and willfully, directly and indirectly, use and employ manipulative and
deceptive devices and contrivances in connection with the purchase and sale of MCSi securities,
which were then registered on a facility namely the NASDAQ, in violation of Title 15, United States
Code, Section 78j; and Rule 10b-5 thereunder, (Title 17, Code of Federal Regulations, Section
240.10b5), in that the defendant, together with others, did knowingly, willfully, directly and
indirectly, (1) employ devices, schemes, and artifices to defraud; (2) make untrue statements of
material fact and omit to state material facts necessary in order to make statements made, in light of
the circumstances under which they were made, not misleading; and (3) engage in acts, practices

29

and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchase and sale of MCSi securities, and by use of interstate commerce and the mails.

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 18, United States Code, Section 2.

## COUNTS 3 - 9
### (False SEC Filings)

128.    The allegations contained in paragraphs 1 through 123 are realleged and incorporated as if fully set forth in this paragraph.

129.    Between on or about March 31, 2001 and November 14, 2002, within the Southern District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S. together with other named and unnamed co-conspirators and others, did unlawfully, willfully, and knowingly, make and cause to be made statements in reports and documents, designed to protect investors and to insure fair dealing in the security markets, required to be filed with the SEC under the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder, which statements were false and misleading with respect to material facts, to wit: the filings listed below:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|---|---|---|
| 3 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended March 31, 2001 | May 14, 2001 |
| 4 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended June 30, 2001 | August 13, 2001 |
| 5 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended September 30, 2001 | November 14, 2001, and amended as of November 16, 2001 |

6     Form 10-Q for MCSi, Inc., for the fiscal quarter ended   May 15, 2002
      March 31, 2002

7     Form 10-Q for MCSi, Inc., for the fiscal quarter ended   August 14, 2002
      June 30, 2002

8     Form 10-Q for MCSi, Inc., for the fiscal quarter ended   November 14, 2002
      September 30, 2002

9     Form 10-K for MCSi, Inc., for the fiscal year ended      April 1, 2002
      December 31, 2001

All in violation of Title 15, United States Code, Sections 78m(a) and 78ff; Title 17, Code of

Federal Regulations, Section 240.13a-1; and Title 18, United States Code, Section 2.

## COUNTS 10 - 16
## (Wire Fraud)

130.     The allegations contained in paragraphs 1 - 123 are realleged and incorporated as if

fully set forth in this paragraph.

131.     Between on or about March 31, 2001 and November 14, 2002, in the Southern

District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S. did unlawfully,

willfully, and knowingly devise and intend to devise a scheme and artifice to defraud and obtain

money, by means of false and fraudulent pretenses, representations and promises, by way of wire and

securities fraud and fraudulently manipulating the corporate financial statements, accounting books

and records of MCSi, well knowing at the time that these pretenses, representations, and promises

were false and fraudulent when made.

31

132.    On the below listed dates set forth in Counts 10 - 16, in the Southern District of Ohio, and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S. knowingly and wilfully did execute the aforesaid scheme and artifice to defraud and to obtain moneys, funds, credits and assets by means of false pretenses, representations and promises, as set forth above, in that they knowingly caused periodic reports, designed to protect investors and to insure fair dealing in the security markets, containing MCSi's financial statements to be transmitted to the SEC over interstate electronic transmission wires, referred to as the EDGAR system as follows:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|----------------------------|
| 10 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended March 31, 2001 | May 14, 2001 |
| 11 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended June 30, 2001 | August 13, 2001 |
| 12 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended September 30, 2001 | November 14, 2001, and amended as of November 16, 2001 |
| 13 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended March 31, 2002 | May 15, 2002 |
| 14 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended June 30, 2002 | August 14, 2002 |
| 15 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended September 30, 2002 | November 14, 2002 |
| 16 | Form 10-K for MCSi, Inc., for the fiscal year ended December 31, 2001 | April 1, 2002 |

All in violation of Title 18, United States Code, Sections 1343 and 2.

32

## COUNTS 17 - 18
### (False Certification of Financial Reports by Corporate Officers)

133.     The allegations contained in paragraphs 1 - 123 are realleged and incorporated as if fully set forth in this paragraph.

134.     Between on or about August 14, 2002 and November 14, 2002, within the Southern District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S. in their respective capacities as the Chief Executive Officer and the Chief Financial Officer of MCSi, a corporate entity considered an issuer with the SEC pursuant to sections 13(a) and 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78m and 78o(d)), did willfully, knowingly, unlawfully and falsely certify in writing to the SEC that the information contained in the accompanying financial statements of the below listed Form 10-Q filings fully complied and comported with the requirements of the above referenced provisions of the Securities Exchange Act of 1934, and furthermore fairly and accurately presented, in all material respects, MCSi's financial condition and results of operations:

| COUNT | FILING | APPROXIMATE DATE OF FILING |
|-------|--------|---------------------------|
| 17 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended June 30, 2002 | August 14, 2002 |
| 18 | Form 10-Q for MCSi, Inc., for the fiscal quarter ended September 30, 2002 | November 14, 2002 |

All in violation of Title 18, United States Code, Section 1350.

33

## COUNTS 19 - 23
### (Mail Fraud)

135.    The allegations contained in paragraphs 1 - 123 are realleged and incorporated as if fully set forth in this paragraph.

136.    Between on or about December 31, 2001 and April 26, 2002, in the Southern District of Ohio and elsewhere, the defendant, **MICHAEL E. PEPPEL** and l.H.S. did unlawfully, willfully, and knowingly devise and intend to devise a scheme and artifice to defraud and obtain money, by means of false and fraudulent pretenses, representations and promises, by way of wire and securities fraud and fraudulently manipulating the corporate accounting books and records of MCSi, well knowing at the time that these pretenses, representations, and promises were false and fraudulent when made.

137.    On or about April 26, 2002, in the Southern District of Ohio, and elsewhere, the defendant, **MICHAEL E. PEPPEL** and I.H.S., for the purpose of executing the aforesaid scheme and artifice to defraud and obtain money, knowingly did cause Registrar and Transfer Company of 10 Commerce Drive, Cranford, New Jersey 07016-3572 to deliver to the United States Postal Service certain properly addressed and pre-paid posted envelopes addressed to MCSi shareholders of record a copy of the 2001 MCSi Annual Report which, contained materially false, fraudulent and fictitious financial statements that included materially inflated, and otherwise false and misleading revenue and income figures, to the following MCSi shareholders of record:

34

| COUNTS | SHAREHOLDER'S NAME | APPROXIMATE DATE OF MAILING | MAILING ADDRESS "TO" | MAILING ADDRESS "FROM" |
|--------|--------------------|-----------------------------|----------------------|------------------------|
| 19 | HF & WF | O/A 4/26/02 | 5824 Markdale Dr. Dayton, OH 45459 | 10 Commerce Drive Cranford, N.J. |
| 20 | HK | O/A 4/26/02 | 3705 East Street Cincinnati, OH 45227 | 10 Commerce Drive Cranford, N.J. |
| 21 | JR | O/A 4/26/02 | 1195 Waves Landing Dayton, OH 45459 | 10 Commerce Drive Cranford, N.J. |
| 22 | MS | O/A 4/26/02 | 4128 Shadow Leaf Dr. Bellbrook, OH 45305 | 10 Commerce Drive Cranford, N.J. |
| 23 | DP | O/A 4/26/02 | 4110 Meadow Wood Lane, Uniontown, OH 44685 | 10 Commerce Drive Cranford, N.J. |

All in violation of Title 18, United States Code, Sections 1341 and 2.

## COUNT 24
### (Money Laundering)

138. On or about December 21, 2001, in the Southern District of Ohio, and elsewhere, defendant, **MICHAEL E. PEPPEL** did knowingly and willfully engage in a monetary transaction that affected interstate commerce by and through William Blair & Company of 222 West Adams Street, Chicago, Illinois, involving criminally derived property of a value greater than $10,000, that is a transfer of a monetary instrument in the amount of $2,778,036.07 from defendant, **MICHAEL E. PEPPEL's** William Blair & Co. Account #XXX-X6381 to defendant, **MICHAEL E. PEPPEL's** William Blair & Co. Account # XXX-X5240, such monetary proceeds having been derived from a specified unlawful activity, to wit: mail fraud and wire fraud in violation of 18 U. S. C. §§ 1341 and 1343.

All in violation of Title 18, United States Code, Section 1957.

35

## COUNT 25
### (Money Laundering)

139. On or about December 21, 2001, in the Southern District of Ohio, and elsewhere, defendant, **MICHAEL E. PEPPEL** did knowingly and willfully engage in a monetary transaction that affected interstate commerce by and through William Blair & Company of 222 West Adams Street, Chicago, Illinois involving criminally derived property of a value greater than $10,000, that is an electronic transfer of a monetary instrument in the amount of $3,741,338.93 from defendant, **MICHAEL E. PEPPEL's** William Blair & Co. Account #XXX–X6381 to William Blair & Co. Account # XXX-X0118, held in the name of "No. 7804 LTD PTNR," such monetary proceeds having been derived from a specified unlawful activity, to wit: mail fraud and wire fraud in violation of 18 U. S. C. §§ 1341 and 1343.

All in violation of Title 18, United States Code, Section 1957.

## COUNT 26
### (Conspiracy to Commit Money Laundering)

140. The allegations contained in paragraphs 1 - 123 of this Indictment are realleged and incorporated as if fully set forth in this paragraph.

141. From on or about January 1, 1999, and continuing through until on or about April 30, 2003, both dates being approximate and inclusive, in the Southern District of Ohio and elsewhere, defendant, **MICHAEL E. PEPPEL** and I.H.S., together with others, both known and unknown to the Grand Jury, did unlawfully, and knowingly combine, conspire, confederate, and agree between themselves, to commit certain offenses against the United States as follows:

a) knowing that certain property involved in a financial transaction affecting interstate commerce, represented the proceeds of some form of unlawful activity, did conduct and attempt to conduct such financial transaction which, in fact involved the proceeds of specified unlawful activity with the intent to promote the carrying on of a specified unlawful activity in violation of 18 U.S.C. § 1956(a)(1)(A)(I), and 18 U.S.C. § 2, and

b) knowingly engage in, and attempted to engage in a monetary transaction by, through, or to a financial institution affecting interstate or foreign commerce in criminally derived property of a value greater than $10,000.00 that is deposited, withdrawn, transferred and exchanged in U.S. currency, funds and monetary instruments such as to affect interstate commerce, from one or more violations of 18 U.S.C. §§ 1341 and 1343 all in violation of 18 U.S.C. § 1957.

## OBJECTS OF THE CONSPIRACY

142.    It was an object of the conspiracy that financial transactions were completed knowing that the property and money involved in said transactions represented proceeds of various forms of specified unlawful activities associated with securities fraud, mail fraud, and wire fraud.

143.    It was an object of the conspiracy that certain performance based loans, bonuses and salaries were paid to the defendant, **MICHAEL E. PEPPEL** and I.H.S., and other known and unknown co-conspirators by MCSi in order to increase their personal wealth.

144.    It was an object of the conspiracy that certain financial transactions were completed with the intent to promote the carrying on of acts of securities fraud in the form of specified unlawful activities to include mail fraud and wire fraud.

37

145.     It was an object of the conspiracy to knowingly engage, or attempt to engage in monetary transactions in property valued in excess of $10,000.00 which was criminally derived from specified unlawful activities associated with securities fraud to include mail fraud and wire fraud.

146.     It was an object of the conspiracy to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of specified unlawful activity, thereby allowing the conspirators to enjoy the benefits of the criminal proceeds received through their securities fraud activities while attempting to insulate themselves from criminal prosecution.

## THE MANNER AND MEANS OF THE CONSPIRACY

147.     The allegations contained in paragraphs 1 - 123 are realleged and incorporated as if fully set forth in this paragraph.

148.     At all times during the above stated time period, defendant, **MICHAEL E. PEPPEL** and I.H.S., together with others, both known and unknown to the Grand Jury, were part of a conspiracy, formed in part to falsify MCSi corporate accounting records, entries and financial statements in order to manufacture, fabricate, and create otherwise fraudulent revenue, earnings, sales, profit/loss figures in order to meet or exceed stock analyst "consensus estimates."

149.     These aforesaid fabricated accounting records, entries and financial statements were based in part: upon fraudulent MCSi transactions involving Mercatum, ClearOne, FedEx, Skytron, "Major Projects," "Major Project 2", and rebates.   Defendant, **MICHAEL E. PEPPEL** and I.H.S., falsified purchase orders, invoices, journal entries, and entries in the JD Edwards accounting system, all associated with these various sham transactions.

150.     The defendant **MICHAEL E. PEPPEL** took deliberate steps to hide these various fraudulent activities from PwC, MCSi's outside auditors.

38

151. Defendant, **MICHAEL E. PEPPEL** and I.H.S., falsified and fabricated MCSi financial statements were electronically placed in interstate commerce, and filed with the SEC via EDGAR, in Form 10-Q periodic reports which were filed with the SEC concerning quarters ending March 31, 2001, June 30, 2001, September 30, 2001, March 31, 2002, June 30, 2002 and September 30, 2002; and in the Form 10-K for the year ending December 31, 2001; and the Form S-3 registration statement filed December 4, 2001 and an amendment thereto filed December 18, 2001.

152. On December 18, 2001, defendant, **MICHAEL E. PEPPEL** and I.H.S. caused MCSi to carry out a public offering of its common stock. In that offering, MCSi sold 4.7 million shares at an offering price (before underwriting commission) of $22.875 a share realizing over $107 million from this sale. In this offering, defendant, **MICHAEL E. PEPPEL** sold 300,000 personal shares, generating proceeds (before expenses) of nearly $6,862,500.

153. On or about December 21, 2001, defendant, **MICHAEL E. PEPPEL** deposited approximately $6,519,375.00 of these illegal proceeds of security, mail, and wire fraud into his personal account (#191-26381) held with William Blair & Company of 222 West Adams Street, Chicago, Illinois.

154. On or about December 21, 2001, defendant, **MICHAEL E. PEPPEL** caused two monetary instrument transfers to be made from his aforesaid account: (1) in the amount of $2,778,036.07 to William Blair & Co. Account # XXX-X5240 held in the name of Michael Peppel P.; and (2) in the amount of $3,741,338.93 to William Blair Account # 156-20118, held in the name of "No. 7804 LTD PTNR."

39

155. It was further part of this conspiracy that defendant, **MICHAEL E. PEPPEL** and

I.H.S., together with others, both known and unknown to the Grand Jury caused criminally derived

funds to be transferred via interstate commerce, which in turn promoted the carrying on of the

specified unlawful activity to include: mail fraud, wire fraud and securities fraud in violation of 18

U. S. C. §§ 1341 and 1343 respectively.

## THE OVERT ACTS OF THE CONSPIRACY

In furtherance of the conspiracy and to effect the objects thereof, a conspirator committed one

or more overt acts listed below in furtherance of the conspiracy causing the following transfers and

numbered overt acts to take place:

1) The Grand Jury specifically realleges and incorporates herein paragraphs 125 a-vv of Count One as if they were fully reproduced herein.

2) The Grand Jury specifically realleges and incorporates herein paragraphs 150 - 154 as if they were fully reproduced herein.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE ALLEGATIONS

### ALLEGATION 1
### (RELATING TO COUNTS 1, 2, 10-16,19-23)

Upon conviction of any violation alleged in Counts 1, 2, 10-16, 19-23 of this Indictment,

defendant, **MICHAEL E. PEPPEL** shall forfeit to the United States pursuant to 18 U.S.C. §

981(a)(1)c and 28 U.S.C. § 2461c, all property, real or personal, which constitutes or is derived from

proceeds traceable to wire fraud in violation of 18 U.S.C. §1343, securities fraud in violation of 15

U.S.C. §78ff, mail fraud in violation of 18 U.S.C. §1341, conspiracy to commit securities fraud in

violation of 18 U.S.C. §1349, or a conspiracy to commit such offense in violation of 18 U.S.C. §371,

including but not limited to the following:

40

A.     As to defendant, **MICHAEL E. PEPPEL**:

Money Judgment

A money judgment in the amount of the proceeds obtained as a result of the conspiracy, securities fraud, wire fraud, and mail fraud offenses, for which the defendant is liable.

B.     As to defendant, **MICHAEL E. PEPPEL**:

Real Property

1.     9520 Cutler Trace, Dayton, Ohio 45458, whose legal description is set forth in Attachment A to this Indictment.

2.     Lot 12, 9621 Tai Trace, Centerville, Ohio 45458, whose legal description is set forth in Attachment A to this Indictment.

3.     Lot 32, 9635 Tai Trace, Centerville, Ohio 45458, whose legal description is set forth in Attachment A to this Indictment.

4.     89.495 acres in Waynesville, Ohio, whose legal description is set forth in Attachment A to this Indictment.

5.     53.9 acres in Waynesville, Ohio, whose legal description is set forth in Attachment A to this Indictment.

6.     Unit "N," 8331 Highway A1A, Melbourne Beach, Florida 32951, whose legal description is set forth in Attachment A to this Indictment.

7.     Unit B406, 703 Solana Shores Drive, Cape Canaveral, Florida 32920-4261, whose legal description is set forth in Attachment A to this Indictment.

Personal Property

8.     The contents of Huntington National Bank Account No. ******2937 in the name of Michael E. Peppel.

9.     The contents of Huntington National Bank Account No. ******2814 in the name of Michael E. Peppel.

10.    The contents of Credit Suisse Account No. ******5145 in the name of Michael E. Peppel.

11.    The contents of Credit Suisse Account No. *****5966 in the name of Lynn Peppel.

12.    The contents of Credit Suisse Account No. *****1766 in the name of Peppel Family

41

Ltd. Partnership.

13.    The contents of Credit Suisse Account No. *****5251in the name of Natalie M. Peppel C/F Michael E. Peppel Jr.

14.    The contents of Credit Suisse Account No. *****5319 in the name of Natalie M. Peppel C/F Marissa C. Peppel.

15.    The contents of Credit Suisse Account No. *****0901 in the name of Natalie M. Peppel C/F Maxwell V. Peppel.

16.    The contents of Bear Stearns Security Corp. Account No. *****4394 in the name of Michael E. and Natalie M. Peppel.

17.    The contents of Harbor Federal Savings Account No. *****5079 in the name of Lynn Peppel.

18.    The contents of Hilliard Lyons Account No. *****3432 in the name of Michael E. Peppel.

19.    The contents of William Blair & Co. Account No. *****5240 in the name of Michael E. Peppel.

20.    The contents of William Blair & Co. Account No. *****6381 in the name of Michael E. Peppel.

21.    The contents of William Blair & Co. Account No. *****0118 in the name of No. 7804 LTD Partnership.

22.    Art by LUDOVICO DILUIGI purchased for $20,000.00 from Gallena Ravagon, Venice, Italy.

23.    Art by LUDOVICO DILUIGI purchased for $9,000.00 from Carlo Ravagon, Geneva, Switzerland.

All pursuant to Title 18, United States Code, Section 981(a)(1)c and Title 28, United States

Code, Section 2461c.

## ALLEGATION 2
## (RELATING TO COUNTS 24-26)

Upon conviction of any violation alleged in Counts 24-26 of this Indictment, defendant,

**MICHAEL E. PEPPEL** shall forfeit to the United States pursuant to 18 U.S.C. §982(a)(1), all

property, real or personal involved in each offense of money laundering in violation of 18 U.S.C.

§1957, and conspiracy to commit money laundering in violation of 18 U.S.C. §1956(h), or any

property traceable to such property, including but not limited to the following:

A.     As to defendant, **MICHAEL E. PEPPEL**:

### Money Judgment

A money judgment in the amount of funds involved in the money laundering, or conspiracy
to commit money laundering, for which the defendant is liable.

B.     As to defendant, **MICHAEL E. PEPPEL**:

### Real Property

1.     9520 Cutler Trace, Dayton, Ohio 45458, whose legal description is set forth in
       Attachment A to this Indictment.

2.     Lot 12, 9621 Tai Trace, Centerville, Ohio 45458, whose legal description is set forth
       in Attachment A to this Indictment.

3.     Lot 32, 9635 Tai Trace, Centerville, Ohio 45458, whose legal description is set forth
       in Attachment A to this Indictment.

4.     89.495 acres in Waynesville, Ohio, whose legal description is set forth in Attachment
       A to this Indictment.

5.     53.9 acres in Waynesville, Ohio, whose legal description is set forth in Attachment
       A to this Indictment.

6.     Unit "N," 8331 Highway A1A, Melbourne Beach, Florida 32951, whose legal
       description is set forth in Attachment A to this Indictment.

7.     Unit B406, 703 Solana Shores Drive, Cape Canaveral, Florida 32920-4261, whose
       legal description is set forth in Attachment A to this Indictment.

Personal Property

8.    The contents of Huntington National Bank Account No. ******2937 in the name of Michael E. Peppel.

9.    The contents of Huntington National Bank Account No. ******2814 in the name of Michael E. Peppel.

10.   The contents of Credit Suisse Account No. ******5145 in the name of Michael E. Peppel.

11.   The contents of Credit Suisse Account No. *****5966 in the name of Lynn Peppel.

12.   The contents of Credit Suisse Account No. *****1766 in the name of Peppel Family Ltd. Partnership.

13.   The contents of Credit Suisse Account No. *****5251in the name of Natalie M. Peppel C/F Michael E. Peppel Jr.

14.   The contents of Credit Suisse Account No. *****5319 in the name of Natalie M. Peppel C/F Marissa C. Peppel.

15.   The contents of Credit Suisse Account No. *****0901 in the name of Natalie M. Peppel C/F Maxwell V. Peppel.

16.   The contents of Bear Stearns Security Corp. Account No. *****4394 in the name of Michael E. and Natalie M. Peppel.

17.   The contents of Harbor Federal Savings Account No. *****5079 in the name of Lynn Peppel.

18.   The contents of Hilliard Lyons Account No. *****3432 in the name of Michael E. Peppel.

19.   The contents of William Blair & Co. Account No. *****5240 in the name of Michael E. Peppel.

20.   The contents of William Blair & Co. Account No. *****6381 in the name of Michael E. Peppel.

21.   The contents of William Blair & Co. Account No. *****0118 in the name of No. 7804 LTD Partnership.

22.   Art by LUDOVICO DILUIGI purchased for $20,000.00 from Gallena Ravagon, Venice, Italy.

23.     Art by LUDOVICO DILUIGI purchased for $9,000.00 from Carlo Ravagon, Geneva, Switzerland.

All pursuant to Title 18, United States Code, Section 982(a)(1).

## FORFEITURE ALLEGATIONS NO. 1 and 2
## SUBSTITUTE ASSETS

If any of the property described above in forfeiture Allegations No. 1 and No. 2, as a result

of any act or omission of the defendant, **MICHAEL E. PEPPEL**:

(a) cannot be located upon the exercise of due diligence;

(b) has been transferred or sold to, or deposited with, a third party;

© has been placed beyond the jurisdiction of the court;

(d) has been substantially diminished in value; or

(e) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to 18 U.S.C. §982(b) and 21 U.S.C. §853(p), to seek

forfeiture of any other property of said defendant up to the value of the forfeitable property described

above.

45

## ATTACHMENT A - LEGAL DESCRIPTIONS

Real Property, including any right title and interest (including any leasehold interest) in the

whole or any lot or tract of land and any appurtenances or improvements, more specifically described

as follows:

1. **9520 Cutler Trace, Dayton, Ohio 45458.**

   Situate in the City of Centerville, County of Montgomery, State of Ohio and being Lot Numbered fifteen (15) Hampton Farms Estates, as the same is recorded in Plat Book "133", pages 32 and 32A, of the Plat Records of Montgomery County, Ohio.

   Parcel No. 067-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

2. **Lot 12, 9621 Tai Trace, Centerville, Ohio 45458.**

   Situated in the County of Montgomery, in the State of Ohio and in the Township of Washington:

   and being Section 17, Town 3, Range 5, MRS, being more particularly described as follows:

   Being all of Lot Numbered 12 as shown on the plat of Hampton Farms Estates, as recorded in Plat Book 133, Page 32 and 32A in the Plat Records of Montgomery County, Ohio.

   Parcel No. O67-287-13-12
   Known as: 9621 Tai Trace, Centerville

   Tax Mailing Address: 9621 Tai Trace, Centerville, Ohio.

3. **Lot 32, 9635 Tai Trace, Centerville, Ohio 45458.**

   Situate in the Township of Washington, County of Montgomery, State of Ohio and being further described as Section 17, Town 3, Range 5, M.R.S., being more particularly described as follows:

   Being all of Lot Numbered Thirty-Two (32) as shown on the plat of Hampton Farms Estates, as recorded in Plat Book 143, Page 14 on the Plat Records of Montgomery County, Ohio, subject to all legal easements, highways, covenants, and zoning restrictions of record.

4. **89.495 Acres in Waynesville, Ohio.**

Situated in Military Survey No. 399, Township of Wayne, County of Warren, State of Ohio, and being more particularly described as follows:

Beginning at the most southerly corner of Lot 5 of Caeser Creek Estates, Phase I, as recorded in Plat Book 39, Page 74-77, Warren County Recorder's Office, said point being in the southeast line of said Military Survey No. 399 and Wayne Township; thence along said southeast line of said Military Survey 59° 18' 54" W, a distance of 1942.55 feet to a point; thence leaving said southeast line of said Military Survey No. 399 and Wayne Township, N. 33° 11' 27" W. a distance of 2162.82 feet to a point; thence N. 58° 07' 53" E. a distance of 1650.32 feet to a point at the northwest corner of said Caeser Creek Estates, Phase I; thence along the southwest boundary of said Caesar Creek Estates, Phase I along the following courses:

1)   S. 03° 51' 56" W. a distance of 237.77 feet to a point;
2)   S. 31° 44' 43" E. a distance of 637.33 feet to a point;
3)   S. 86° 42' 25" E. a distance of 528.40 feet to a point;
4)   N. 01° 57' 13" E. a distance of 35.00 feet to a point;
5)   S. 64° 26' 29" E. a distance of 302.56 feet to a point;
6)   S. 17° 57' 19" E. a distance of 317.38 feet to a point;
7)   N. 72° 02' 41" E. a distance of 56.30 feet to a point in the northwest terminus of Stockholm Court
8)   S. 19° 51' 11" E. a distance of 531.89 feet to the real point of beginning for this description, passing at 60.03 feet to the southwest terminus of said Stockholm Court.

Containing in all 89.495 acres, more or less.

Sidwell No.: 10-24-115-008

5. **53.9 Acres in Waynesville, Ohio.**

Situated in Township of Wayne, County of Warren, State of Ohio, being part of VMS No. 399 and being further bounded and described as follows:

Beginning at a mag nail (set) in the centerline of state route 73, said mag nail, being in the line between Wayne Township and Massie Township and between VMS Nos. 399 and 3820, said mag nail also being the westerly most corner of a 4.66 acre "Tract 5" as conveyed to Mary H. Hartsock (O.R. 336, Page 105); Thence with the centerline of State Route 73 N. 77° 06' 25" W., a distance of 218.23 feet to a mag nail (set), said mag nail being the southeasterly corner of 5 acre tract as conveyed to Cary Browne (O.R. 1615, Page 601), thence with Browne's easterly line N. 13° 11' 55" E., passing a ½" iron pin (found) at 30.28 feet, a total distance of 128.21 feet to a ½" iron pin (found); thence continuing with Browne's easterly line N. 05° 56' 35" W., a distance of 1132.30 feet to a 5/8' iron pin (set), said iron pin being in the

southeasterly line of a 99.32 acre "Tract No. 1" as conveyed to The James E. Rich and John B. Rich Partnership (O.R. 345, Page 158); thence with the southeasterly line of The James E. Rich and John B. Rich Partnership N. 53° 16' 35" E., passing a 5/8" iron pin (set) at 1140.45 feet marking a corner of a 88.488 acre tract as conveyed to Robert D. Shick, et ux (O.R. 205, Page 46) and continuing with Shick's line a total distance of 1529.60 feet to a ½" iron pin (found), said iron pin being in the southwesterly line of a 89.495 acre tract as conveyed to Michael E. Peppel, et ux (O.R. 2027, Page 381); thence with Peppel's southwesterly line S. 39° 08' 37" E., a distance of 1235.15 feet to a stone (found), said stone being in the Northwesterly line of a 50.31 acre "Tract 1" as conveyed to Mary H. Hartsock (O.R. 336, Page 105) and being in the line between Wayne Township and Massie Township; thence with said township line and with Hartsock's northwesterly line passing a corner to said 50.31 acre "Tract 1" and continuing with the line of the aforementioned 4.66 acre "Tract 5" as conveyed to Mary H. Hartsock (O.R. 336, Page 105) S. 53° 35' 50" W., passing a 5/8" iron pin (set) by a post at 2080.96 feet, a total distance of 2117.96 feet to the beginning, containing 53.900 acres of land.

Sidwell No.: 10-30-400-015

6. **Unit "N", 8331 Highway A1A, Melbourne Beach, Florida 32951.**

Unit "N", THE BEACH HOUSE CONDOMINIUM, a Condominium, according to the Declaration of Condominium recorded in Official Records Book 3154, Page 2726, and all amendments thereto, of the Public Records of Brevard County, Florida, together with an undivided share in the common elements appurtenant thereto.

7. **Unit B406, 703 Solana Shores Drive, Cape Canaveral, Florida 32920-4261.**

Condominium Unit No. B406, of SOLANA SHORES CONDO PHASE II, a Condominium, according to the Declaration thereof, as recorded in Official Records Book 4275, at Page 3132, of the Public Records of Brevard County, Florida and all amendments thereto, together will all appurtenances thereto.

Parcel ID Number: 24-37-14-00-00056.0-B406.00

A   T R U E   B I L L

/S/
_____
F O R E M A N

GREGORY G. LOCKHART
United States Attorney

VIPAL J. PATEL
Deputy Chief, Criminal Division

48