## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Case No.: 3:06-cr-00196-SSB** |
| | : | |
| **v.** | : | **Judge Sandra S. Beckwith** |
| | : | |
| **MICHAEL E. PEPPEL,** | : | |
| | : | **MEMORANDUM REGARDING U.S.** |
| **Defendant.** | : | **SENTENCING GUIDELINES** |
| | : | **CALCULATIONS** |
| | : | |

## INTRODUCTION

The government is seeking in this case multiple level enhancements for Mr. Peppel's sentence based upon three Sentencing Guideline factors: loss, §2B1.1(b), number of victims, §2B1.1(b)(2), and use of sophisticated means, §2B1.1(b)(8). On each, the government bears the burden of proving the factual basis. The government presented its evidence at the evidentiary hearing before this Court on June 21 and 23, 2011.[1] Based upon that evidence, there is no basis in law for an enhancement in Mr. Peppel's sentence due to any of the factors.

The established facts of this case are straightforward. Mr. Peppel participated in the Mercatum transaction, which fraudulently inflated MCSi's net sales for the year ended December 31, 2011. As the record makes clear, Mercatum was not a fictitious transaction nor one that was concealed or created furtively by Mr. Peppel. It involved the actual shipment of actual products to a genuine distributor who actually tried to sell them to customers. The transaction took place with the full knowledge, guidance, and approval of the Company's board of directors, including its independent directors, and its sophisticated, "big four" outside auditor.

---

[1] The government offered three witnesses: Special Agent Maria Gross of the IRS Criminal Investigation Division, Dr. Marlena Akhbari, chair of the Department of Finance at Wright State University, and Joseph Geraghty, a financial consultant who specializes in servicing distressed companies. References to the testimony at the hearing will be [witness name], [volume number]-[page number].

The fraud in the Mercatum transaction was because it was not correctly booked.  Specifically, it was accounted for as an appropriate "bill and hold" transaction, permitting immediate revenue recognition, when it should have been booked as a "consignment," which would have permitted the Company to recognize revenue only when Mercatum sold the products to customers.

The only effect of the Mercatum transaction that the government has established is that it overstated MCSi's net sales for the year ended December 31, 2001 by approximately 4.6%, less than the informal 5% "rule of thumb" that auditors use when assessing whether or not an error in financial statements is material for accounting purposes.[2]  The government has not established the transaction's effect on MCSi's net income for the period, and the government's own evidence suggests that any net income overstatement may be as low as $1.9 million.  These serious but quantitatively modest overstatements affected the Company's financial statements for a year in which the Company's results, with or without Mercatum, badly failed to meet its own guidance or Wall Street analysts' expectations.  Even with false revenue from Mercatum included, the Company reported a loss of $0.70 per share, vastly less than the consensus estimate of $1.24 in income, and investors punished the Company mercilessly, causing the Company's share price to fall a catastrophic 40% following the release of earnings.  At most, Mercatum only slightly and unquantifiably mitigated the effects of the Company's obviously disastrous year.

Notwithstanding these incontrovertible facts, the government, through its blunderbuss approach to loss calculations and advocacy of other clearly inapplicable Guidelines enhancements, is seeking to punish Mr. Peppel for far more than the Mercatum transaction and for more, indeed, than even all the conduct alleged in the Superseding Indictment.  As the self-

---

[2]  *ECA Local 134 IBEW Joint Pension Trust v. JPMorgan Chase Co.*, 553 F.3d 187, 204 (2nd Cir. 2009) ("the five percent numerical threshold is a good starting place for assessing the materiality of the alleged misstatement"); SEC Staff Accounting Bulletin 99 (1999) ("One rule of thumb in particular suggests that the misstatement or omission of an item that falls under a 5% threshold is not material in the absence of particularly egregious circumstances, such as self-dealing or misappropriation by senior management").

serving testimony of failed "turnaround specialist" Joseph Geraghty makes clear, the government

seeks to impose blame, and punishment, on Mr. Peppel for the entire MCSi bankruptcy. This is

factually inaccurate, unsupportable as a matter of law, and fundamentally wrong.

## FACTS

### 1.        The Mercatum transaction.

On the Mercatum transaction, MCSi booked a $37 million sale that had been approved by

the Board of MCSi and whose accounting treatment was approved by MCSi's independent

auditors, PricewaterhouseCoopers. Akhbari, 1-76-77; Geraghty, 2-38, 60-61; Exhs. 9-10. The

Mercatum transaction had the effect of increasing net sales for MCSi's 2001 year by $37 million.

On the record before the Court, there is no way of knowing the amount of impact from

the Mercatum transaction on the net income or loss of the Company.[3] The government presented

no testimony on the subject. The MCSi board minutes from March 11, 2002 recite a "margin at

35-40%" on the transaction. Exh. 9. That would translate into a cost of goods of between $22.2

and $24.1 million and net income of $13 million to $15 million. There is a government expert's

report that identified a range of possible margins associated with the transaction anywhere from

5% to 100% – with the 100% margin attributed to one witness who had previously testified that

the margins were 90%. Exh. 46, p. 20. Thus, by the government's own account, the

overstatement of net income may be anywhere between $1.9 million and $37 million. And since

PwC knew of the transaction, approved it as appropriate for bill-and-hold treatment, and certified

its audit of MCSi's financials, it is hard to believe that the cost of goods was really zero. The

government has done nothing to prove the amount of any overstatement of net income.

---

[3]        Mr. Peppel, a former employee who left the company well before these criminal proceedings started, has had no access to either the financial records of the company or the records of its auditors PWC to make his own evaluation of this point. Quite plainly the government has had either access to or the ability to obtain access to all of those records.

2. **The Mercatum transaction increased net sales in the 2001 financial results MCSi released on February 26, 2002; even with the transaction those results were so bad that the stock immediately fell 40%.**

Public release of the Mercatum information came with announcement of 2001 year-end results. Exh. D (February 26, 2002 press release). The same information was included in the 10-K filed April 1, 2002. Exh. P. With the $37 million Mercatum transaction included, reported 2001 net sales of $810 million were overstated by 4.6%. Exhs. D, P. Because no one knows the cost of goods recorded for the transaction, there is no way of knowing how net income would have been affected by it. With some net income from the Mercatum transaction apparently included in the results, the Company's net for the year still represented a 70¢ per share loss. *Id.*

The 70¢ per share loss came as a surprise to the market. Market analysts' consensus on the stock at the time of the press release had been $1.25 in net income per share, revised down from a significantly higher earlier estimate as these analysts lost confidence in the Company. Thus net income for the year came in nearly $2 a share lower than what was expected, a disaster. The stock price fell precipitously, losing 40% of its market value in one day. Exh. D; Akhbari, 7.

Under the only credible government theories, the loss resulting from the securities fraud offence here is equal to the loss incurred by persons who purchased MCSi stock *after* the February 26, 2002 announcement of earnings presumably at a price higher than the stock would have been if the Mercatum transaction had not been included in the Company's sales and earnings. The impact of Mercatum on net sales for the Company is known; the impact on net income of the Company is unknown; the impact on the stock price is unknown. The government's expert on securities damages testified that she had not and could not calculate how the false information regarding the Mercatum transaction affected the stock price. (Akhbari, 1-

-4-

78-79 ("Q. And in terms of what the market value impact of removing that $37 million as of that date, that would only be speculation? A. Correct").

**3.      Following the February 26, 2002 release of MCSi's 2001 financial results, the stock price continued to move lower over the next year – as did the stock of its key publicly-traded comparable companies.**

Between February 26, 2002 and the following January, the stock price continued to drift lower on poor earnings results and questions about the long term prospects of the video conferencing business that was central to MCSi's business model.



**4.      None of the 2003 news that drove the stock price down further had anything to do with the Mercatum transaction.**

In January, 2003, the SEC filed a complaint against ClearOne, one of the few publicly traded peers of MCSi, suggesting that its earnings had been overstated. While the SEC complaint against ClearOne did mention MCSi, it listed MCSi as a purchaser of ClearOne products and accused *ClearOne* of having misstated the timing and nature of its sales. Nothing challenged MCSi's accounting treatment of its purchases from ClearOne. Exh. L, ¶¶40, 47. Nothing in the SEC complaint otherwise suggested any accounting manipulations or false statements by MCSi. *Id.* Nothing in the SEC complaint related to Mercatum. *Id.*

On January 17, 2003 the first of several shareholder class actions was filed against MCSi – and the stock took another hit. Exh. H. These 10b-5 class actions cited purported false statements leading up to the February 26, 2002 announcement of earnings. Harrison Complaint,

-5-

Exh. G, ¶ 16 (class period from July of 2001 through February 26, 2002).  The theory was that purchasers of MCSi stock had been misled by too rosy a view of the future coming from the Company in the months leading up to the February 26, 2002 earnings announcement, and that they had lost money when the stock fell by 40% upon the making of that announcement.  Exh. G.

Finally, on February 14, 2003 MCSi announced that it had received a subpoena as part of an SEC investigation.  Exh. E.  There was no reference to any accounting irregularities, no reference to the February 26, 2002 earnings announcement, and no reference to the Mercatum transaction.  The stock price fell further upon that announcement.

## LEGAL ANALYSIS

**I.      Burden of Proof.**

**1.      The government bears the burden of proof on the sentencing enhancements it seeks.**

The government has the burden of proof on facts supporting an upward adjustment under the guidelines.  *United States v. Adu*, 82 F.3d 119, 123-124  (6th Cir. 1996) ("party seeking a departure, either upward or downward from a presumptive guideline sentence, has the burden of proving entitlement to the departure"); *United States v. Jones,* 641 F.3d 706,712 (6th Cir. 2011) ("The United States' burden is to prove the amount of loss under the sentencing guidelines by a preponderance of the evidence"); *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007) ("The government bears the burden of proof on the facts underlying a sentence enhancement").

**2.      The requirement of a reasonable estimate does not authorize the Court to indulge in speculation or to use factually or logically flawed premises.**

The government argues that precision is not required in loss determination.  All that is required is a "reasonable estimate of the loss."  U.S.S.G. §B1.1, comment 2(C).  But leeway in

the precision of a calculated number is very different from asking a court to entertain speculation or abandon wholesale the required proximate cause link between the offense and the offense.

Mr. Geraghty is the sole basis for the government's new-found theory of lender loss. When asked about the lenders' reaction in December 2001 to learning of the dismal prospects for MCSi's finances for its 2001 year, he testified that he could only "speculate" on that reaction because he did not know the lenders' thinking.  Geraghty, 2-25-26 ("I'm going to speculate because I don't have [intimate] knowledge with regard to their calculus").  And yet his theory of loss depends entirely on his speculation about how those same lenders might have responded two months later if they had received essentially the same information, *i.e.*, notice that the 2001 financial results were terrible through the breach of a financial covenant in the Company's credit agreement.  Similarly, Dr. Akhbari testified that she could not directly assess the impact of the $37 million Mercatum sales overstatement on MCSi stock because that would be "speculation." Akhbari, 1-78-79.  If the head of the Department of Finance at Wright State University, who teaches stock valuation, cannot identify a per share loss associated with the offense without speculating, how does the government expect anyone else to be able to do the same thing?

"While estimates are permissible, courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."  *United States v. Sepulveda,* 115 F.3d 882, 890 (11th Cir. 1997); *United States v. Liss,* 265 F.3d 1220, 1230 (11th Cir. 2001) (where the amount of loss is at issue, government must "support [ ] its loss calculation with reliable and specific evidence"); *United States v. Wilson,* 993 F.2d 214, 218 (11th Cir. 1993) ("the district court must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines"); *cf., Onyekelu v. Mercy Health Care*

*Partners,* 2008 WL 4560770 (S.D. Ohio 2008)  at *5 ("this unsupported speculation is insufficient to satisfy plaintiffs' burden of coming forward with pretext evidence").

Nor is the problem with the government's proof that of the "inherent imperfections" of estimates.  Courts characterize those as primarily quantitative in nature, whereas the factual errors and failures to address important matters that are found here are "logical defects."  *United States v. Laurienti*, 611 F.3d 530, 559 (9th Cir. 2010) (while inherent imperfections are permissible as long as they are "logical and are not prone to overwhelming the final result," logical defects render a loss calculation fatally unreasonable, even when the precise quantitative effects of the defects cannot be calculated).  Although the Sixth Circuit has not defined reasonable estimate is for securities fraud purposes, its recent decision in *United States v. Jones*, 641 F.3d 706 (6th Cir. 2011), applies a standard that is very similar to the Ninth Circuit's approach in *Laurienti*.  In Jones, the court rejected, as "procedurally unreasonable," a loss estimate based on a logically and factually flawed statistical analysis in a healthcare fraud case.

The government's various loss numbers here fail under the standards of both *Laurienti* and *Jones*.  They include analytical flaws, factual errors, and unsupportable assumptions that render them procedurally or logically unreasonable.  For example, every government calculation includes a substantial number of MCSi's shares that were not traded during the fraud period and that cannot possibly have engendered or suffered a loss cognizable under Section 2.B.1.1.  Similarly, none of the government's numbers make any meaningful attempt to distinguish the effects, if any, of Mr. Peppel's fraud on MCSi's share price from even the most obvious and important other factors affecting it, including the Company's very substantial decline in performance and share price over the previous year, the tremendous decline in the Company's industry during the period, analyst and investor discomfort with the Company's strategy of

-8-

growth by acquisition, the failure of the expected surge of video conferencing technology following the September 11th terrorist attacks, and the effects of Ira Stanley's serious and distinguishable fraud.  Mr. Geraghty's "bank loss" theory is similarly flawed because, among other things, it relies on a credit agreement covenant recalculation that disregards the provisions of the credit agreement that define how the covenant must be calculated, ignores publicly available financial information that should have been included in the calculation, and utterly misunderstands the relative rights and roles of the Company and lenders in interpreting and enforcing the covenant.

**II.  Loss.**

### Standard for determining loss.

Subject to the exclusions in subdivision (D), loss is the greater of actual loss or intended loss.

(i) Actual Loss – "Actual loss" means the ***reasonably foreseeable*** pecuniary harm that ***resulted from the offense***.

(ii) Intended Loss – "Intended loss" (I) means the pecuniary harm that was intended to result from the offense; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (e.g., as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value).

(iii) Pecuniary Harm – "Pecuniary harm" means harm that is monetary or that otherwise is readily measurable in money. Accordingly, pecuniary harm does not include emotional distress, harm to reputation, or other non-economic harm.

(iv) Reasonably Foreseeable Pecuniary Harm – For purposes of this guideline, "reasonably foreseeable pecuniary harm" means pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense.

U.S.G. § 2B1.1, Application
Notes, ¶3 (November, 2002).[4]

At various times, the government has offered a number of different analyses, disclosed and undisclosed, with loss values ranging from $400,000 to $298 million. Each of the analyses the government has shared with Mr. Peppel involves a product of two numbers – a per share loss that resulted from the offense and the number of shares affected by that loss. The government has the burden of proof on both pieces of that equation. The heart of the argument was presented

---

[4]     Paragraphs 22 and 24 of the Amended Initial PSIR recites that the parties agreed to use the "2002 edition of the Sentencing Guidelines Manual" in this matter and that Mr. Peppel's plea agreement will be null and void if the court does not use the "2002 edition of the Guidelines Manual." Paragraph 5 of the Plea Agreement was more specific: the parties carefully identified "the Sentencing Guidelines Manual dated November 1, 2002 … exclusively" (emphasis added). By design, the Agreement does not contemplate application of later amendments and, recognizing that application of that specific set of guidelines was an essential condition of the plea, provides that the Plea Agreement "shall be deemed null and void" if any other guidelines are used.

The Department of Probation had added a four-point "public company officer" enhancement that was first introduced in the Emergency Amendments to the Guidelines that went into effect January 25, 2003, well after November 1, 2002. This enhancement was clearly not intended by the United States or the Defendant to be included in Mr. Peppel's guidelines calculation, and consequently Mr. Peppel objected to addition of this enhancement. The Emergency Amendments were adopted not only after November 1, 2002, but well after Mr. Peppel's relevant conduct. Because they add a substantively new and substantial enhancement Mr. Peppel could not have contemplated at the time of his conduct, their application in this case would be contrary to basic notions of fairness and raise ex post facto issues. All three of the charges to which Mr. Peppel pled guilty derive from the Mercatum transaction, which occurred in the first quarter of 2001. The affected 2001 financial results appeared in the Company's earnings release on February 26, 2002 and then in the Company's 10-K filed April 1, 2002. The 10-Q filed August 14, 2002 referred to in Charges 1 and 17 did not contain different or additional misstatements arising from the Mercatum transaction. Rather, it included a false statement and was falsely certified by Mr. Peppel because it contained the 2001 results affected by the Mercatum transaction. Neither the Plea Agreement nor even the Superseding Indictment contains any allegation or statement to the contrary. Nor do they include any act by Mr. Peppel after the filing of the August 14 10-K. Indeed, the Superseding Indictment does not allege any overt act by Mr. Peppel occurring in 2003, either related to Mercatum or otherwise. The last reasonable date that could be used as the end of Mr. Peppel's relevant conduct is August 14, 2002. However, because the information included in that 10-Q was merely repetition of previously filed information, the more appropriate reference date is April 1, 2002. In either case, the end of Mr. Peppel's offense conduct came at least six months before the Emergency Amendments became effective.

All of this issue may be moot, since the government certainly has not raised the "public company officer" enhancement in the evidentiary hearing. If the issue is not moot, plainly it would be unjust to apply the post-November 2002 amendments to Mr. Peppel.

by Dr. Marlena Akhbari, who testified to a loss of $62,023,918, the product of total affected shares of 21,330,212 and a per share loss of $2.91.[5] Exh. 41.

### 1. The government's affected shares numbers are grossly overstated.

Each of the calculations the government has at various times embraced has involved more than 20 million affected shares. All have started with some 25 million shares outstanding for the Company and subtracted from that the shares held by Mr. Peppel and Mr. Stanley. That was where, for example, SEC accountant Hlavacek stopped his analysis and had total affected shares of more than 24 million. Dr. Akhbari recognized that the treasury shares held by MCSi could not be affected shares so she subtracted out the 2.8 million treasury shares to get to her 21 million figure. Akhbari, 1-56-57; Exh. 41.

All of those calculations, however, assume that the owners of every share of stock experienced a loss as a result of the false public statements related to the Mercatum transaction. That simply is not true as a matter of law. Someone who purchases stock before a false statement is made in a securities filing has no injury and no claim. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 731 (1975) ("The plaintiff class in a Rule 10b-5 action was limited to actual purchasers and sellers"); *O & G Carriers, Inc. v. Smith,* 799 F.Supp. 1528, 1539 (S.D.N.Y. 1992) ("Since the alleged fraud therefore took place *after* O & G Carriers, Bren and Rothfarb had invested, the alleged fraud was not 'in connection with' the purchase or sale of a security" emphasis in original); *Perz-Rubio v. Wyckoff,* 718 F.Supp. 217, 236 (S.D.N.Y. 1989) ("The alleged fraud must be prior to or contemporaneous with the securities transaction in question"); *Gulf Corp. v. Mesa Petroleum Co.,* 582 F.Supp. 1110, 1121 (D. Del. 1984) (misrepresentations postdating a plaintiff's purchases of stock are not made "in connection with

---

[5] Dr. Akhbari looked at the decline in the market price of MCSi common stock on January 15, 2003 and determined that 68.42% of that value ($2.91) was lost due to disclosures of information between then and February 14, 2003. Exh. 41.

the purchaser's sale of any security" for purposes of Section 10(b) and Rule 10b-5); *Troyer v. Karcagi,* 476 F.Supp. 1142, 1148 (S.D.N.Y. 1979) ("There can be no such causal connection where the misstatement or omission occurred after the purchase"); *Clinton Hudson & Sons v. Lehigh Valley Cooperative Farms,* 73 F.R.D. 420, 424-26 (E.D. Pa. 1977), *aff'd,* 586 F.2d 834 (3d Cir. 1978) ("here, where the activity alleged to be fraudulent occurs five years after the purchase, plaintiff's claims against the defendants amount to nothing more than the hindsight observations that because of their 1969 activities, the defendants must have contemplated doing wrong prior to that time and must have been doing so in 1964").

Here, someone who purchased MCSi stock prior to February 26, 2002 did not pay a price affected in any way by the Mercatum transaction. Akhbari, 1-69, 1-74-76, 1-93. While acknowledging that point, Dr. Akhbari testified that she thought that some who purchased MCSi stock prior to February 26, 2002, might have sold it earlier than they did but for the overstatement of 2001 net sales. Akhbari, 1-75-76. She admitted that she could not identify any individual person who fell into that category. Akhbari, 1-91-92.

Notwithstanding Dr. Akhbari's speculations, the law on this is well settled. The loss is limited to those purchasing after February 26, 2002. There is no loss arising from a securities violation to someone who holds a security and decides not to sell it. *Walck v. American Stock Exchange, Inc.,* 687 F.2d 778, 790 (3rd Cir. 1982), *cert. denied,* 461 U.S. 942, 103 S. Ct. 2118 (1983) ("Appellant cannot predicate liability on any activities … that induced them to 'retain'" stock); *V.T. Investors v. R & D Funding Corp.,* 733 F.Supp. 823, 832 (D. N.J. 1990) ("Shareholders who allege that they decided not to sell their shares because of an unduly rosy representation or a failure to disclose unfavorable material are thus precluded from bringing a private action under Rule 10b-5"); *Konstantinakos v. Federal Deposit Ins. Corp*., 719 F.Supp.

-12-

35, 37 (D.Mass. 1989) ("Where a misrepresentation or omission causes a person to retain shares previously purchased, rather than purchase new shares or sell already owned ones, the shareholder does not have standing to bring a 10b-5 claim"); *Troyer v. Karcagi,* 479 F.Supp. 1142, 1148 (S.D.N.Y. 1979) ("where it is alleged that a misrepresentation or omission by Karcagi induced the 'mere retention' of the discretionary counts by the Troyers, no claim under Rule 10b-5 can be asserted"); *cf., Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734-735 (1975) ("a putative plaintiff, who neither purchases nor sells securities but sues instead for intangible economic injury such as loss of a noncontractual opportunity to buy or sell, is more likely to be seeking a largely conjectural and speculative recovery in which the number of shares involved will depend on the plaintiff's subjective hypothesis").

Dr. Akhbari acknowledged that she did not have information to determine how many people had purchased the stock prior to February 26, 2002 and held it through February 14, 2003. Akhbari, 1-96 ("Q. Was that information made available to you? A. No.") The government, however, did have that information. It produced Exhibit 39(b), a listing of shareholders who held certificates of MCSi stock. The list includes for each shareholder the date the certificate was issued, the number of shares and, if applicable, the date the certificate was canceled upon sale of the stock.

From that information, Special Agent Gross prepared Exhibit 39c identifying those shareholders who held their stock at any time between January 15, 2003 and February 14, 2003. Exh. 39c; Gross, 1-19. There are 284 different shareholders listed on Exhibit 39c. Gross, 1-20. But as the exhibit reflects, the great bulk of those had purchased their shares prior to February 26, 2002. Only 42 shareholders (*see* attached highlighted Exhibit 39c) bought after the Mercatum information made its way to the public February 26, 2002.

-13-

Those 42 shareholders purchased a total of 263,571 shares after February 26, 2002.

Attached as Exhibit S is a listing of the 42 highlighted in the attached Exhibit 39c. For each

shareholder, Exhibit S includes the information – all taken from Exhibit 39(b) – as to the number

of shares purchased, the dates the shares were issued and, if applicable, cancelled.

Three names in particular jump out in Exhibits 39c and S. Numbers 9 and 231 are

Jonathan Barry and David White, both of Yorkshire, England, who were the two principals of

Mercatum with whom the Mercatum transaction was negotiated and put together. Mr. White, at

the time a subject of the government's investigation, is discussed at length in Mr. Funk's 2006

report, Government Exh. 46. Mr. White accounted for 166,902 of the MCSi shares purchased

after February 26, 2002 included in Exhibit 39c, and Mr. Barry accounted for another 26,802 of

these shares. Each certainly had full knowledge of the details of the Mercatum transaction, and

with such information they can have suffered no loss. The third name is Mr. White's father, an

investor in Mercatum whose logistics business worked with the company (shareholder number

268 in Exhibit 39c). Like his son, he would have no claim of loss. Excluding those three

shareholders, the total number of shares purchased after February 26, 2002 by the shareholders

listed in Exhibit 39c is 49,157. If the per share loss numbers of the Probation Department or Dr.

Akhbari were correct, total loss would not be measured in the millions, but in the thousands: [6]

| | | Dr. Akhbari's per share loss figure | Probation Department's per share loss figure |
|---|---|---|---|
| | | $2.90785 | $0.87 |
| Affected shares (with Mercatum principals) | 263,571 | $766,425 | $229,307 |

---

[6]    Neither the government's Exhibits 39(b) nor 39c includes people who held their MCSi stock in street name because, for example, it was in a brokerage account. Since the government has offered no information as to those persons, there is no basis on this record for drawing any conclusions as to their shares. One could speculate that since shares in certificate form accounted for about 10% of all shareholdings, the numbers in the chart could be multiplied by 10 – and maybe that is how the government reached its $400,000 number for Mr. Stanley. But there is no evidence presented to support that, or any other conclusion.

| | | | |
|---|---|---|---|
| Affected shares without Mercatum principals | 49,157 | $142,941 | $42,767 |

2. **The government cannot establish a per share loss that resulted from the Mercatum transaction.**

While she had never done an analysis linking securities fraud to a loss before, Dr. Akhbari applied the generally accepted approach of an event study to isolate the value of information that was made public during the time period between January 15 and February 14, 2003. It was her testimony that the decline in price of MCSi stock in that time period evidenced "some extraordinary bad news" about the Company that was flowing into the marketplace. Akhbari, 1-52. Upon cross examination, she conceded that none of that bad information reflected the $37 million net sales overstatement from the Mercatum transaction.

The four pieces of information that were made public during that time period (Akhbari, 1-98) and moved the stock significantly were:

- The January 15, 2003 SEC enforcement action filed against MCSi's competitor and supplier ClearOne. Exh. L. Mentions MCSi as a purchaser of ClearOne products in ¶¶ 40, 46-47. No implication that MCSi had done anything wrong; no reference to Mercatum or MCSi financials at all.

- The filing of private securities lawsuits against MCSi in January and February, 2003 – all of which related to information allegedly not disclosed leading up to the February 26, *2002* earnings report that caused the stock to drop 40%. No reference to Mercatum (Mercatum numbers not in any of the challenged financials). Akhbari, 1-103.

- The response MCSi publicly made to the securities lawsuits – that it would "vigorously defend them." Exh. H.

- On February 14, MCSi announced that it had received a subpoena for records in connection with an ongoing SEC investigation. Exh. E. The announcement of the investigation made no reference to Mercatum, no reference to accounting issues, no reference to prior public statements made by MCSi.

12273092.1

As of the end of that time period, the information as to the $37 million net sales overstatement of 2001 was still not public information affecting the price of the stock.

On those facts, the law is very clear.

> **a.** **The government's evidence, if included in a civil complaint, would not survive a motion to dismiss.**

First, if all of the evidence that the government presented on loss from the securities fraud in this case were set out as allegations in a civil complaint for securities fraud, this Court would dismiss the complaint for failing to establish any loss caused by the misrepresentations. In the civil setting, a plaintiff must establish "a causal connection between a material misrepresentation and the loss." *Brown v. Earth Board Sports USA, Inc.*, 481 F.3d 901, 920 (6th Cir. 2007) (quoting *Dura*, 544 U.S. at 342). As the Sixth Circuit held in *Indiana State Dist. Council v. OmniCare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009), "price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred *after the truth behind the misrepresentation or omission became known to the market*" (emphasis added). *See also Local 295 v. Fifth Third Bank Corp.*, 731 F.Supp. 2d 689 (S.D. Ohio 2010) ("complaint fails to establish loss causation with respect to many of the misrepresentations and omissions alleged because the press release did not contain any disclosures or corrections addressed to them").

That conclusion followed directly from *Dura Pharmaceuticals v. Broudo*, 544 U.S. 336 (2005). In *Dura*, the issue was exactly what loss causation evidence must be asserted – at the pleading stage – to support a 10b-5 complaint. As here, the issue involved false statements about financial results of a publicly traded corporate defendant. Justice Breyer, writing for a

unanimous Court,[7] concluded that persons who purchased the stock immediately after the false

information went to the marketplace were not at that point injured:

> For one thing, as a matter of pure logic, at the moment the
> transaction takes place, the plaintiff has suffered no loss; the
> inflated purchase payment is offset by ownership of a share that at
> that instant possesses equivalent value. Moreover, the logical link
> between the inflated share purchase price and any later economic
> loss is not invariably strong.

> \* \* \*

> If the purchaser sells later after the truth makes its way into the
> marketplace, an initially inflated purchase price might mean a later
> loss. But that is far from inevitably so. When the purchaser
> subsequently resells such shares, even at a lower price, that lower
> price may reflect, not the earlier misrepresentation, but changed
> economic circumstances, changed investor expectations, new
> industry-specific or firm-specific facts, conditions, or other events,
> which taken separately or together account for some or all of that
> lower price.

> *Dura*, 544 U.S. at 343-344.

It was only after the false information has been corrected in the marketplace and the stock

price fell in reaction to that information that a person can be said to have a loss.  Even then, there

remains a question of whether the securities fraud has caused the loss or some other of the

numerous factors that affect price:

> Given the tangle of factors affecting price, the most logic alone
> permits us to say is that the higher purchase price will sometimes
> play a role in bringing about a future loss. It may prove to be a
> necessary condition of any such loss, and in that sense one might
> say that the inflated purchase price suggests that the
> misrepresentation (using language the Ninth Circuit used) "touches
> upon" a later economic loss. But, even if that is so, it is
> insufficient. To "touch upon" a loss is not to cause a loss, and it is
> the latter that the law requires.

---

[7] The Supreme Court was reversing a decision by the Ninth Circuit, whose "views about loss causation differ from those of other circuits that have considered this issue."  544 U.S. at 340.

*Dura*, 544 U.S. at 344 (citations omitted).

Applying the teaching of *Dura* and *Local 295* to the evidence before this Court on this issue, false information first entered the marketplace February 26, 2002.  It was not separately identified but was a part of the net sales figure for the Company, overstated by 4.6%, and presumably part of the net income for the year which would likely have been a greater loss than it was.  The extent of that greater loss is not known.

The government's problem is showing the economic loss occurring "after the truth behind the misrepresentation or omission became known to the market."  *Omnicare*, 583 F.3d at 944.  The facts here parallel exactly those alleged in *Local 295 v. Fifth Third Bank*, 731 F.Supp. 2d 689 (S.D. Ohio 2010), in which this Court dismissed those securities fraud claims for which the subsequent disclosures "did not contain any disclosures or corrections addressed to" the prior misrepresentations.  There is simply no evidence that the truth on the Mercatum transaction became known at any time prior to MCSi's June 3, 2003 bankruptcy.  By that point, the stock was worth 6¢ a share.  Exh. 10.  No one has testified nor could anyone testify that the 6¢ value was somehow inflated by a $37 million overstatement of net sales from a year and a half earlier.  There simply was no loss in securities value associated with the Mercatum transaction.

> **b.**    **The *Dura* standard for proximate cause in a civil securities claim is the same standard for loss, from securities fraud under the Sentencing Guidelines.**

Most Circuits who have considered the issue have concluded that the principles of *Dura* apply directly to loss calculations in securities fraud cases under §2B1.1 of the Sentencing Guidelines.  *See United States v. Rutkoske*, 506 F.3d 170, 180 (2nd Cir. 2007) (*Dura* applies to loss calculation under Sentencing Guidelines; vacating district court's sentence because its estimate of the loss caused by the defendant's fraud failed to take into account "other factors

-18-

relevant to a decline in" the company's "share price"); *United States v. Olis*, 429 F.3d 540, 546 (5th Cir. 2005) (*Dura* applies; "the civil damage measure should be the backdrop for criminal responsibility both because it furnishes the standard of compensable injury for securities fraud victims and because it is attuned to stock market complexities"); *United States v. Nacchio*, 573 F.3d 1062, 1078 (10th Cir. 2009) (applying *Dura*; "criminal cases have the same 'tangle of factors affecting price' … that is found in civil cases," internal citations omitted).  Dr. Akhbari, having reviewed the literature on the relationship between securities fraud and loss, did her best to follow the principles of *Dura* in her analysis:

> Q. Did you seek to apply the principles of *Dura Pharmaceuticals* to your analysis?
>
> A. To the best of my ability.
>
> Dr. Akhbari, 1-97.

If *Dura* applies, the evidence the government has presented utterly fails to establish any loss caused by Mercatum or by Mr. Peppel.

### c. The government's evidence does not satisfy even the Ninth Circuit test for establishing a securities loss.

The government urges that this Court reject the teachings of *Dura* related to what is and is not a causal relationship in securities fraud and adopt instead the Ninth Circuit test as set out in *United States. v. Berger*, 587 F.3d 1038 (9th Cir. 2009).  On these facts, however, *Berger* does not help the government.  Although the *Berger* court declined to follow *Dura*, it still rejected the district court's analysis that did not meet Ninth Circuit requirements that the "government must show both 'but-for' and 'proximate' causation in establishing loss."  587 F.3d at 1043 (describing the holding in *U.S. v. Hicks*, 217 F.3d 1038 (9th Cir. 2000)).  The court then set forth what the district court was to do on remand:

whatever method is chosen should attempt to gauge the difference
between Craig's share price – as inflated through fraudulent
representation – and what that price would have been absent the
misrepresentation.

587 F.3d at 1046-1047.

Here the government has completely failed to offer the Court any way "to gauge the
difference between [MCSi's] share price – as inflated through fraudulent representation – and
what that price would have been absent the misrepresentation." *Id*. Dr. Akhbari made no
attempt and agreed she could make no attempt to measure that difference:

> Q.      And did you make any effort to determine how far the
> stock would have fallen that day [February 26, 2002] if the $37
> million revenue from Mercatum had not been included?
>
> A.      I did not.
>
> * * *
>
> Q.      And in terms of what the market value impact of removing
> that $37 million as of that date, that would only be speculation?
>
> A.      Correct.

Akhbari, 1-78-79.

With no basis to gauge the impact of the fraud on the stock price, the Government has failed to
establish any evidence of securities fraud loss, even under the Ninth Circuit test.

> **3.      Other proposed loss numbers provide no more basis for a finding of
> loss than Dr. Akhbari's approach.**

The government has offered the Court several other numbers besides Dr. Akhbari's $62
million. SEC accountant Scott Hlavacek started the parade when the government embraced his
loss figure of $298,119,295.80. Dr. Akhbari examined Mr. Hlavacek's analysis and dismissed it
as simplistic. Akhbari, 1-90-91 ("On many levels it was, I think, an unsophisticated attempt").
Notwithstanding that fact, the government continued, well after it had hired Dr. Akhbari in
December 2010, Akhbari, 1-61, to advocate the $298 million number. Final Presentence Report,

April 14, 2011, Addendum, 48 ("The government objects to the loss calculation proposed by the probation officer and asserts that the appropriate loss figure is $298 million").

The Probation Department has another calculation that drives an $18.2 million number in the Amended Presentence Investigation Report.  It is based upon total affected shares of 21,330,212 and a per share loss of 87¢.  Final Presentence Investigation Report, ¶¶132-135.  Here too, the number of shares of stock used by the Probation Department correctly address the many shareholders who had purchased prior to February 26, 2002 and therefore had not paid an inflated price.  Applying the 49,157 shares that were actually purchased by someone other than a Mercatum principal after February 26, 2002 from Exhibit S, the 87¢ Probation Department per share loss would drive a loss number of $42,767.

The Probation Department's approach on per share loss assumes the stock price after February 26, 2002 had a premium for the Mercatum transaction just as in Dr. Akhbari's approach.  It then assumes that 100% of the decline in the stock immediately following the February 14, 2003 announcement of the SEC investigation reflected the value of the Mercatum transaction.  As with Dr. Akhbari's analysis, the approach ignores the fact that there was no disclosure about Mercatum, about financials, or any specifics in that announcement:

> DAYTON, OHIO - February 14, 2003 - MCSi, Inc. (Nasdaq: MCSI) today announced that it has learned of an investigation of the Company by the United States Securities and Exchange Commission and has received a subpoena from the SEC seeking production of documents. The Company intends to cooperate fully with the investigation.  MCSi cannot now predict the course or outcome of the investigation or whether additional information will be sought.

Exh. E.

Courts consistently hold that where an announcement of an SEC investigation does not disclose the fraud at issue, as MSCi's February 14 announcement plainly does not, the

-21-

announcement cannot provide the required causal connection between the fraud and any investor loss. *See Durham v. Whitney Info. Network, Inc.,* 2009 WL 3783375, at *22 (M.D. Fla. Nov. 10, 2009) (loss causation not satisfied because the company's announcement of an SEC investigation did not "sufficiently establish a connection between the specific alleged fraudulent activity (the three theories of fraud) and the drop in stock. Indeed, there is no connection between the text of the press releases and the theories of fraud"); *In re Maxim Integrated Prods., Inc. Sec. Litig.,* 639 F.Supp. 2d 1038, 1047 (N.D. Cal. 2009) (loss causation not satisfied; company's "disclosures regarding compliance with an SEC investigation [and] subpoenas from the United States Attorney's office ... do not reveal the alleged fraud"); *In re Dell, Inc. Sec. Litig.*, 591 F.Supp. 2d 877, 910 (W.D. Tex. 2008) (announcement of an SEC investigation did not satisfy loss causation; "nor does the disclosure of an investigation, whether conducted internally or by the SEC, absent a revelation of prior misrepresentations, constitute a corrective disclosure for purposes of loss causation"); *In re Take-Two Interactive Sec. Litig.*, 551 F.Supp. 2d 247, 285-86 (S.D.N.Y. 2008) (disclosure of grand jury subpoenas did not satisfy loss causation because "if a plaintiff relies upon a particular disclosure as the basis for his loss causation allegations, that disclosure must somehow reveal to the market some part of the truth regarding the alleged fraud .... [T]he nexus between the June 26 Disclosure and the Options Backdating Fraud is far too tenuous to permit the inference that the former unveiled some part of the fraudulent nature of the latter"); *In re Hansen Natural Corp. Sec. Litig.*, 527 F.Supp. 2d 1142, 1162 (C.D. Cal. 2007) (loss causation not satisfied because the company's announcement of an SEC investigation did not "contain a disclosure of wrongdoing").

Like Dr. Akhbari's analysis, the circumstances that the Probation Department identified provide no basis under *Dura* or the Ninth Circuit test for reaching a causal link between the securities fraud here and market or investor loss.

Finally, there is the number that is the government's conclusion in Mr. Stanley's plea:

> The parties stipulate that the loss for § 2B1.1(b)(1) purposes is between $400,000 and $1,000,000.

Stanley Plea, Exh. C.

No witness was able to identify where the $400,000 and $1 million numbers in the Stanley plea came from. Gross, 1-27-28; Akhbari, 1-73; Geraghty, 2-99. It therefore provides no basis for an upward adjustment in the sentencing guidelines. What it does highlight is the arbitrariness of the government's array of numbers – $298 million, $62 million, $18.2 million, $400,000. *See United States v. Olis*, 429 F.3d 540, 547 n. 11 (5th Cir. 2005) ("The Government does not further the goals of sentencing uniformity or fairness when, as seems to be happening in these cases, the Government persistently adopts aggressive, inconsistent, and unsupportable theories of loss").

### 4. The proffered evidence of bank fraud loss provides no basis for loss here.

Understanding that it could prove no loss based on securities fraud, the government brought out, at the last minute, an expert to testify about purported losses to the Company's bank lenders that he alleged somehow arose from the Mercatum transaction. The theory of Mr. Geraghty's testimony was that MCSi's bankers had some $88.5 million in loans to the Company outstanding and unrecoverable after the Company was liquidated in bankruptcy, and that all of the lenders' losses resulted from the $37 million overstatement of the Company's 2001 net sales in the Company's February 2002 earnings release and subsequent Form 10-K. To reach that conclusion, Mr. Geraghty performed a specious and speculative recalculation of the "Consolidated Total Debt/Consolidated EBITDA Ratio" covenant in Section 9.7 of the

-23-

Company's credit agreement as of December 31, 2001, assuming without basis that the Mercatum transaction caused the Company's *net income* to be overstated by $37 million and concluding, wrongly, that the Company would have been in breach of the covenant if the effects of the Mercatum transaction were removed from the Company' financial results.  Exh. O, page 37 *et. seq.* (Amended and Restated Credit Agreement).

### a. MCSi's lenders have no loss from securities fraud – the relevant offense here.

The heart of the Government's charges against Mr. Peppel in this case is securities fraud. He was never charged with bank fraud.  Indictment (docket no. 3); Superseding Indictment (docket no. 54).  Indeed, neither indictment in this case mentions MCSi's lenders at all.  *Id.*  He did not plead guilty to bank fraud.  Docket no. 179; Exhibit 39.  Nonetheless the government, at the last moment, has decided it wants to demonstrate loss resulting from fraud purportedly perpetrated upon MSCi's banks.

Securities fraud in this country is the making of false statements in connection with the "purchase or sale of a security."  It does not deal with information provided to lenders.  It is clear, as a matter of law, that the banks suffered no securities fraud loss.  Securities Exchange Act of 1934, §10(b); *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723 (one who neither buys nor sells securities has no claim under §10(b) of Rule 10b-5).  Thus, for example, in the case the government repeatedly cites and relies upon, *United States v. Berger,* 587 F.3d 1038 (9th Cir. 2009), the defendant was convicted of securities fraud violations and loan fraud violations – receiving millions of dollars in loan proceeds "based on either nonexistent or substantially overstated collateral."  587 F.3d at 1040.  The court found a $3.14 million loss to the banks the result of the loan fraud and, separately identified a $2.1 million shareholder loss. 587 F.3d at 1041.

-24-

The only authority that the government can find for taking into consideration, under the Sentencing Guidelines for securities fraud, the losses suffered by a lender is *United States v. Paul,* 634 F.3d 668 (2nd Cir. 2011), a case that is manifestly inapplicable.  First, and contrary to what the government suggests in its briefing, *Paul* dealt with restitution, not enhancements under the Sentencing Guidelines.  And its facts have no bearing on this case.  In *Paul*, the defendant manipulated outside trading data about a security, such as its trading volume and the price and number of bids for it, not financial data or other information about the Company's financial performance.  The purpose of the fraud was not to mislead the Company's investors, but rather to inflate the value of securities held by the defendant as collateral for margin loans.   While the government says the case involved "banks who extended loans to securities fraud defendant," Government Loss Memo, 4 (Docket no. 196), in fact the loans were provided by the defendant's brokerage house.  In addition, the loans were made through nominee accounts that the defendant fraudulently created and "that he fully controlled, but maintained under other names to mask his involvement."  634 F.3d at 670.  Ultimately the court concluded that the loans would never have been made but for the fraud in creating the accounts, which was part and parcel of the securities fraud.  Clearly, such facts are dramatically removed, on every level, from those before this Court. It is not appropriate to consider the banks losses here as somehow the result of the Mercatum transaction.

Again unlike *Paul*, the loss that the banks experienced in this case resulted directly from the financial failure of the Company which, while it may have started under Mr. Peppel's leadership, had nothing to do with the Mercatum transaction or its disclosure to the marketplace. It was quite plainly a function of factors unrelated to the Mercatum transaction which saw the market for the Company's products and services decline in the months and years following

-25-

September 11, 2001, which decline continued after Mr. Peppel left the Company in March of 2003. Indeed, that decline was in no way halted under the financial leadership of the Government's new-found expert witness, Mr. Geraghty.

### b. The bank loss calculation rests entirely upon speculation in two areas – the covenant calculation itself and how the lenders might have reacted to the covenant calculation.

Beyond the clear legal problem of including alleged lender losses in a securities fraud loss calculation under the Guidelines, the government's theory of loss is not supported by a factual basis. Rather, it is premised on the convoluted, speculative, and demonstrably inaccurate factual argument that if the Mercatum transaction had caused the Company to avoid breaching its debt to EBITDA ratio covenant for the year ended December 31, 2001, the Company's lenders would have called their loans as soon as they became aware of the breach and thereby avoided losses in bankruptcy (losses that the government cannot even correctly quantify). The government has not established any element of this argument, and, in fact, each element is demonstrably wrong.

The assertion that the lenders would have called their loans if the Company breached its debt to EBITDA covenant in early 2002 is highly speculative and clearly contradicted by the evidence before the court. Although Mr. Geraghty insinuated much about what the lenders might have done upon such a breach, the only specific, concrete action he was willing to commit to in his testimony was that the lenders "kind of call a time out," Geraghty, 1-144, and perhaps required the Company to get outside assistance to better focus its financial plans or otherwise make performance improvements as a result of the covenant breach. These hardly would have been major events in the relationship between the Company and the lenders, and there is no indication that such actions would have prevented any loss to the lenders whatsoever.

Moreover, the notion that the lenders would have taken even the minimal action of calling a "time out" at this time seems highly questionable.  In the first place, Mr. Geraghty testified that the lenders learned in December 2001, that the Company's performance for the year ended December 31, 2001 was going to be abysmal, and yet they took no action against the Company at all.  Geraghty, 2-25, 2-39.  By the time the Company would have actually experienced Mr. Geraghty's purported financial covenant breach, the lenders would have long since known that the Company's 2001 financial performance fell far below expectations.  Any breach that did occur would not have given the lenders new information about the Company's financial performance, but rather it merely would have confirmed information the Company gave to them in December.  The lenders did not accelerate the loans, call a "time out," or take any other action when they were first apprised of the Company's dramatic and unexpected financial failures in December 2001, and it is absurd for Mr. Geraghty to speculate that they would have taken any action at all, much less exercised the "nuclear option" of calling the loans, when they were reminded of this old news by a covenant breach based on the same data two months later.

Likewise, Mr. Geraghty testified that the lenders were in the long established habit of relaxing the Company's financial covenants when its performance was not consistent with plan and therefore would have resulted in a breach of the financial covenants.  Geraghty, 1-164 *et. seq.*  The notion that the lenders would have used this particular covenant breach as a cause for acceleration rather than a cause for the renegotiation of the covenant levels is highly suspect. He acknowledged, again on cross-examination, that in the real world, banks do not pull all of their financing just because one covenant is missed in one quarter.  Geraghty, 2-144.  Mr. Geraghty likewise acknowledged in cross-examination that the same banks who he says might have done something had MCSi missed its covenant kept extending credit even at the point of the

Company's distress and bankruptcy filing the following year.  Geraghty, 2-45, 2-105.  So Mr. Geraghty's contention that the lenders would have called the loans and cut their losses if they had been aware that the Mercatum transaction was inflating income and therefore the calculation of EBITDA is legally inadequate speculation and largely contradicted by his own testimony.

Not only are Mr. Geraghty's speculations about the action that lenders might have taken if the covenant had been breached highly suspect, but his conclusion that removing the Mercatum would have caused the Company to breach the covenant is entirely wrong for a number of reasons.  First, a basic and fatal problem with Mr. Geraghty's approach is that, to do his calculation and reach the conclusion he wanted to reach, he had to assume that the entire $37 million in net sales from the Mercatum transaction produced $37 million in net income to MCSi – that is, that there was a 100% margin on the transaction or zero cost of goods sold associated with it.  He made that assumption notwithstanding the fact that there is no evidence in the record as to what the cost of goods sold on that transaction was, much less that the cost of goods sold was zero.  And he acknowledged, on cross-examination, that if a cost of goods sold was in fact recorded, his calculation would have come out differently.  Indeed, if the cost of goods sold for the Mercatum transaction was any of the non-zero amounts contemplated in the Funk report, or, indeed, as little as $2.2 million – a margin of 94% – the Company would have been in compliance with the covenant even using Mr. Geraghty's flawed calculation methodology.

Likewise, Mr. Geraghty's interpretation and calculation of the covenant are biased, arbitrary, and wrong, and correcting his mistakes makes clear that the Company would have been in compliance with the covenant even with the Mercatum transaction removed from its results. The Company's Amended and Restated Credit Agreement, a detailed and carefully negotiated document, provides instructions on how to calculate the debt to EBITDA ratio.  For purposes of

-28-

this covenant, the Credit Agreement provides that EBITDA is calculated by starting with the Company's GAAP net income for the period and then making certain adjustments, including increasing the figure by the amount of any "extraordinary (and other one-time) non-cash losses and charges" the company incurred during the period. Exh. O, page 43. While, as Mr. Geraghty correctly stated, "extraordinary charges" are defined under GAAP and are not relevant to this discussion, the expression "other one-time losses and charges" is not an accounting term of art, but instead is a common and borrower-friendly negotiated addition to the EBITDA definition that expands the "add back" to net income to include costs that the Company believes are outside the ordinary course of business and unlikely to recur in the near future. There are three items, set forth in the table below, totaling $7.1 million, readily identifiable in the Company's 10-K for the year ended December 31, 2001 that fall within this definition, and the Company would have complied with the covenant even with the Mercatum sales removed if less than a third of the dollars from these items had been included in the EBITDA calculation.

| Non-cash restructuring charges related to abandonment of certain business | $4.9 million | Exhibit P. (Form 10-K for December 31, 2001), page 21 |
| Non-recurring portion of non-cash provision for receivables owned by distressed customers after September 11 | $2.0 million | Exhibit P, pages 21 and 23 |
| Non-cash portion of restructuring charges arising from Zengine acquisition | $0.17 million | Exhibit P, page 22 |

Clearly, each of these items (each of which is indisputably non-cash), which relate to the total abandonment of a business, the economic effects of the September 11th terrorist attacks, and an important acquisition of a particular business, respectively, are not ordinary course and not things the Company would have expected to recur. Needless to say, because he was seeking a

particular result and not an accurate calculation, Mr. Geraghty ignored all these items in his calculation of EBITDA.

Section 8.1(c) of the credit agreement provides that the ratio of debt to EBITDA and other financial covenants are to be calculated by the Company's chief financial officer or other responsible officer, and the agreement does not give the lenders any right to dispute these calculations. Exh. O, page 83. Moreover, the defendant is not aware of any case in which the federal courts, the Ohio state courts, or the New York state courts have ruled on which items should be included in EBITDA for purposes of the financial covenants in a credit agreement, nor is he aware of any instance of bank lenders litigating with a company in these courts over which items should be included in the calculation. Thus, the Company's accounting and financial personnel had great discretion under both applicable law and the terms of the credit agreement over what items would and would not be included in the EBITDA calculation. Mr. Geraghty's theory of loss is premised on the assumption that, but for the Mercatum transaction, the Company would have reported a breach of the debt to EBITDA covenant in February 2002, and the lenders would have called the loans as result of that breach. For purposes of evaluating this theory, then, the important question is not whether the items listed above are correctly included in EBITDA as an academic matter, but, instead, whether the Company's finance personnel would have, in their discretion, actually included them in this calculation. Because each of these items is, in fact, correctly included in EBITDA as an academic matter, there should be little doubt that the company's finance personnel, who had greater leeway, would have included them in the calculation. Despite his stubborn advocacy of his own, incorrect calculation of the covenant, on cross-examination Mr. Geraghty acknowledged that the calculation depended heavily on the discretion of the person doing the calculation. Geraghty, 2-143.

12273092.1

Putting aside the questions of how the covenant should be calculated and what the lenders would have done if it had been breached, the government has not and cannot possibly offer any evidence that suggests that Mr. Peppel's conduct proximately caused any loss whatsoever to the lenders, and indeed there are very strong indications from the record that the banks would have been repaid in full if Mr. Geraghty, as interim CFO for the Company, and other members of the new management team had either entirely avoided the bankruptcy process or liquidated the Company immediately. Indeed, the Company's bankruptcy petition, which discloses the Company's asset position *after* Mr. Geraghty's arbitrary $80 million write-down of assets, shows total assets of approximately $181 million, more than twice what was necessary to cover all the Company's obligations under the credit agreement. Exhibit A to the Bankruptcy Petition of MCSi, Inc., filed with the United States Bankruptcy Court for the District of Maryland, Case 03-80169, June 3, 2003. Of course, neither one of these courses of action would have gotten Mr. Geraghty's employers the massive fee they collected at the expense of the lenders and the Company's other creditors.

When Mr. Geraghty took over as CFO, the Company was in the process of successfully negotiating a forbearance agreement that kept the lenders from calling the loans, and, indeed, the fact that lenders were interested in finding the Company a "turnaround specialist", suggests that they believed that the Company remained viable and able to make good on its obligations under the credit agreement, in a non-bankruptcy setting, after Mr. Peppel departed. On the other hand, the Company's bankruptcy filings make clear that there were plenty of assets to pay the lenders at the time Mr. Geraghty took over, and, notwithstanding Mr. Geraghty's assertions to the contrary, the bankruptcy court's records show that the residual assets of the Company, *i.e.*, the least saleable and least valuable ones, were ultimately liquidated at nearly fifty percent of *book*

value.  Given that the Company's bankruptcy petition reflected assets with a book value nearly
$181 million, it seems very likely that the lenders would have been paid in full if Mr. Geraghty
had taken steps to liquidate the Company immediately upon his arrival.  On cross-examination,
Mr. Geraghty admitted this possibility.  Geraghty, 2-52.

By Mr. Geraghty's own account, a reorganization in bankruptcy would have been suicide
for the Company because it was primarily in the contracting business at the time, and, as Mr.
Geraghty explained, key clients doing contract business "don't want to do business with
bankrupt entities, particularly long-term contract companies."  Geraghty, 2-20.  Unfortunately,
attempting to reorganize the Company in bankruptcy is precisely what Mr. Geraghty and his
colleagues did do.  Presented with viable courses of action that might have saved the Company
or, at the very least, prevented or mitigated the lenders' losses, Mr. Geraghty and his fellows
instead chose the one course sure to bring the Company to a slow and certain death.  Worse,
because the Company, its business further compromised by the stigma of bankruptcy, was
incurring substantial losses throughout 2003, the more than nine-month delay his failed efforts to
reorganize the Company imposed on the liquidation process further diminished the assets
available to the lenders.  Although he carefully avoided the issue in his direct testimony, Mr.
Geraghty was clearly aware of his role in causing the lenders' losses.  When pressed on cross
examination, Mr. Geraghty could not dispute that the $85 million loss he said resulted from the
Mercatum transaction was equally the result of subsequent actions the banks and the Company
(including when Mr. Geraghty was acting as MCSi's Chief Financial Officer) took between the
time that Mr. Peppel left the Company and the time the Company was ultimately liquidated.

Likewise, Geraghty's spontaneous write-down of the Company's assets when he became
CFO is highly suspect.  He testified that he scrubbed items he, in his sole discretion, "thought

were overstated," writing the Company's assets down by approximately $80 million. Geraghty, 2-47. Mr. Geraghty had every reason to make an over zealous write-down of the Company's assets. By placing the Company in such a weak asset position, he would have been more of a hero if he had succeeded in turning around the Company and would have had far more of an excuse if he failed, which of course, he ultimately did.

On the bank fraud loss, like the securities fraud loss, the government cannot meet its burden of proof and establish any loss.

## II.     Number of victims.

The government seeks here the maximum enhancement of 4 levels for an offense with 250 or more victims:

> (Apply the greater) If the offense –
>
> (A)(i) involved more than 10, but less than 50, victims; or (ii) was committed through mass-marketing, increase by 2 levels; or
>
> (B) involved 50 or more victims, increase by 4 levels.

U.S.S.G. §2B1.1(b)(2)

Again, the government has the burden of proof on facts underlying the enhancement. To meet that burden, the government must offer facts, not estimates. *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009) ("The Guidelines do not, however, allow a district court to 'estimate' the number of victims to enhance a sentence under §2B1.1(b)(2)").

Because the securities loss here was zero, there were no victims. Even if the government's theory of loss were correct, the number of victims is dramatically smaller than what it argues.

## 1.     The government's evidence demonstrates 39 potential victims, not 284.

-33-

The government offered evidence in the form of Exhibit 39c listing, according to the testimony, 284 separate shareholders of record of MCSi stock during the timeframe from January 15, 2003 to February 14, 2003.  Gross, 1-19 - 1-20; Exhibit 39c.  In fact, the exhibit shows no such thing.  The exhibit includes 284 accounts to be sure.  But those accounts are mostly persons who purchased their stock before – usually well before – February 26, 2002, at a time when there was no information in the market or in the stock price related to the Mercatum transaction.  None of those persons was harmed; none was a victim.  Removing all of those non-victims (as well as Jonathan Barry and David White, the Mercatum principals who knew all about the Mercatum transaction, and David White's father, who worked with Mercatum as well) leaves those persons who purchased MCSi stock after February 26, 2002 (paying what the government argues was an inflated price), 39 shareholders.  They are identified in Exhibit S to this brief, which is cross-referenced to the page numbers of the government's Exhibit 39(b) and the shareholder names and numbers from Exhibit 39c (highlighted copy attached to brief as well).  That is the sum and substance of evidence, based on the government's records, of the number of persons whom the government believes were harmed.

**III.     Sophisticated means.**

The government argues for a 2-level enhancement based upon the use of "sophisticated means:"

> If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by **2** levels. If the resulting offense level is less than level **12**, increase to level **12**.

> U.S.S.G. §2B1.1(b)(8) (2002).

> Sophisticated Means Enhancement.—For purposes of subsection (b)(8)(C), "sophisticated means" means especially complex or

-34-

> especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

Commentary to U.S.S.G.
§2B1.1(b)(8)(2002)

On the facts, the government has not and cannot establish a basis for such enhancement.

**1.      There is no evidence here of the use of sophisticated means as would justify the additional enhancement the government seeks.**

The structure of § 2B1.1(b)(8) indicates what it was that it was intended to cover.  That structure is two specific examples of circumstances that involve sophisticated means – relocating or participating in relocating to another jurisdiction to evade law enforcement officials and committing the offense from outside the United States.  The final phrase then talks about "the offense otherwise involv[ing] sophisticated means."  Under the principle of statutory construction *ejusdem generis*, those general words in the third phrase "are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Washington State Dept. of Social & Health Service v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384-85 (2003); *United States v. Mabry*, 518 F.3d 442, 447 (6th Cir. 2008) ("Where a statute lists specific things followed by a more general one, the canon of *ejusdem generis* provides guidance"); *Canton Police Benev. Ass'n of Canton v. United States*, 844 F.2d 1231, 1236 (6th Cir. 1988) ("the time-honored rule of *ejusdem generis*, i.e., that a general word in a statute takes its character from the specific words with which it appears").  Courts have regularly applied *ejusdem generis* to the Sentencing Guidelines.  *United States v. Walker*, 393 F.3d 819, 824-827 (8th Cir. 2005); *United States v. Thomas*, 361 F.3d 653, 659 (D.C. Cir.2004) (Construction of

-35-

U.S.S.G. §4B1.2; "when a statute or regulation begins with a list of specific categories and ends with a general catch-all, the interpretative canons of *ejusdem generis* ('of the same kind or class') and *noscitur a sociis* (a word is 'known by its associates') counsel that the latter be read in light of the former"); *United States v. Mendoza-Alvarez*, 79 F.3d 96, 99 (8th Cir.1996) (construction of U.S.S.G. §2K2.1(b)(2); "Under the interpretative maxim of *ejusdem generis*, a general term following more specific terms is held to apply 'only to other items akin to those specifically enumerated'"); *United States v. Holmes*, -- F.3d. --, 2011 WL 2410739 (9th Cir. 2011) (concurring opinion) (construction of U.S.S.G. §2K2.1(b)(2); "The traditional legal terms for taking account of context are *ejusdem generis* and *noscitur a sociis*").

The evidence on sophisticated means came through the expert testimony of Mr. Geraghty, the disgruntled former acting CFO of MCSi whose company had received nearly $4 million for its services of taking a struggling company and moving it into bankruptcy and ultimately liquidation.  Mr. Geraghty testified that he believes that sophisticated means were used in the Mercatum transaction because:

- There were multiple invoices produced covering it (there were 3);

- The product was shipped out of the country (the purchaser was, in fact, out of the country and was buying the product for resale into third world countries);

- The subsequent acquisition by MCSi of the company that had purchased the product;

- The ultimate sale of the inventory to a United Arab Emirates concern; and

- The "bill and hold" nature of the transaction.

Geraghty, 1-152-154.

The government asked Mr. Geraghty if those indicia of the transaction had allowed the transaction to be concealed from the Company's auditors, PricewaterhouseCoopers.  Tellingly, Mr. Geraghty was careful not to agree:

> Q. Was Price Waterhouse Coopers, based on your understanding of the facts related to this transaction, were they fooled?  What's your reaction of what they played?
>
> A. Well, I never had any direct discussion with PricewaterhouseCoopers with regard to their particular comment on – on that transaction, but apparently they approved that transaction in some form or fashion and had some comfort level to it.

Geraghty, 1-154.

In fact, on cross examination, Mr. Geraghty acknowledged that the entire transaction, including each of the elements he identified as the reasons why this was a sophisticated means, was laid out to, understood and approved by the Company's outside independent auditor, PricewaterhouseCoopers.  Geraghty, 2-38, 2-57.

With respect to "sophisticated means" as described in the Sentencing Guidelines, it is very clear that Mr. Peppel and the MCSi operation involved in the Mercatum transaction did not move to a different jurisdiction to escape detection and did not operate from overseas to escape detection.  So, the question is whether those elements of the Mercatum transaction which Mr. Geraghty identified qualify, under the principle of *ejusdem generis*, as similar in nature to moving jurisdictions or operating from out of the country.  The answer is they clearly did not. All of that involves engaging in activity out of the ordinary in order to escape detection.  Doing the Mercatum transaction in three invoices as opposed to one certainly was not out of the ordinary and did nothing to escape detection.  One can keep walking down Mr. Geraghty's list. The most telling point here is that every one of those elements that Mr. Geraghty identified as indicating the use of sophisticated means was known by and approved by the Company's Board

-37-

and its outside auditors. Akhbari, 1-76-77; Geraghty, 2-38, 60-61. That is the opposite of concealment. That is doing what is supposed to be done.

The sophisticated means enhancement requires "especially complex or especially intricate offense conduct." U.S.S.G. §2B1.1(b)(8), Application Note 6(B). The Guidelines state that "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" will satisfy this definition. Mr. Geraghty's testimony does not satisfy this standard.

His testimony reveals no evidence of Mr. Peppel using fictitious entities, corporate shells, or offshore financial accounts. Moreover, the government has presented no evidence that Mr. Peppel hid the Mercatum transaction from PricewaterhouseCoopers. Instead, as discussed above, Mr. Geraghty admitted that the entire Mercatum transaction was explained to PricewaterhouseCoopers. Every one of the elements of the Mercatum transaction that Mr. Geraghty identified as indicating the use of sophisticated means was known by and approved by PricewaterhouseCoopers, as well as by MCSi's Board of Directors. In sum, the testimony of Mr. Geraghty – who provided the government's only testimony regarding "sophisticated means" – comes nowhere near the definition of "sophisticated means" in the Guidelines.

For these same reasons, the probation officer's conclusion that the "sophisticated means" enhancement applies is flawed. Contrary to the probation officer's conclusion, the Mercatum transaction was not in any way hidden from Pricewaterhouse Coopers. Again, Mr. Geraghty confirmed this in his testimony to the Court. Further, the probation officer does not even attempt to contend that Mr. Peppel used "fictitious entities, corporate shells, or offshore financial accounts." While the probation officer initially stated in the Presentence Investigative Report that Mr. Peppel used "fictitious entities to fraudulently recognized MCSi's corporate revenue,"

¶155, the Addendum to the Presentence Investigative Report implicitly retracted that assertion and made no mention of any use by Mr. Peppel of a fictitious entity.

Because the government has not presented evidence that Mr. Peppel hid "assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts" or otherwise used "especially complex or especially intricate offense conduct," U.S.S.G. §2B1.1(b)(8), Application Note 6(B), the government has failed to satisfy its burden of proof that the "sophisticated means" enhancement applies.

## CONCLUSION

Because the government has failed to demonstrate that there was any loss here occasioned by the offense, that as a consequence there were no victims from the offense, and that there was no use of sophisticated means as that term is used in Sentencing Guideline § 2B1.1(b)(8).  The sentencing enhancements that the government seeks should be disallowed.

Respectfully submitted,

/s/ *Ralph W. Kohnen*
Ralph W. Kohnen (0034418)
Jeanne M. Cors (0070660)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
(513) 381-2838
(513) 381-0205 (facsimile)
kohnen@taftlaw.com
cors@taftlaw.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and accurate copy of the foregoing Motion for Extension was served electronically upon counsel of record via the Court's CM/ECF system, this _____ day of July, 2011.

/s/ *Ralph W. Kohnen*_____
Ralph W. Kohnen

12273092.1

## Stock Ownership
### January 15, 2003 thru February 14, 2003

| | Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|---|
| 1 | Allen | CA | 08/02/2001 | None |
| 2 | Arnold, | CA | 12/04/1999 | None |
| 3 | Atkins, | GA | 03/15/1999 | None |
| 4 | Axer, | OH | 09/14/2000 | 01/08/2004 |
| 5 | Bachelor, | OH | 04/15/1998 | 02/18/2004 |
| 6 | Bailey, | OH | 07/19/2000 | None |
| 7 | Baker, | OH | 07/30/1997 | None |
| 8 | Barrett, | OH | 04/08/1999 | None |
| 9 | Barry, | England | 06/28/2002 | None |
| 10 | Batley, | AL | 10/15/2002 | None |
| 11 | Bauman, | OH | 07/30/2001 | None |
| 12 | Bear Stearns Securities Corp | NY | 10/02/1998 | None |
| 13 | Beepha, | OH | 07/19/2000 | None |
| 14 | Bellar, | OH | 11/08/2000 | None |
| 15 | Berry, | OH | 07/19/2000 | None |
| 16 | Blankenship, | OH | 05/12/1997 | None |
| 17 | Blankenship, | OH | 05/12/1997 | None |
| 18 | Bochenek, | IL | 05/19/1999 | None |
| 19 | Bochenek, | IL | 05/19/1999 | None |
| 20 | Bradley, | VA | 08/19/2002 | None |
| 21 | Breg, | GA | 02/14/2001 | None |
| 22 | Briddell, | OH | 01/08/1998 | None |
| 23 | Brown, | OH | 07/19/2000 | None |
| 24 | Busch, | OH | 07/05/2001 | None |
| 25 | Caldwell, | NC | 03/20/2001 | None |
| 26 | Canada Inc | Canada | 02/16/2000 | None |
| 27 | Carpenter, | OH | 07/19/2000 | None |
| 28 | Cartlidge, | SC | 03/15/1999 | None |
| 29 | Chad, | MO | 01/16/2003 | None |
| 30 | Clark, | WA | 06/15/1998 | 04/14/2003 |
| 31 | Cloud, | OH | 11/21/1996 | None |
| 32 | Cloud, | OH | 11/21/1996 | None |
| 33 | Cloud, | OH | 11/21/1996 | None |
| 34 | Cole, | OH | 07/19/2000 | None |
| 35 | Corcoran, | MN | 04/05/2000 | None |
| 36 | Crosby, | NV | 12/06/2001 | None |
| 37 | Crosby, | NV | 12/06/2001 | None |
| 38 | Culp, | OH | 05/16/2000 | None |
| 39 | Culp, | OH | 05/16/2000 | None |
| 40 | Curtis, | TN | 03/15/1999 | None |
| 41 | Curts, | CA | 08/16/2002 | None |
| 42 | Dasco, | MA | 11/29/2000 | None |
| 3 | Day, | OH | 12/09/1999 | None |
| 44 | Dean Witter Reynolds Inc | NY | 04/20/1998 | 03/26/2003 |
| 45 | Del Rosario, | GA | 09/21/2000 | None |

42 shareholders with certificate issue dates, from exhibit 39(b), after 2/26/2002 – highlighted in yellow.

Page 1

GOVERNMENT EXHIBIT 39c.

## Stock Ownership
### January 15, 2003 thru February 14, 2003

| Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|
| 46 Dempsey, ███ | Canada | 09/28/2000 | None |
| 47 Dexter, ███ | GA | 03/15/1999 | None |
| 48 Dhadphale, ███ | CA | 12/13/2001 | None |
| 49 Dickey, ███ | OH | 10/23/2000 | None |
| 50 Dickey, ████ | OH | 10/23/2000 | None |
| 51 Diener, ████ | OH | 06/14/1999 | None |
| 52 Donoho, █████ | OH | 07/19/2000 | None |
| 53 Dotson, ████ | CA | 12/04/1998 | None |
| 54 Dreyer, ████ | OH | 02/04/1999 | 08/26/2004 |
| 55 Edwards, ████ | GA | 10/16/2000 | None |
| 56 Engelsman, ████ | CT | 08/05/1998 | None |
| 57 Engelsman, ████ | CT | 08/05/1998 | None |
| 58 Faulconer, █████ | OH | 03/06/2001 | None |
| 59 Feaver, ██████ | CA | 12/13/2001 | None |
| 60 Fenberg, █████ | OH | 12/11/1997 | None |
| 61 Fenberg, ████ | OH | 12/11/1997 | None |
| 62 Fernandes, ███ | England | 06/28/2002 | None |
| 63 Fitzgerald, ███ | OH | 07/19/2000 | None |
| 64 Fitzgerald, ███ | OH | 07/19/2000 | None |
| 65 Foliano, ████ | OH | 08/13/1998 | None |
| 66 Foliano, ████ | OH | 08/13/1998 | None |
| 67 Fort Pitt Fund III | PA | 09/04/1998 | None |
| 68 Fulop, ███ | OH | 07/29/2000 | None |
| 69 Garcia, ███ | OH | 07/29/2000 | None |
| 70 Giles, █████ | OH | 11/20/1996 | 12/15/2004 |
| 71 Giles, ████ | OH | 11/20/1996 | 12/15/2004 |
| 72 Gordon, █████ | OH | 04/27/2000 | None |
| 73 Gorsuch, █████ | OH | 07/19/2000 | None |
| 74 Graf, ████ | WI | 01/07/2000 | None |
| 75 Graslie, █████ | CA | 11/27/2001 | None |
| 76 Guerra, █████ | CA | 12/04/1998 | None |
| 77 Guzik, █████ | IL | 02/12/2003 | None |
| 78 Hanson, ██████ | OH | 07/19/2000 | None |
| 79 Hart, ████ | WA | 04/18/2002 | 09/30/2004 |
| 80 Hart, ███ | OH | 08/06/1998 | None |
| 81 Hart, ████ | OH | 08/06/1998 | None |
| 82 Heide, ███ | OH | 07/19/2000 | None |
| 83 Hemmelgano, ██████ | OH | 03/15/1999 | None |
| 84 Henry, █████ | OH | 01/03/2001 | 12/05/2003 |
| 85 Henry, █████ | OH | 01/03/2001 | 12/05/2003 |
| 86 Herlitz, ██ | CA | 04/01/2002 | None |
| 87 Herrick, ██████ | DC | 09/30/1997 | None |
| 88 Higdon, █████ | OH | 07/19/2000 | None |
| 89 Hill, ████ | OH | 12/11/1996 | None |
| 90 Hill, ████ | OH | 12/11/1996 | None |

**Stock Ownership**

**January 15, 2003 thru February 14, 2003**

| Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|
| 91 Holmerg, ▮ | OH | 07/29/2000 | None |
| 2 Holt, ▮ | NY | 03/12/1997 | 07/09/2003 |
| 93 Holt, ▮ ▮ | GA | 11/19/1996 | None |
| 94 Huffman, ▮ | OH | 11/15/1996 | None |
| 95 Huggins, ▮ | OH | 07/19/2000 | None |
| 96 Humac Company | TX | 04/13/1999 | None |
| 97 Hunt, ▮ | WA | 03/24/1999 | None |
| 98 Jackson, ▮ | OH | 01/20/2000 | None |
| 99 Jaffoni & Collins Inc. | NY | 05/17/2000 | None |
| 100 Janney, ▮ | MD | 02/04/1999 | None |
| 101 Janney, ▮ | MD | 02/04/1999 | None |
| 102 Jeffries, ▮ | NC | 04/28/2000 | None |
| 103 JJB Hilliard WL Lyons Inc | KY | 11/07/2001 | 03/30/2004 |
| 104 Joseph, ▮ | OH | 07/19/2000 | None |
| 105 Kappel, ▮ | IL | 02/07/2003 | None |
| 106 Kavannagh, ▮ | NJ | 10/05/2001 | None |
| 107 Keller, ▮ | OH | 07/21/2000 | None |
| 108 Keller, ▮ | OH | 07/21/2000 | None |
| 109 Kelly, ▮ | OH | 03/07/2001 | None |
| 110 Kelly, ▮ | OH | 03/07/2001 | None |
| 111 Kelly, ▮ | IL | 10/14/1998 | None |
| 112 Kenney, ▮ | OH | 08/20/1997 | None |
| 3 Kenney, ▮ | OH | 08/20/1997 | None |
| 114 Kennis, ▮ | OH | 07/19/2000 | None |
| 115 Kilmarx, ▮ | TN | 03/05/2002 | None |
| 116 Koloski, ▮ | OH | 03/16/1999 | None |
| 117 Kopacz, ▮ | IL | 08/21/1998 | None |
| 118 Kopacz, ▮ | IL | 08/21/1998 | None |
| 119 Kraft, ▮ | OH | 11/29/1999 | None |
| 120 Kraft, ▮ | OH | 11/29/1999 | None |
| 121 Kraft, ▮ | OH | 11/29/1999 | None |
| 122 Kronauge, ▮ | OH | 08/06/1997 | None |
| 123 Kronauge, ▮ | OH | 08/06/1997 | None |
| 124 Kronenberger, ▮ | OH | 09/10/2002 | None |
| 125 Krug, ▮ | OH | 08/20/2002 | None |
| 126 Lambiase, ▮ | OH | 07/29/2000 | None |
| 127 Lambright, ▮ | OH | 10/13/2000 | None |
| 128 Larkin, ▮ | GA | 06/15/2001 | None |
| 129 Laucria, ▮ | OH | 09/07/2000 | None |
| 130 Lavoie, ▮ | CT | 11/29/2000 | None |
| 131 Lees, ▮ | England | 06/28/2002 | None |
| 132 Lemming, ▮ | OH | 03/06/1998 | None |
| 3 Lentz, ▮ | TN | 09/11/1998 | None |
| 34 Lerette, ▮ | NC | 10/16/2000 | None |
| 135 Liberati, ▮ | PA | 09/30/1997 | 12/10/2003 |

Stock Ownership
January 15, 2003 thru February 14, 2003

| Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|
| 136 Logel, ■ | OH | 08/02/2000 | None |
| 37 Lois, ■ | OH | 07/19/2000 | None |
| 138 Long, ■ | MD | 12/17/1998 | None |
| 139 Loya, ■ | CA | 12/04/1998 | None |
| 140 Lucas, ■ | OH | 02/03/2003 | None |
| 141 Luquis, ■ | OH | 07/19/2000 | None |
| 142 Lynch, ■ | MO | 02/05/2003 | None |
| 143 Mack, ■ | PA | 10/28/1998 | None |
| 144 Mallory, ■ | OH | 07/19/2000 | None |
| 145 Martin, ■ | MO | 09/24/2002 | None |
| 146 Maseth, ■ | OH | 07/19/2000 | None |
| 147 Matre, ■ | OH | 11/10/1997 | None |
| 148 Matthews ■ | GA | 08/16/1999 | None |
| 149 Matthews, ■ | OH | 10/05/2000 | None |
| 150 McCain, ■ | OH | 07/29/2000 | None |
| 151 McCoy, ■ | Ga | 12/21/2000 | None |
| 152 McGrath, ■ | IL | 08/14/2001 | None |
| 153 McGraw, ■ | CA | 01/06/2000 | 02/10/2003 |
| 154 McMorrine, ■ | OH | 12/09/1999 | None |
| 155 McMorrine, ■ | OH | 12/09/1999 | None |
| 156 Melms, ■ | IL | 01/07/2000 | None |
| 57 Merkle, ■ | OH | 03/12/2002 | None |
| 58 Middleton, ■ | GA | 11/06/2000 | None |
| 159 Miller, ■ | OH | 10/02/2001 | None |
| 160 Miller, ■ | OH | 07/10/2001 | None |
| 161 Minton, ■ | OH | 08/25/1998 | None |
| 162 Minton, ■ | OH | 08/25/1998 | None |
| 163 Morgan Keegan & Co. Inc | TN | 11/09/2001 | None |
| 164 Munson, ■ | OH | 07/19/2000 | None |
| 165 Murphy, ■ | CA | 10/13/2000 | None |
| 166 Murphy, ■ | CA | 10/13/2000 | None |
| 167 Muth, ■ | OH | 03/21/2001 | None |
| 168 Newhouse, ■ | OH | 01/29/1999 | None |
| 169 Nussbaum, ■ | Canada | 12/01/1998 | None |
| 170 O'Brien, ■ | AL | 10/14/1999 | None |
| 171 O'Brien, ■ | AL | 12/09/1999 | None |
| 172 O'Neil, ■ | MI | 11/13/2000 | None |
| 173 Osowski, ■ | OK | 10/01/2002 | None |
| 174 Ostmo, ■ | OK | 02/12/2003 | None |
| 175 Paradine, ■ | OH | 07/19/2000 | None |
| 176 Park, ■ | GA | 08/16/2000 | None |
| 177 Parrish, ■ | OH | 07/19/2000 | None |
| 78 Parrish, ■ | OH | 07/19/2000 | None |
| 79 Peck, ■ | OH | 10/31/1997 | None |
| 180 Peck, ■ | OH | 02/07/2003 | None |

## Stock Ownership
### January 15, 2003 thru February 14, 2003

| Client Account | | State/Country | Issue Date | Cancel Date |
|---|---|---|---|---|
| 181 | Peil, | WI | 01/07/2000 | None |
| J2 | Peil, | WI | 01/07/2000 | None |
| 183 | Pellegrino, | OH | 07/19/2000 | None |
| 184 | Pena, | CA | 08/16/2000 | None |
| 185 | Pequignot, | OH | 11/16/1998 | None |
| 186 | Perry, | TN | 07/24/2002 | None |
| 187 | Piotrowski, | OH | 12/24/1997 | None |
| 188 | Porter, | OH | 07/19/2000 | None |
| 189 | Porter, | OH | 07/19/2000 | None |
| 190 | Post, | CO | 03/24/1999 | None |
| 191 | Powers, | IL | 06/14/1999 | None |
| 192 | Radcliffe, | PA | 03/24/1998 | None |
| 193 | Radcliffe, | PA | 09/30/1997 | None |
| 194 | Radcliffe, | PA | 01/12/1999 | None |
| 195 | Radcliffe, | PA | 01/12/1998 | None |
| 196 | Rautzen, | OH | 12/04/1997 | None |
| 197 | Reg & Tran Co for Holders of Zengine | NJ | 11/21/2001 | None |
| 198 | Richards, | OH | 03/02/1998 | 01/03/2005 |
| 199 | Richards, | OH | 03/02/1998 | 01/03/2005 |
| 200 | Richardson, | WA | 06/15/1998 | None |
| 201 | Riddle, | GA | 09/11/2000 | None |
| ^02 | Ridenour, | OH | 07/19/2000 | None |
| J3 | Ritter, | TN | 07/21/1999 | None |
| 204 | Rizzo, | OH | 07/19/2000 | None |
| 205 | Roberts, | IL | 07/06/2000 | None |
| 206 | Roberts, | IL | 07/06/2000 | None |
| 207 | Rollison | GA | 02/15/2001 | None |
| 208 | Rosa, | OH | 07/19/2000 | None |
| 209 | Ruchman, | IL | 03/05/1998 | None |
| 210 | Ruecker, | WI | 01/07/2000 | None |
| 211 | Rypstra, | CA | 12/04/1998 | None |
| 212 | Savarino, | CA | 12/13/2001 | None |
| 213 | Scates, | OH | 07/19/2000 | None |
| 214 | Schierling, | OH | 11/25/1996 | None |
| 215 | Schierling, | OH | 11/25/1996 | None |
| 216 | Schnibbe, | OH | 07/19/2000 | None |
| 217 | Schoen, | OH | 03/06/1998 | None |
| 218 | Schwartz, | OH | 11/15/1996 | None |
| 219 | Schwarz, | OH | 04/04/2000 | None |
| 220 | Scott, | OH | 03/17/1997 | None |
| 221 | Scott, | FL | 05/18/2000 | None |
| 222 | Scruggs, | OK | 10/01/2002 | None |
| `3 | Scurti, | CO | 06/27/2000 | None |
| ∠24 | Seales, | OH | 07/19/2000 | None |
| 225 | Serena, | OH | 08/12/1998 | None |

## Stock Ownership
### January 15, 2003 thru February 14, 2003

| Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|
| 226 Serena, ███ | OH | 08/12/1998 | None |
| .7 Sillery, ███ | OH | 03/27/1998 | 12/27/2004 |
| 228 Sillery, ███ | OH | 03/27/1998 | 12/27/2004 |
| 229 Simmons, ███ | GA | 07/02/2001 | None |
| 230 Singleton, ███ | GA | 03/16/1999 | None |
| 231 Smith, ███ | England | 06/28/2002 | None |
| 232 Smith, ███ | CT | 11/29/2000 | None |
| 233 Smith, ███ | TN | 03/15/1999 | None |
| 234 Smith, ███ | CT | 11/29/2000 | None |
| 235 Snyder, ███ | GA | 03/23/2001 | None |
| 236 Soukenik, ███ | VA | 09/30/1997 | None |
| 237 Spadafora, ███ | PA | 09/03/1998 | None |
| 238 Spartz, ███ | WI | 01/07/2000 | None |
| 239 Spray, ███ | OH | 07/19/2000 | None |
| 240 Sprenger, ███ | NC | 11/27/2002 | None |
| 241 Sprenger, ███ | NC | 11/27/2002 | None |
| 242 Stefanski, ███ | IL | 01/07/2000 | None |
| 243 Steiden, ███ | KY | 02/04/2002 | None |
| 244 Steiden, ███ | KY | 02/04/2002 | None |
| 245 Stevenson, ███ | OH | 11/21/2000 | None |
| 246 Sullivan Jr., ███ | OH | 08/18/1999 | None |
| ^47 Taylor, ███ | TX | 07/06/1999 | None |
| ₅8 Tedder, ███ | OH | 07/19/2000 | None |
| 249 Teeters, ███ | AL | 03/24/1999 | None |
| 250 Tenzel, ███ | TN | 10/18/1999 | None |
| 251 Thomas-McClure, ███ | CA | 11/23/2001 | None |
| 252 Thompson, ███ | GA | 06/20/2000 | None |
| 253 Tracy, ███ | MO | 10/09/2002 | None |
| 254 Tregea, ███ | CA | 02/12/2002 | None |
| 255 Trott, ███ | WA | 03/16/1999 | None |
| 256 Turner, ███ | OH | 07/19/2000 | None |
| 257 Turvy, ███ | OH | 07/05/2000 | None |
| 258 UpChurch, ███ | TN | 08/16/2000 | None |
| 259 Vail, ███ | OH | 04/29/1998 | None |
| 260 Velazquez, ███ | OH | 07/19/2000 | None |
| 261 Vergauwen, ███ | IL | 01/07/2000 | None |
| 262 Walker, ███ | OH | 06/30/1997 | None |
| 263 Warrick, ███ | OH | 01/27/1997 | None |
| 264 Werner, ███ | NY | 12/06/2001 | None |
| 265 Westminster Invest. LTD Partnership | PA | 09/30/1997 | None |
| 266 Wheater, ███ | NY | 03/15/1999 | None |
| 267 White, ███ | England | 06/28/2002 | None |
| 8 White, ███ | United Arab Emirates | 06/28/2002 | 01/23/2003 |
| ₂69 Whitfield, ███ | CO | 11/19/2002 | None |
| 270 Whittaker, ███ | CA | 11/20/2002 | None |

## Stock Ownership
### January 15, 2003 thru February 14, 2003

| Client Account | State/Country | Issue Date | Cancel Date |
|---|---|---|---|
| 271 Wilhelm, ■■■ | OH | 10/01/2001 | None |
| 2 Wilkes, ■ | CA | 11/23/2001 | None |
| 273 Williams, ■■■ | OH | 11/25/1996 | None |
| 274 Wilson, ■■ | IN | 06/22/2000 | 01/03/2005 |
| 275 Wilson, ■■■ | IN | 06/22/2000 | 01/03/2005 |
| 276 Wilson, ■■ | OH | 11/17/1997 | None |
| 277 Winstel, ■■■ | WV | 03/05/2002 | None |
| 278 Wolf, ■■■ | NY | 11/23/2001 | None |
| 279 Woodard, ■■■ | OH | 12/15/2000 | None |
| 280 Yetsko, ■ | OH | 03/15/1999 | None |
| 281 Yoches, ■■■ | CA | 11/23/2001 | None |
| 282 Yuhas, ■■■ | OH | 11/22/1996 | None |
| 283 Yuhas, ■■ | OH | 11/22/1996 | None |
| 284 Zimmer, ■■■ | OH | 10/20/1998 | None |

9 appear to be business entities

**MCSi shareholders who purchased stock after February 26, 2002 and prior to MCSi bankruptcy, June 3, 2003; information from Government exhibits 39(b) and 39c.**

| Exh. 39c shareholder number | Exh. 39(b) page | Last name | City | State | Number of shares | Issue Date | Cancel Date |
|---|---|---|---|---|---|---|---|
| 9 | 4 | Barry | West Yorkshire | England | 13,401 | 6/28/02 | |
| 9 | 4 | Barry | West Yorkshire | England | 13,401 | 8/15/02 | |
| **10** | 4 | Batley | Spanish Fort | AL | 22 | 10/15/02 | |
| 20 | 7 | Bradley | Roanoke | VA | 73 | 8/19/02 | |
| 29 | 33 | Chad | Eagle Rock | MO | 93 | 1/16/03 | |
| 41 | 37 | Curtis | Carmichael | CA | 449 | 6/16/02 | |
| 42 | 37 | Dasco | Monson | MA | **161** | 3/21/02 | |
| 62 | 42 | Fernandes | West Yorkshire | England | 6,701 | 6/28/02 | |
| 62 | 42 | Fernandes | West Yorkshire | England | 6,701 | 6/28/02 | |
| 77 | 46 | Guzik | Rolling Meadows | IL | 75 | 2/12/03 | |
| 79 | 47 | Hart | Everett | WA | 30 | 4/18/02 | 9/30/04 |
| 86 | 48 | Herhtz | Albany | CA | 668 | 4/1/02 | |
| 105 | 53 | Kappel | Plainsfield | IL | 395 | 2/7/03 | |
| 115 | 55 | Kilmarx | Madison | TN | 137 | 3/5/02 | |
| 124 | 58 | Kronberger | Dayton | OH | 134 | 9/10/02 | |
| 125 | 58 | Krug | Dayton | **OH** | **100** | 8/20/02 | |
| 130 | 60 | Lavoie | Kensington | CT | 7,500 | 5/13/02 | |
| 131 | 60 | Lees | West Yorkshire | England | 3,046 | 6/28/02 | |
| 131 | 60 | Lees | West Yorkshire | England | 3,046 | 6/28/02 | |
| 140 | 62 | Lucas Trust | Dayton | OH | 1,500 | 2/3/03 | |
| 142 | 63 | Lynch | Branson | MO | 71 | 2/5/03 | |
| 145 | 64 | Martin | Branson | MO | 549 | 9/24/02 | |
| 145 | 64 | Martin | Branson | MO | 75 | 2/3/03 | |
| 157 | 69 | hledde | Dayton | OH | 475 | 3/12/02 | |
| 163 | 71 | Morgan Keegan & Co. Inc | Memphis | TN | 1,920 | 6/12/02 | |
| 173 | 75 | Osowski | Chelsea | OK | 35 | 10/1/02 | |
| 174 | 75 | Ostmo | Tulsa | OK | 159 | 2/12/03 | |
| 180 | 78 | Peck | Cincinnati | OH | 1,207 | 2/7/03 | 3/5/03 |
| 184 | 79 | Pena | Livermore | CA | 200 | 8/16/02 | |
| 186 | 80 | Perry | Memphis | TN | 284 | 7/24/02 | |
| 197 | 84 | Reg & Tran/Holders of Zengine | Cranford | NJ | 593 | 4/5/02 | |
| 222 | 91 | Scruggs | Chelsea | OK | 35 | 10/1/02 | |
| 231 | 94 | Smith | North Yorkshire | England | 3,046 | 6/28/02 | |
| 231 | 94 | Smith | North Yorkshire | England | 3,046 | 6/28/02 | |
| 232 | 94 | Smith | Coventry | CT | 1,688 | 5/13/02 | |
| 233 | 94 | Smith | Antioch | TN | 422 | 10/20/02 | |
| 234 | 94 | Smith | Coventry | CT | 1,722 | 5/13/02 | |
| 240, 241 | 97 | Sprenger | Charlotte | NC | 2 | 11/27/02 | |
| 253 | 100 | Tracy | Eagle Rock | MO | 54 | 10/9/02 | |
| 267 | 105 | White | North Yorkshire | England | 83,451 | 6/28/02 | |
| 267 | 105 | White | North Yorkshire | England | 83,451 | 6/28/02 | |
| 268 | 105 | White | Abu Dhabi | UAE | 10,355 | 6/28/02 | 1/23/03 |
| 268 | 105 | White | Abu Dhabi | UAE | 10,355 | 6/28/02 | 1/23/03 |
| 269 | 105 | Whitfield | Denver | CO | 764 | 11/19/02 | |
| 270 | 106 | Whittaker | Danville | CA | 152 | 11/20/02 | |
| 272 | 107 | Wilkes | San Francisco | CA | 1,113 | 5/2/02 | |
| 277 | 108 | VVi nstel | Wheeling | WV | 428 | 3/5/02 | |
| 281 | 109 | Yoches | Costa Mesa | CA | 286 | 11/7/02 | |

**42 separate** shareholders — 263,571 shares

PENGAD-Bayonne, N. J.

**DEFENDANT'S
EXHIBIT**

**MCSi shareholders who purchased stock before February 26, 2002 and held their stock January 15, 2003 thru February 14, 2003; Information from Government exhibits 39b and 39c**

| Exh. 39c shareholder number | Exh. 39(b) page | Last name | City | State | Certificate Number | Number of Shares | Issue Date | Cancel Date |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | Allen | Long Beach | CA | 7171 | 73 | 8/2/2001 | |
| 2 | 2 | Arnold | Mountain View | CA | 5102 | 100 | 12/4/1998 | |
| 2 | 2 | Arnold | Mountain View | CA | 5150 | 300 | 1/29/1999 | |
| 3 | 2 | Atkins | Duluth | GA | 5179 | 5 | 3/15/1999 | |
| 4 | 2 | Axer Trust | Beavercreek | OH | 7033 | 300 | 9/14/2000 | 1/8/2004 |
| 5 | 3 | Bachelor | Dayton | OH | 249 | 50 | 4/29/1998 | 2/18/2004 |
| 5 | 3 | Bachelor | Dayton | OH | 241 | 100 | 4/15/1998 | 2/18/2004 |
| 6 | 3 | Bailey | Dayton | OH | 5502 | 75 | 7/19/2000 | |
| 7 | 3 | Baker | Kettering | OH | 306 | 50 | 4/24/1998 | |
| 7 | 3 | Baker | Kettering | OH | 70 | 100 | 7/30/1997 | |
| 8 | 3 | Barrett | Dayton | OH | 5212 | 100 | 4/8/1999 | |
| 11 | 4 | Bauman | Dayton | OH | 7148 | 100 | 5/9/2001 | |
| 12 | 5 | Bear Sterns | Brooklyn | NY | 5216 | 67,052 | 5/7/1999 | |
| 13 | 5 | Beephan | Dayton | OH | 5504 | 25 | 7/19/2000 | |
| 14 | 5 | Bellar | Dayton | OH | 7071 | 100 | 11/8/2000 | |
| 15 | 6 | Berry | Dayton | OH | 5505 | 25 | 7/19/2000 | |
| 16, 17 | 6 | Blankenship | West Carrollton | OH | 308 | 50 | 4/24/1998 | |
| 16, 17 | 6 | Blankenship | West Carrollton | OH | 51 | 100 | 5/12/1997 | |
| 18, 19 | 6 | Bochenek | Park Ridge | IL | 5217 | 100 | 5/19/1999 | |
| 21 | 7 | Breg | Hoschton | GA | 7118 | 492 | 2/14/2001 | |
| 22 | 7 | Briddell | New Carlisle | OH | 310 | 15 | 4/24/1998 | |
| 22 | 7 | Briddell | New Carlisle | OH | 151 | 30 | 1/8/1998 | |
| 23 | 8 | Brown | Dayton | OH | 5507 | 25 | 7/19/2000 | |
| 24 | 8 | Busch | North Olmstead | OH | 7162 | 51 | 7/5/2001 | |
| 25 | 8 | Caldwell | Durham | NC | 7134 | 3 | 3/20/2001 | |
| 26 | 9 | 3702642 Canada Inc. | St. Laurent | Quebec | 7231 | 451 | 11/26/2001 | |
| 27 | 9 | Carpenter | Dayton | OH | 5508 | 25 | 7/19/2000 | |
| 28 | 9 | Cartlidge | Anderson | SC | 5185 | 27 | 3/15/1999 | |
| 30 | 34 | Clark | Maple Valley | WA | 5424 | 14,363 | 4/5/2000 | |
| 30 | 34 | Clark | Maple Valley | WA | 282 | 66,068 | 6/15/1998 | 4/14/2003 |
| 31, 32 | 34 | Cloud | Dayton | OH | 24 | 20 | 11/21/1996 | |
| 31, 32 | 34 | Cloud | Dayton | OH | 311 | 10 | 4/24/1998 | |
| 31, 33 | 35 | Cloud | Dayton | OH | 23 | 20 | 11/21/1996 | |
| 31, 33 | 35 | Cloud | Dayton | OH | 312 | 10 | 11/21/1996 | |
| 34 | 35 | Cole | Dayton | OH | 5509 | 75 | 7/19/2000 | |
| 35 | 35 | Corcoran | Stillwater | MN | 5422 | 30 | 4/5/2000 | |
| 36, 37 | 35 | Crosby Trust | Las Vegas | NV | 7246 | 45 | 12/6/2001 | |
| 38 | 36 | Culp | Dayton | OH | 5462 | 1,898 | 5/16/2000 | |
| 39 | 36 | Culp | Dayton | OH | 7111 | 3,178 | 1/31/2001 | |
| 40 | 36 | Curtis | Memphis | TN | 5176 | 1 | 3/15/1999 | |
| 43 | 37 | Day | Centerville | OH | 5318 | 10 | 12/9/1999 | |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5265 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5266 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5267 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5268 | 10,000 | 9/22/1999 | 3/16/2004 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5269 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5270 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5271 | 10,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5272 | 897 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5273 | 1,000 | 9/22/1999 | 3/16/2004 |
| 44 | 106 | Dean Witter Reynolds Inc. | New York | NY | 5274 | 1,000 | 9/22/1999 | 3/16/2004 |
| 45 | 37 | Del Rosario | Morrow | GA | 7040 | 5 | 9/21/2000 | |
| 46 | 38 | Dempsey | Brooklin | Ontario | 7013 | 41 | 8/29/2000 | |
| 47 | 38 | Dexter | Ball Ground | GA | 5181 | 6 | 3/15/1999 | |
| 48 | 38 | Dhadphale | San Leandro | CA | 7267 | 77,735 | 12/18/2001 | |
| 49, 50 | 38 | Dickey | London | OH | 7059 | 35 | 10/23/2000 | |
| 51 | 39 | Diener | Dayton | OH | 5238 | 8 | 6/14/1999 | |
| 52 | 39 | Donoho | Dayton | OH | 5511 | 25 | 7/19/2000 | |
| 53 | 39 | Dotson | Livermore | CA | 5105 | 150 | 12/4/1998 | |
| 54 | 40 | Dreyer | Kettering | OH | 5157 | 50 | 2/4/1999 | 8/26/2004 |
| 55 | 41 | Edwards | Douglasville | GA | 7057 | 8 | 10/16/2000 | |
| 56, 57 | 41 | Engelsman | Xenia | OH | 5019 | 100 | 8/5/1998 | |
| 58 | 41 | Faulconor Trust | Kettering | OH | 7126 | 500 | 3/6/2001 | |
| 59 | 42 | Feaver | San Francisco | CA | 7263 | 77,736 | 12/18/2001 | |
| 60, 61 | 42 | Fenberg | Dayton | OH | 318 | 50 | 4/24/1998 | |
| 60, 61 | 42 | Fenberg | Dayton | OH | 7214 | 1 | 11/23/2001 | |
| 60, 61 | 42 | Fenberg | Dayton | OH | 129 | 100 | 12/11/1997 | |
| 63 | 43 | Fitzgerald | Dayton | OH | 5515 | 25 | 7/19/2000 | |
| 64 | 43 | Fitzgerald | Dayton | OH | 7027 | 25 | 9/7/2000 | |
| 64 | 43 | Fitzgerald | Dayton | OH | 5514 | 75 | 7/19/2000 | |
| 65, 66 | 43 | Foliano | Fairborn | OH | 5132 | 100 | 1/19/1999 | |
| 65, 66 | 43 | Foliano | Fairborn | OH | 5031 | 100 | 8/13/1998 | |
| 67 | 43 | Pitt Fund III | Uniontown | PA | 5043 | 3,000 | 9/4/1998 | |
| 67 | 43 | Pitt Fund III | Uniontown | PA | 5044 | 5,000 | 9/4/1998 | |
| 67 | 43 | Pitt Fund III | Uniontown | PA | 5045 | 42,000 | 9/4/1998 | |
| 68 | 44 | Fulop | Dayton | OH | 5516 | 50 | 7/19/2000 | |
| 69 | 44 | Garcia | Dayton | OH | 5517 | 25 | 7/19/2000 | |
| 70, 71 | 44 | Giles | West Carrollton | OH | 322 | 100 | 4/24/1998 | 12/15/2004 |
| 70, 71 | 44 | Giles | West Carrollton | OH | 21 | 200 | 11/20/1996 | 12/15/2004 |
| 72 | 45 | Gordon | Englewood | OH | 5452 | 1,000 | 4/27/2000 | |
| 73 | 45 | Gorsuch | Dayton | OH | 5518 | 25 | 7/19/2000 | |
| 74 | 45 | Graf | North Prairie | WI | 5350 | 431 | 1/7/2000 | |
| 75 | 45 | Graslie | San Jose | CA | 7239 | 17 | 11/27/2001 | |
| 75 | 45 | Graslie | San Jose | CA | 7240 | 75 | 11/27/2001 | |
| 76 | 46 | Guerra | Redwood City | CA | 5148 | 750 | 1/29/1999 | |
| 76 | 46 | Guerra | Redwood City | CA | 5149 | 1,500 | 1/29/1999 | |
| 76 | 46 | Guerra | Redwood City | CA | 5106 | 750 | 12/4/1998 | |
| 78 | 47 | Hanson | Dayton | OH | 7026 | 25 | 9/7/2000 | |
| 78 | 47 | Hanson | Dayton | OH | 5519 | 75 | 7/19/2000 | |
| 80, 81 | 47 | Hart Trust | Dayton | OH | 5404 | 40 | 3/21/2000 | |
| 82 | 47 | Heide | Dayton | OH | 5520 | 25 | 7/19/2000 | |
| 83 | 48 | Hemmelgano | Dayton | OH | 5178 | 3 | 3/15/1999 | |
| 84, 85 | 48 | Henry | Centerville | OH | 7104 | 500 | 1/3/2001 | 12/5/2003 |
| 87 | 48 | Herrick | Washington | DC | 223 | 4,628 | 3/25/1998 | |
| 87 | 48 | Herrick | Washington | DC | 328 | 6,949 | 4/24/1998 | |
| 87 | 48 | Herrick | Washington | DC | 92 | 9,270 | 9/30/1997 | |
| 88 | 49 | Higdon | Dayton | OH | 5521 | 50 | 7/19/2000 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 89, 90 | 49 | Hill | Huber Heights | OH | 7241 | 1 | 11/28/2001 | |
| 91 | 49 | Holmberg | Dayton | OH | 5522 | 25 | 7/19/2000 | |
| 92 | 49 | Holt | Freeport | NY | 46 | 100 | 3/12/1997 | 7/9/2003 |
| 92 | 49 | Holt | Freeport | NY | 334 | 50 | 4/24/1998 | 7/9/2003 |
| 93 | 50 | Holt | Lenox | GA | 19 | 40 | 11/19/1996 | |
| 93 | 50 | Holt | Lenox | GA | 122 | 10 | 11/10/1997 | |
| 93 | 50 | Holt | Lenox | GA | 335 | 25 | 4/24/1998 | |
| 94 | 50 | Huffman | Dayton | OH | 60 | 15,000 | 7/8/1997 | |
| 94 | 50 | Huffman | Dayton | OH | 61 | 5,000 | 7/8/1997 | |
| 94 | 50 | Huffman | Dayton | OH | 337 | 10,000 | 4/24/1998 | |
| 95 | 50 | Huggins | Dayton | OH | 5523 | 25 | 7/19/2000 | |
| 96 | 51 | Humac Company | Dallas | TX | 276 | 5 | 5/21/1998 | |
| 96 | 51 | Humac Company | Dallas | TX | 239 | 10 | 4/13/1998 | |
| 97 | 51 | Hunt | Seattle | WA | 5201 | 12 | 3/24/1999 | |
| 98 | 51 | Jackson | Kettering | OH | 5369 | 2 | 1/20/2000 | |
| 99 | 52 | Jaffoni & Collins Inc. | New York | NY | 5460 | 1 | 5/17/2000 | |
| 100, 101 | 52 | Janney | Germantown | MD | 5160 | 20 | 2/4/1999 | |
| 102 | 52 | Jeffries | Moncure | NC | 5455 | 5 | 4/28/2000 | |
| 104 | 53 | Joseph | Dayton | OH | 5524 | 25 | 7/19/2000 | |
| 106 | 54 | Kavanagh | Bayville | NJ | 7044 | 15 | 10/5/2000 | |
| 107, 108 | 54 | Keller | Beavercreek | OH | 7002 | 100 | 7/21/2000 | |
| 109, 110 | 54 | Kelly | Beavercreek | OH | 7127 | 100 | 3/7/2001 | |
| 111 | 54 | Kelly | Paols Heights | IL | 5074 | 1,071 | 10/14/1998 | |
| 112, 113 | 55 | Kenney | Centerville | OH | 339 | 200 | 4/24/1998 | |
| 112, 113 | 55 | Kenney | Centerville | OH | 213 | 180 | 3/16/1998 | |
| 112, 113 | 55 | Kenney | Centerville | OH | 79 | 400 | 8/20/1997 | |
| 114 | 55 | Kennis | Dayton | OH | 5525 | 25 | 7/19/2000 | |
| 116 | 56 | Koloski | Dayton | OH | 5191 | 8 | 3/16/1999 | |
| 117, 118 | 56 | Kopacz | Elgin | IL | 5035 | 25 | 8/21/1998 | |
| 119 | 56 | Kraft | Dayton | OH | 7079 | 17 | 11/27/2000 | |
| 119 | 56 | Kraft | Dayton | OH | 5302 | 23 | 11/29/1999 | |
| 120 | 56 | Kraft | Dayton | OH | 7078 | 17 | 11/27/2000 | |
| 120 | 57 | Kraft | Dayton | OH | 5301 | 10 | 11/29/1999 | |
| 121 | 57 | Kraft | Dayton | OH | 5303 | 30 | 11/29/1999 | |
| 122, 123 | 58 | Kronauge | Dayton | OH | 5497 | 150 | 7/10/2000 | |
| 122, 123 | 58 | Kronauge | Dayton | OH | 7258 | 1 | 12/14/2001 | |
| 126 | 59 | Lambiase | Dayton | OH | 5526 | 25 | 7/19/2000 | |
| 127 | 59 | Lambright | Centerville | OH | 7055 | 20 | 10/13/2000 | |
| 128 | 59 | Larkin | Clarkston | GA | 7158 | 13 | 6/15/2001 | |
| 129 | 59 | Laurica | Dayton | OH | 7028 | 25 | 9/7/2000 | |
| 132 | 60 | Lemming | Dayton | OH | 346 | 50 | 4/24/1998 | |
| 132 | 60 | Lemming | Dayton | OH | 202 | 100 | 3/6/1998 | |
| 133 | 61 | Lentz | Nashville | TN | 7115 | 521 | 1/31/2001 | |
| 134 | 61 | Lerette | Durham | NC | 7056 | 3 | 10/16/2000 | |
| 135 | 61 | Liberati | Sewickley | PA | 5479 | 50,000 | 6/21/2000 | 12/10/2003 |
| 135 | 61 | Liberati | Sewickley | PA | 5482 | 27,368 | 6/21/2000 | 12/10/2003 |
| 135 | 61 | Liberati | Sewickley | PA | 5553 | 29,133 | 7/26/2000 | 12/10/2003 |
| 135 | 61 | Liberati | Sewickley | PA | 5554 | 25,000 | 7/26/2000 | 12/10/2003 |
| 135 | 61 | Liberati | Sewickley | PA | 5555 | 25,000 | 7/26/2000 | 12/10/2003 |
| 136 | 61 | Logel | Dayton | OH | 7067 | 75 | 11/2/2000 | |
| 137 | 62 | Lois | Dayton | OH | 5527 | 25 | 7/19/2000 | |
| 139 | 62 | Loya | Redwood City | CA | 5107 | 50 | 12/4/1998 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 141 | 63 | Luquis | Dayton | OH | 5528 | 25 | 7/19/2000 | |
| 143 | 63 | Mack Profit-Sharing Plan | Pittsburgh | PA | 5087 | 1,000 | 10/28/1998 | |
| 144 | 63 | Mallory | Dayton | OH | 5529 | 100 | 7/19/2000 | |
| 146 | 64 | Maseth | Dayton | OH | 5530 | 50 | 7/19/2000 | |
| 147 | 64 | Matre Trust | Kettering | OH | 349 | 50 | 4/24/1998 | |
| 147 | 64 | Matre Trust | Kettering | OH | 123 | 100 | 11/10/1997 | |
| 148 | 65 | Matthews | Duluth | GA | 7102 | 31,883 | 12/28/2000 | |
| 148 | 65 | Matthews | Duluth | GA | 7121 | 26,450 | 2/15/2001 | |
| 149 | 66 | Matthews | Dayton | OH | 7046 | 1,000 | 10/5/2000 | |
| 150 | 66 | McCain | Dayton | OH | 5531 | 25 | 7/19/2000 | |
| 151 | 67 | McCoy | Lawrenceville | GA | 7095 | 1 | 12/21/2000 | |
| 152 | 67 | McGrath | Crystal Lake | IL | 7178 | 22 | 8/14/2001 | |
| 153 | 67 | McGraw | Alameda | CA | 5344 | 600 | 1/6/2000 | 2/10/2003 |
| 153 | 67 | McGraw | Alameda | CA | 7230 | 4 | 11/26/2001 | 2/10/2003 |
| 154, 155 | 68 | McMorrine | Jamestown | NC | 5319 | 45 | 12/9/1999 | |
| 156 | 68 | Melms | Arlington Heights | IL | 5349 | 513 | 1/7/2000 | |
| 158 | 69 | Middleton | Atlanta | GA | 7070 | 21 | 11/6/2000 | |
| 159 | 69 | Miller | Sandusky | OH | 7192 | 57 | 10/2/2001 | |
| 160 | 69 | Miller | Dayton | OH | 7163 | 150 | 7/10/2001 | |
| 161, 162 | 70 | Minton | Xenia | OH | 5038 | 300 | 8/25/1998 | |
| 164 | 72 | Munson | Dayton | OH | 5532 | 25 | 7/19/2000 | |
| 165, 166 | 72 | Murphy | Sacramento | CA | 7054 | 515 | 10/13/2000 | |
| 167 | 73 | Muth | Dayton | OH | 7136 | 450 | 3/21/2001 | |
| 168 | 73 | Newhouse | Dayton | OH | 5151 | 200 | 1/29/1999 | |
| 169 | 74 | Nussbaum | Saint-Laurent | Quebec | 5100 | 1 | 12/1/1998 | |
| 170 | 74 | O'Brien | Huntsville | AL | 5280 | 9 | 10/14/1999 | |
| 171 | 74 | O'Brien | Huntsville | AL | 5320 | 8 | 12/9/1999 | |
| 172 | 74 | O'Neil | Clarklake | MI | 7074 | 100 | 11/13/2000 | |
| 175 | 75 | Paradine | Dayton | OH | 5533 | 25 | 7/19/2000 | |
| 176 | 76 | Park | Oxford | GA | 7009 | 4 | 8/16/2000 | |
| 177 | 76 | Parrish | Dayton | OH | 5535 | 75 | 7/19/2000 | |
| 177 | 76 | Parrish | Dayton | OH | 7025 | 25 | 9/7/2000 | |
| 178 | 76 | Parrish | Dayton | OH | 5536 | 75 | 7/19/2000 | |
| 179 | 77 | Peck | Cincinnati | OH | 120 | 5,000 | 10/31/1997 | |
| 181 | 78 | Peil | Brookfield | WI | 5347 | 1,240 | 1/7/2000 | |
| 182 | 78 | Peil | Waukesha | WI | 5353 | 172 | 1/7/2000 | |
| 183 | 78 | Pellegrino | Dayton | OH | 5537 | 25 | 7/19/2000 | |
| 185 | 80 | Pequignot | Columbus | OH | 5092 | 64 | 11/16/1998 | |
| 187 | 80 | Piotrowski | Riverside | OH | 361 | 100 | 4/24/1998 | |
| 187 | 80 | Piotrowski | Riverside | OH | 131 | 200 | 12/24/1997 | |
| 188 | 81 | Porter | Dayton | OH | 5538 | 100 | 7/19/2000 | |
| 188 | 81 | Porter | Dayton | OH | 7022 | 25 | 9/7/2000 | |
| 189 | 81 | Porter | Dayton | OH | 5539 | 25 | 7/19/2000 | |
| 190 | 81 | Post | Denver | CO | 5205 | 88 | 3/24/1999 | |
| 191 | 81 | Powers | Glenview | IL | 5237 | 200 | 6/14/1999 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 219 | 50,920 | 3/25/1998 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5442 | 10,000 | 4/17/2000 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5442 | 10,000 | 4/17/2000 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5444 | 10,000 | 4/17/2000 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5445 | 10,000 | 4/17/2000 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5446 | 10,000 | 4/17/2000 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 5449 | 1,133 | 4/17/2000 | |

| 192, 193 | 82 | Radcliffe | Uniontown | PA | 7187 | 5,000 | 9/25/2001 | |
| 192, 193 | 82 | Radcliffe | Uniontown | PA | 7188 | 5,000 | 9/25/2001 | |
| 193 | 83 | Radcliffe | Uniontown | PA | 157 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 159 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 160 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 161 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 162 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 163 | 10,000 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 164 | 7,477 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 165 | 1,500 | 1/12/1998 | |
| 193 | 82 | Radcliffe | Uniontown | PA | 366 | 750 | 4/24/1998 | |
| 194 | 83 | Radcliffe | Uniontown | PA | 166 | 1,500 | 1/12/1998 | |
| 195 | 83 | Radcliffe | Uniontown | PA | 167 | 1,500 | 1/12/1998 | |
| 195 | 83 | Radcliffe | Uniontown | PA | 368 | 750 | 4/24/1998 | |
| 196 | 84 | Rautzen | Dayton | OH | 275 | 50 | 5/20/1997 | |
| 196 | 84 | Rautzen | Dayton | OH | 369 | 250 | 4/24/1998 | |
| 196 | 84 | Rautzen | Dayton | OH | 274 | 200 | 5/20/1998 | |
| 196 | 84 | Rautzen | Dayton | OH | 126 | 500 | 12/4/1997 | |
| 198, 199 | 85 | Richards | Tipp City | OH | 5026 | 100 | 8/10/1998 | 1/3/2005 |
| 198, 199 | 85 | Richards | Tipp City | OH | 371 | 50 | 4/24/1998 | 1/3/2005 |
| 198, 199 | 85 | Richards | Tipp City | OH | 191 | 100 | 3/2/1998 | 1/3/2005 |
| 200 | 85 | Richardson | Issaquah | WA | 7109 | 11,490 | 1/12/2001 | 5/6/2003 |
| 200 | 85 | Richardson | Issaquah | WA | 7249 | 17,236 | 1/4/2002 | |
| 201 | 86 | Riddle | Lawrenceville | GA | 7029 | 5 | 9/11/2000 | |
| 202 | 86 | Ridenour | Dayton | OH | 5540 | 50 | 7/19/2000 | |
| 203 | 86 | Ritter | Nashville | TN | 37211 | 20 | 7/21/1999 | |
| 204 | 86 | Rizzo | Dayton | OH | 5541 | 25 | 7/19/2000 | |
| 205 | 87 | Roberts | Naperville | IL | 7205 | 11,228 | 11/13/2001 | |
| 206 | 87 | Roberts | Lincolnshire | IL | 7197 | 9,917 | 11/6/2001 | |
| 207 | 87 | Rollson | Lawrenceville | GA | 7129 | 1 | 3/9/2001 | |
| 207 | 87 | Rollson | Lawrenceville | GA | 7119 | 34 | 2/15/2001 | |
| 208 | 88 | Rosa | Dayton | OH | 7024 | 25 | 9/7/2000 | |
| 208 | 88 | Rosa | Dayton | OH | 5543 | 100 | 7/19/2000 | |
| 209 | 88 | Ruchman | Northbrook | IL | 372 | 50 | 4/24/1998 | |
| 209 | 88 | Ruchman | Northbrook | IL | 198 | 100 | 3/5/1998 | |
| 210 | 88 | Ruecker | Hartford | WI | 5357 | 719 | 1/7/2000 | |
| 211 | 88 | Rypstra | San Jose | CA | 5110 | 875 | 12/4/1998 | |
| 212 | 89 | Savarino | Berkeley | CA | 7265 | 77,735 | 12/18/2001 | |
| 213 | 89 | Scates | Dayton | OH | 5544 | 25 | 7/19/2000 | |
| 214, 215 | 89 | Schierling | Bellbrook | OH | 376 | 100 | 4/24/1998 | |
| 214, 215 | 89 | Schierling | Bellbrook | OH | 27 | 200 | 11/25/1996 | |
| 216 | 90 | Schnibbe | Dayton | OH | 7023 | 25 | 9/7/2000 | |
| 216 | 90 | Schnibbe | Dayton | OH | 5545 | 75 | 7/19/2000 | |
| 217 | 90 | Schoen | Dayton | OH | 337 | 50 | 4/24/1998 | |
| 217 | 90 | Schoen | Dayton | OH | 203 | 100 | 3/6/1998 | |
| 218 | 91 | Schwartz | Dayton | OH | 5329 | 1,000 | 12/21/1999 | |
| 219 | 90 | Schwartz Trust | Kettering | OH | 5405 | 5,000 | 4/4/2000 | |
| 219 | 90 | Schwartz Trust | Kettering | OH | 5406 | 5,000 | 4/5/2000 | |
| 219 | 90 | Schwartz Trust | Kettering | OH | 5407 | 5,000 | 4/6/2000 | |
| 220 | 91 | Scott | Troy | OH | 47 | 25 | 3/18/1997 | |
| 220 | 91 | Scott | Troy | OH | 382 | 12 | 4/24/1998 | |
| 221 | 91 | Scott | Tampa | FL | 5461 | 29 | 5/18/2000 | |

| 223 | 92 | Scurti | Colorado Springs | CO | 5484 | 28 | 6/27/2000 | |
| 224 | 92 | Seales | Dayton | OH | 5546 | 25 | 7/19/2000 | |
| 225, 226 | 92 | Serena | Dayton | OH | 5028 | 100 | 8/12/1998 | |
| 227, 228 | 93 | Sillery Trust | Kettering | OH | 234 | 100 | 3/27/1998 | |
| 227, 228 | 93 | Sillery Trust | Kettering | OH | 384 | 50 | 4/24/1998 | |
| 229 | 93 | Simmons | Smyrna | GA | 7160 | 12 | 7/2/2001 | |
| 230 | 93 | Singleton | Alpharetta | GA | 5197 | 4 | 3/16/1999 | |
| 233 | 94 | Smith | Antioch | TN | 5180 | 5 | 3/15/1999 | |
| 235 | 95 | Snyder | Dunwoody | GA | 7139 | 2 | 3/23/2001 | |
| 236 | 96 | Soukenik | Arlington | VA | 96 | 4,640 | 9/30/1997 | |
| 236 | 96 | Soukenik | Arlington | VA | 227 | 2,317 | 3/25/1998 | |
| 236 | 96 | Soukenik | Arlington | VA | 388 | 3,478 | 4/24/1998 | |
| 236 | 96 | Soukenik | Arlington | VA | 5230 | 3,601 | 6/4/1999 | |
| 236 | 96 | Soukenik | Arlington | VA | 7219 | 105 | 11/23/2001 | |
| 237 | 96 | Spadafora | Indiana | PA | 5042 | 1,000 | 9/3/1998 | |
| 237 | 96 | Spadafora | Indiana | PA | 5080 | 500 | 10/23/1998 | |
| 237 | 96 | Spadafora | Indiana | PA | 5081 | 500 | 10/23/1998 | |
| 237 | 96 | Spadafora | Indiana | PA | 5172 | 1,000 | 2/19/1999 | |
| 238 | 97 | Spartz | Menomonee Falls | WI | 5351 | 250 | 1/7/2000 | |
| 238 | 97 | Spartz | Menomonee Falls | WI | 7257 | 2 | 12/14/2001 | |
| 239 | 97 | Spray | Dayton | OH | 5547 | 25 | 7/19/2000 | |
| 242 | 98 | Stefanski | Glen Ellyn | IL | 5352 | 624 | 1/7/2000 | |
| 243, 244 | 98 | Steiden | Louisville | KY | 7292 | 67 | 2/4/2002 | |
| 245 | 98 | Stevenson | Dayton | OH | 7077 | 40 | 11/21/2000 | |
| 246 | 99 | Sullivan | Beavercreek | OH | 5276 | 225 | 8/18/1999 | |
| 247 | 99 | Taylor | Houston | TX | 5244 | 10 | 7/6/1999 | |
| 248 | 99 | Tedder | Dayton | OH | 5549 | 25 | 7/19/2000 | |
| 249 | 99 | Teeters | San Bruno | CA | 5247 | 5 | 7/12/1999 | |
| 249 | 99 | Teeters | San Bruno | CA | 5204 | 55 | 3/24/1999 | |
| 250 | 100 | Tenzel | Nashville | TN | 5281 | 49 | 10/18/1999 | |
| 251 | 100 | Thompson | San Diego | CA | 7226 | 45 | 11/23/2001 | |
| 252 | 100 | Thompson | Alpharetta | GA | 5475 | 3 | 6/20/2000 | |
| 254 | 101 | Tregea | Alameda | CA | 7295 | 54 | 2/12/2002 | |
| 255 | 101 | Trott | Seattle | WA | 5192 | 15 | 3/16/1999 | |
| 256 | 101 | Turner | Dayton | OH | 5550 | 50 | 7/19/2000 | |
| 257 | 102 | Turvy | Cincinnati | OH | 5489 | 276 | 7/5/2000 | |
| 258 | 102 | UpChurch | Smyrna | TN | 7010 | 7 | 8/16/2000 | |
| 259 | 102 | Vail | Dayton | OH | 248 | 50 | 4/29/1998 | |
| 260 | 102 | Velazquez | Dayton | OH | 5552 | 25 | 7/19/2000 | |
| 261 | 103 | Vergauwen | Downers Grocer | IL | 7228 | 264 | 11/23/2001 | |
| 261 | 103 | Vergauwen | Downers Grocer | IL | 5345 | 35,142 | 1/7/2000 | |
| 262 | 103 | Walker | Dayton | OH | 395 | 15 | 4/24/1998 | |
| 262 | 103 | Walker | Dayton | OH | 56 | 30 | 6/30/1997 | |
| 263 | 103 | Warrick | Cleveland | OH | 397 | 100 | 4/24/1998 | |
| 263 | 103 | Warrick | Cleveland | OH | 38 | 200 | 1/27/1997 | |
| 264 | 104 | Werner | New York | NY | 7247 | 100 | 12/6/2001 | |
| 265 | 104 | Westminster Investments LTD | Pittsburgh | PA | 106 | 20,000 | 9/30/1997 | 3/19/2004 |
| 265 | 104 | Westminster Investments LTD | Pittsburgh | PA | 107 | 20,000 | 10/1/1997 | 3/20/2004 |
| 265 | 104 | Westminster Investments LTD | Pittsburgh | PA | 108 | 20,000 | 10/2/1997 | 3/21/2004 |
| 265 | 104 | Westminster Investments LTD | Pittsburgh | PA | 5467 | 10,000 | 6/5/2000 | 3/19/2004 |
| 265 | 104 | Westminster Investments LTD | Pittsburgh | PA | 5473 | 55,000 | 6/14/2000 | |
| 266 | 104 | Wheater | Rochester | NY | 5183 | 12 | 3/15/1999 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 271 | 107 | Wilhelm Trust | Dayton | OH | 7191 | 250 | 10/1/2001 | |
| 271 | 107 | Wilhelm Trust | Dayton | OH | 7216 | 2 | 11/23/2001 | |
| 272 | 107 | Wilkes | San Francisco | CA | 7222 | 955 | 11/23/2001 | |
| 273 | 107 | Williams | Dayton | OH | 28 | 10 | 11/25/1996 | |
| 273 | 107 | Williams | Dayton | OH | 403 | 5 | 4/24/1998 | |
| 274, 275 | 107 | Wilson | Crown Point | IN | 5478 | 100 | 6/22/2000 | 1/3/2005 |
| 274, 275 | 107 | Wilson | Crown Point | IN | 7217 | 45 | 11/23/2001 | 1/3/2005 |
| 276 | 108 | Wilson | Kettering | OH | 253 | 10 | 5/5/1998 | |
| 276 | 108 | Wilson | Kettering | OH | 404 | 30 | 4/24/1998 | |
| 276 | 108 | Wilson | Kettering | OH | 124 | 60 | 11/17/1997 | |
| 278 | 108 | Wolf | New York | NY | 7285 | 1 | 1/14/2002 | |
| 279 | 109 | Woodward | Springboro | OH | 7093 | 60 | 12/15/2000 | |
| 280 | 109 | Yetsko | Kettering | OH | 5177 | 3 | 3/15/1999 | |
| 281 | 109 | Yoches | Costa Mesa | CA | 7225 | 812 | 11/23/2001 | |
| 282, 283 | 110 | Yuhas | Struthers | OH | 25 | 100 | 11/22/1996 | |
| 284 | 110 | Zimmer | Union | OH | 5458 | 150 | 5/11/2000 | |
| | | | | | | **1,239,051 shares** | | |

Not included are the following shareholders listed in Exhibit 39c, whose shares were either purchased and sold prior to February 26, 2002 or purchased after MCSi's bankruptcy on June 3, 2003:

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 103 | 53 | JJB Hilliard WL Lyons Inc. | Louisville | KY | 7196 | 25,000 | 11/7/2001 | 11/14/2001 |
| 103 | 53 | JJB Hilliard WL Lyons Inc. | Louisville | KY | 7211 | 10,000 | 11/21/2001 | 11/30/2001 |
| 138 | 62 | Long | Baltimore | MD | 7425 | 475 | 7/17/2003 | |