**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| United States of America, | : | Case No. 3:06-CR-196 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| Michael E. Peppel, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

The Court held an evidentiary hearing in this case on June 21 and 23, 2011 with respect to the disputed issues concerning the advisory Sentencing Guidelines.  Those disputed issues include the amount of loss, the number of victims, and the sophisticated means enhancement.  The parties have submitted post-hearing briefs (Docs. 204 and 205).  This Order presents the Court's findings and conclusions on these issues, and resolves all outstanding objections to the pre-sentence report's Guidelines calculations.

1.  <u>Amount of Loss</u>.

As noted in the Court's order granting the evidentiary hearing (Doc. 193), the pre-sentence report recommends that loss be calculated based upon the difference in the market price for MCSi stock on the trading day before and immediately after the announcement of the SEC investigation into MCSi (February 14 and

18, 2003).[1]  The share price declined by $0.87, or approximately 40% of its February 14 market value.  The probation officer believes that this per-share loss best isolates the market effect of the offense conduct, and adequately excludes other factors in accordance with the Supreme Court's decision in <u>Dura Pharmaceuticals, Inc. v. Broudo</u>, 544 U.S. 336 (2005).  That per-share loss, times the number of publicly-held shares (some 21 million), results in the pre-sentence report's calculation of actual loss of approximately $18 million.  (See PSR ¶¶ 132-135)

The Government objected to this calculation, and claimed that the loss calculated by the SEC's expert, John Hlavacek, in his 2006 report is the actual loss in this case.  Mr. Hlavacek calculated the MCSi shareholder loss to be approximately $298 million.  This was based on the average weekly market price of MCSi stock from May 14, 2001 to November 14, 2002 ($13.59), less the closing price on February 18, 2003 ($1.25), times the total shares held by non-insiders (24,158,776).

At the evidentiary hearing, the Government presented the testimony of Dr. Marlena Akhbari, a Professor of Finance at Wright State University.  Dr. Akhbari conducted an "event study" to attempt to isolate the effect of Peppel's fraud with respect

---

[1] February 14, 2003 was a Friday, and the announcement of the SEC investigation was made after the markets closed.  Monday, February 17 was a legal holiday, so the next public trading day was February 18, 2003.

-2-

to the Mercatum transaction on MCSi's share price.  Dr. Akhbari generally opined that public disclosure of four separate pieces of adverse information about MCSi from January 15 to February 14, 2003, caused a decline in value of $2.91 per share.  The Government also presented testimony from Joseph Geraghty, who opined that Peppel's fraud with respect to the Mercatum transaction caused an actual loss to MCSi's secured lenders of approximately $88 million.

Peppel did not present an independent calculation of market loss.  He has argued that shareholder loss simply cannot be reasonably calculated, and that at best, the Court should utilize his gain from the sale of MCSi stock in December 2001 during the public offering.  (Peppel sold 300,000 MCSi shares, grossing $6,862,500.)

In its post-hearing brief, the Government argues that the conservative estimate contained in the pre-sentence report, as well as that offered by Dr. Akhbari, comply with the principles announced in Dura as they may apply to criminal sentencing.  It also argues that Peppel caused an intended loss conservatively estimated to be $18 million, as he concealed the truth about MCSi's financial prospects in order to inflate the market price of the stock, which he needed to do in order to successfully complete a public offering in late 2001, and maintain shareholder confidence in the company.

-3-

Peppel's post-hearing brief rejects all of the Government's proposed loss calculations.  He argues that market-based shareholder loss due solely to his admitted Mercatum fraud cannot be determined, because there is no reasonable method by which to isolate that loss as opposed to losses caused by market price fluctuations and reductions caused by a variety of other factors. He contends that he cannot be held responsible for loss stemming from other MCSi misrepresentations or omissions with respect to other transactions perpetrated by Ira Stanley, such as Skytron, FedEx, and others alleged in the superceding indictment.  And he argues that MCSi's lenders did not suffer any cognizable loss caused by the fraud, and that Geraghty's testimony to the contrary should be rejected.  Because actual loss cannot be reasonably estimated, Peppel argues that at best, the Court should use the net amount he gained from his sale of MCSi stock in December 2001.

Application Note 2(C) to Guidelines Section 2B1.1 states that the Court "need only make a **reasonable estimate** of the loss."  The estimate shall be based on the information available to the Court, including factors such as "the approximate number of victims multiplied by the average loss to each victim."  The background notes to this section also state:

> The Commission has determined that,
> ordinarily, the sentences of defendants
> convicted of federal offenses should reflect
> the nature and magnitude of the loss caused

-4-

> or intended by their crimes. Accordingly,
> along with other relevant factors under the
> guidelines, loss serves as a measure of the
> seriousness of the offense and the
> defendant's relative culpability and is a
> principal factor in determining the offense
> level under this guideline.

MCSi was a publicly-traded corporation and listed on the NASDAQ exchange during the time covered by the indictment in this case. When the fraudulent conduct involves a publicly-traded corporation, the Guidelines clearly contemplate that an appropriate measure of loss is that incurred by innocent shareholders.

The Supreme Court recently addressed the evidentiary standards that apply to proof of loss causation in a civil securities action. In Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), the court rejected the Ninth Circuit's conclusion that a plaintiff's allegation that he purchased stock at an inflated price is sufficient, in itself, to establish loss causation. The Court stated that "[g]iven the tangle of factors affecting price, the most logic alone permits us to say is that the higher purchase price will sometimes play a role in bringing about a future loss." Id. at 343. The Court observed that permitting an inflated purchase price to satisfy loss causation requirements would essentially transform the securities statutes into a scheme of investor insurance.

Peppel urges this Court to adopt in toto the civil standards

-5-

of proof applicable to a securities plaintiff, including requiring the Government to proffer direct evidence tying Peppel's admitted conduct concerning Mercatum to any shareholder loss; and limiting any loss calculation to those shares that were purchased after the February 26, 2002 public announcement of MCSi's 2001 financial results, which for the first time incorporated the revenue misstatements with respect to Mercatum.

The Sixth Circuit has not directly addressed the issue of whether and to what extent the civil loss causation standards should apply to the task of estimating loss in a criminal securities fraud case under Guidelines Section 2B1.1. Peppel cites United States v. Jones, 641 F.3d 706 (6th Cir. 2011), which he contends mandates the application of a very similar standard, and requires proof of loss that is free of "logical defects." The defendant in Jones was a podiatrist who was indicted for healthcare fraud based on fraudulent Medicare billing. The Sixth Circuit rejected the amount of loss found by the district court because it was based upon the Government's factually and procedurally flawed statistical analysis of a sample of the defendant's bills. The statistician collected what purported to be a representative sample of bills from 264 patient files, but only 210 of those files were actually available and reviewed. There was no testimony that the 210 available files and related billings were in fact a representative sample of the universe of

-6-

defendant's Medicare bills, and the district court made no findings about the effect of the missing files nor whether any of the sample bills were actually fraudulent.  The district court did not explain how it arrived at the loss amount it used to calculate defendant's Guidelines range, and the exhibits relied on by the government concerning loss were not introduced at trial nor were they explained on the record at sentencing.  Based on all of these facts, the Court remanded for a calculation of the amount of loss actually caused by any fraudulent billing practices.

In this Court's view, the result in <u>Jones</u> simply reflects a basic and accepted principle that loss under Section 2B1.1 cannot be based on speculation or guesswork, but rather must be based on a preponderance of reliable evidence in the record that permits adequate appellate review.  <u>Jones</u> does not suggest that the Sixth Circuit would adopt wholesale the evidentiary standards applicable to civil securities fraud plaintiffs for purposes of calculating criminal securities loss under the Sentencing Guidelines.

Peppel also argues that in the absence of explicit Sixth Circuit authority, the Court should follow the Second and Fifth Circuit's decisions endorsing the application of <u>Dura</u> to criminal sentencing, citing <u>United States v. Rutkoske</u>, 506 F.3d 170 (2d Cir. 2007), and <u>United States v. Olis</u>, 429 F.3d 540 (5th Cir.

-7-

2005).  Rutkoske involved charges of securities fraud against a
broker who engaged in high-pressure sales tactics and fraudulent
nondisclosures concerning an internet gambling stock.  The
defendant appealed the district court's calculation of actual
loss to shareholders, which was based upon losses from purchases
and sales between January 1997 and July 29, 1999.  The closing
date was chosen because it was the last available market-maker
"blue sheet" information concerning the stock's price, and it was
dated some months after the conspiracy had ended.  The method
used by the district court to calculate total loss essentially
attributed the total decline in the stock's value over the entire
period to the defendant's fraud.

     The Second Circuit remanded the case for resentencing,
concluding that the district court had not excluded other factors
that could have affected the stock price during that period.  The
court agreed that Dura "... provides useful guidance. ... [W]e
see no reason why considerations relevant to loss causation in a
civil fraud case should not apply, at least as strongly, to a
sentencing regime in which the amount of loss caused by a fraud
is a critical determinant of the length of a defendant's
sentence."  However, the court also stated:

> Determining the extent to which a defendant's
> fraud, as distinguished from market or other
> forces, caused shareholders' losses
> inevitably cannot be an exact science. ...
> The Guidelines' allowance of a 'reasonable
> estimate' of loss remains pertinent.  And

cases might arise where share price drops so
quickly and so extensively immediately upon
disclosure of a fraud that the difference
between pre- and post-disclosure share prices
is a reasonable estimate of loss caused by
the fraud.  Even there, however, a
coincidentally precipitous decline in shares
of comparable companies would merit
consideration. ... Normally, expert opinion
and some consideration of the market in
general and relevant segments in particular
will enable a sentencing judge to approximate
the extent of loss caused by a defendant's
fraud.

Id. at 179-180 (citations omitted).

In United States v. Olis, 429 F.3d 540 (5th Cir. 2005), the

defendant was a tax lawyer and accountant at Dynegy Corporation.

He was convicted of wire and securities fraud based on a scheme

to disguise certain company loans as positive revenue generated

from company operations.  He also conspired with other company

employees to conceal the true nature of the transaction from the

company's outside auditor.  When the SEC required the company to

restate its revenue and properly account for the transaction, its

stock price dropped.  Defendant was sentenced before United

States v. Booker under the then-mandatory Guidelines.  The

district court calculated the loss caused by defendant to be

greater than $100 million, based solely upon actual losses

sustained by one large Dynegy shareholder, a state retirement

fund.  Defendant was sentenced to 292 months.

The Fifth Circuit remanded for resentencing, finding the

Booker argument had been preserved, and that the district court's

loss calculation was flawed.  The district court relied entirely on the trial testimony of the retirement fund's witness about the plan's purchase and sale of the Dynegy stock.  Evidence of other extrinsic causes of that loss were not explored or quantified, and the district court refused to consider the defendant's expert report presenting an economic analysis of stock price and market movements over the period of the fraud and after the restatement of earnings was disclosed.  In discussing an appropriate measure of loss, the Fifth Circuit noted that the civil securities loss causation standard of Dura provides "useful guidance" and "should be the backdrop for criminal responsibility both because it furnishes the standard of compensable injury for securities fraud victims and because it is attuned to stock market complexities." Id. at 546.[2]

Thus, while both Rutkoske and Olis emphasize Dura's

_____

[2] On remand, the Government presented an expert's event study of Dynegy's stock price during the time that the scheme was first disclosed and earnings restated, and the SEC's announcement of a formal investigation.  Given many factors cited in that report, including extreme share price volatility and the array of public announcements (both positive and negative) concerning Dynegy over that period of time, the district court ultimately found that actual loss could not be reasonably estimated.  The court instead used intended loss, Dynegy's federal tax savings intended by defendant as part of the scheme, of $79 million. This loss, along with elimination of the enhancement for more than 50 victims, resulted in an adjusted offense level of 34, and an advisory sentencing range of 151 to 188 months.  Twenty-four of the 34 levels represented the intended loss.  The district court ultimately sentenced the defendant to a variance sentence of 72 months.  United States v. Olis, 2006 U.S. Dist. LEXIS 68281 (S.D. TX, September 22, 2006).

requirement of careful analysis of the causal relationship
between defendant's conduct and any resulting loss, and the
exclusion of other factors that affect share price, neither case
adopts wholesale and in toto the standards of civil loss
causation set forth in Dura and in cases brought under Section
10b and Rule 10b-5.  See also, United States v. Nacchio, 573 F.3d
1062 (10th Cir. 2009), vacating the district court's net-profit
calculation of defendant's gain from insider trading (by selling
his option shares at a favorable price), and directing the court
to eliminate the gain caused by legitimate price appreciation
over the same period, as well as the underlying inherent value of
the stock.  The court noted that it is appropriate "... in some
situations to seek guidance from civil jurisprudence in
performing the criminal sentencing function," and approved the
use of a disgorgement formula generally used in civil insider
trading cases.  Id. at 1079.

However, the Ninth Circuit rejected the contention that
Dura's civil loss causation principles apply to determining
Guidelines loss, in United States v. Berger, 587 F.3d 1038 (9th
Cir. 2008).  The court found that the "primary policy rationale"
articulated in Dura, forbidding mere price inflation or
overvaluation at the time of purchase as a measure of loss, "does
not apply in a criminal sanctions context."  That is because the
criminal sentencing court must gauge loss caused by the fraud

that was sustained by society as a whole, not the loss sustained
by any individual plaintiff or plaintiffs:

> ... where the value of securities have [sic]
> been inflated by a defendant's fraud, the
> defendant may have caused aggregate loss to
> society in the amount of the fraud-induced
> overvaluation, even if various individual
> victims' respective losses cannot be
> precisely determined or linked to the fraud.
> As a result, the principle underlying the
> *Dura Pharmaceuticals* Court's reluctance to
> allow mere over-valuation as a basis for
> establishing loss is generally not present in
> the criminal sentencing context ... .

Id. at 1044.  The Ninth Circuit specifically rejected application
of Dura's requirement of evidence that the share price fell after
the fraud was revealed to the market, noting that the Guidelines
require only a reasonable estimate of loss based upon the
information and evidence available to the court.  However, the
court reversed the district court's determination of loss in that
case, which was based on an examination of the stock values of
other unrelated companies after accounting irregularities had
been publicly disclosed.  The court rejected that "counterfactual
approach," because it assumed that a loss existed and then
attempted to measure it by comparing other companies in other
years in different economic conditions.  Id. at 1046.

This Court finds that Berger is persuasive in distinguishing
between the basic requirements of proof needed to establish the
element of loss causation in a civil securities action, and the
task of arriving at a reasonable estimate of actual loss under

-12-

Guidelines Section 2B1.1.  The Court recognizes that the amount of loss is likely the single most important determinant in calculating the advisory Guidelines sentencing range in this case, as it is in most criminal securities cases when the defendant lacks any criminal history.  As the Sixth Circuit concluded in <u>Jones</u>, establishing the fact and the amount of loss cannot be based on speculation or mere guesswork.  When addressing this question in the context of a publicly traded company, the difficulties inherent in any analysis that assumes an efficient market and the vagaries of public markets in general render any method less than perfect.[3]  But the Court's job is not to arrive at a perfectly precise method; it is to craft a reasonable estimate based on all of the available information.  The Court finds that the evidence presented by the parties is sufficient to arrive at a reasonable estimate.

Mr. Hlavacek's conclusion as to actual loss needs no extended discussion.  The Government's own expert criticized Hlavacek's method, calling it "an unsophisticated analysis."  (Doc. 202, Akhbari Testimony, TR 90)  Dr. Akhbari stated that Hlavacek's analysis was not reliable because it did not adjust for larger market movements; it considered gross average weekly

---

[3] For a critique of the overarching importance given by the Guidelines to the estimation of market loss, and of various methods the courts have used to calculate that loss, see Kevin McCormack, <u>Untangling the Capricious Effects of Market Loss in Securities Fraud Sentencing</u>, 82 Tulane L. Rev. 1145 (Feb. 2008).

stock prices for MCSi over quite a long period of time; and it failed to omit Treasury stock from its calculations. The Court finds that Hlavacek's opinion that Peppel's fraud caused over $298 million in shareholder loss is not reasonable for all of these reasons. In particular, the Court concludes that using the average weekly share price from May 14, 2001 to November 14, 2002 and then comparing that price with the price on a single day would result in an overstatement of loss caused by the fraudulent scheme. Too many other factors having nothing to do with the fraud affected the price of MCSi over that long period of time, and using the weekly average does not, in the Court's opinion, adequately discount the effects of the myriad of those factors.

Dr. Akhbari's testimony and her opinions were more helpful, as she was more focused on the question of loss actually caused by the fraudulent conduct and attempting to exclude the effect of other variables. But the Court must also reject Dr. Akhbari's conclusion with respect to per-share loss in this case. She performed an event study, which she described as finding an historically uneventful period in a company's financial history to attempt to track the company's normal performance in comparison to a relevant general market. Then a critical event or events are located that caused a significant difference in the company's performance in comparison to that general market. She found that the S&P 600 information technology index provided the

-14-

best reference for an historical comparison, as prior to 2003 the company and that index generally tracked each other's performance.

She then identified an "event window" of January 15 to February 18, 2003.  On January 15, the SEC announced its investigation into ClearOne Communications, a company that Peppel was not affiliated with but with which MCSi did business.  The SEC's civil complaint against ClearOne alleged that ClearOne violated GAAP by overstating revenues, income and accounts receivable.  And it specifically alleged that Peppel agreed to accept a shipment of ClearOne products in September 2001, but that MCSi was not required to pay for those products until they were sold.  (Defendant Hearing Ex. L, SEC Complaint, ¶40)  The complaint does not allege that Peppel committed any fraud; the SEC alleged that ClearOne fraudulently recorded the MCSi transaction.  Nevertheless, Dr. Akhbari believed that this information was the investing public's first awareness (in her words, investors became "acutely aware") that MCSi might be dishonest in its own financial reporting.  (Doc. 202, TR 48)  Dr. Akhbari chose February 19, 2003 as the closing date for the event window, the second trading day following MCSi's announcement of the SEC investigation into the company.  She explained that she used the second trading day (and a multi-week event window) because MCSi is a relatively small company whose investors are

-15-

"more likely to be believers, investors that are more likely to hold on in certain situations." (<u>Id</u>. at 49)

Dr. Akhbari then compared MCSi's stock price movement over the period January through May 2003 with the S&P 600 index, and with two companies she identified as competitors in the field, Lexmark and Insight Resources. (Government Hearing Exs. 42 and 43) Generally, the index and those competitors' share prices were relatively flat over that period, while MCSi began a steady decline on January 15. The S&P 600 index lost just over ten percent of its market value between January 15 and February 19, 2003, while MCSi lost 78.76 percent. The difference between the two, 68.42%, is the market loss to MCSi stock that Dr. Akhbari attributed solely to Peppel's fraud regarding Mercatum. She later clarified that she could not determine if by February 19, public knowledge of fraudulent behavior at MCSi was specifically related to the Mercatum transaction. (<u>Id</u>. at 64)

The Court is concerned that a flat, percentage-change comparison between a broader market index such as the S&P 600 and MCSi may overstate the magnitude of the loss actually caused by the offense conduct. The composition of the S&P technology index is not known, but it very likely includes companies that were larger and more established than MCSi during the period of comparison. And Dr. Akhbari recognized that beginning in late 2001 and early 2002, MCSi was changing the focus of its business

-16-

from computers to video conferencing. Given that, her choice of
Lexmark as a reliable comparison competitor in 2002 and into 2003
is somewhat questionable. Dr. Akhbari also testified that during
2002, MCSi's performance generally tracked the technology index
(and those of the competitors she identified) and that the
company was "holding its own" during that time. While the graph
(Government Hearing Ex. 45) may depict a relatively flat
performance for MCSi in the last half of 2002, in fact from July
15, 2002 through December 31, 2002, the stock price actually
dropped from $10.27 to $4.75, a 54% loss. The company's value
was steadily dropping throughout the second half of 2002, prior
to the event window Dr. Akhbari chose. The Court is concerned
that simply using the loss that MCSi's stock price sustained
during Dr. Akhbari's event window would not properly account for
the likelihood that **any** negative news about the company would
amplify that downward price trend, regardless of Peppel's
involvement in the negative event.

Dr. Akhbari also reviewed the pre-sentence report's
calculation of loss, which she admitted used appropriate
valuation factors such as a tight event window timeline and some
consideration of broader market performance. She noted that the
overall market rose on the trading day used in the pre-sentence
report (from February 14 to February 18) while MCSi stock went
down. She believed that difference should also have been

-17-

incorporated into a per-share loss calculation. She described the pre-sentence report's approach to loss as the "most conservative estimate." (TR at 59)

The Government also presented testimony from Joseph Geraghty, who opined that Peppel's fraud caused a loss to MCSi's secured lenders of $88.5 million. Mr. Geraghty is a consultant and a "turnaround" specialist. His company, Conway MacKenzie & Dunleavy, was retained by MCSi in February 2003 after the company was recommended to MCSi by its consortium of lenders. Geraghty testified that the lenders had lost confidence in MCSi's management team, as MCSi was by that point in violation of certain covenants contained in the revolving credit agreement with the lenders. Peppel resigned from MCSi a few weeks after Geraghty was retained, and the Board asked Stanley to leave shortly thereafter. Geraghty served as MCSi's chief financial officer after Stanley's departure.

The original credit agreement and note between MCSi and the lenders was dated as of January 8, 1998, and there were approximately fifteen amendments to those documents from 1998 through late 2002. Geraghty presented a chart he prepared demonstrating that from the fourth quarter of 2001 through first quarter of 2003, the outstanding loan balance owed by MCSi grew from $37,427,000 to $129,400,000. Geraghty then reviewed MCSi's financial statements in order to recalculate the company's EBITDA

(earnings before insurance, taxes, depreciation and amortization). The revolving credit facility included a covenant requiring the outstanding loan balance not exceed a stated ratio to the company's consolidated EBITDA. (The credit agreement specifically defined "EBIT" and "EBITDA" at Section 1.1 of the original 1998 agreement, page 5; see Government Hearing Ex. 29.) Geraghty essentially opined that if the Mercatum transactions had been properly accounted for in MCSi's last quarter 2001 financial statements, the debt ratio covenant would have been breached and the lenders would have called the loans, thereby avoiding the loss the lenders eventually sustained when MCSi filed bankruptcy in June 2003.

The Court rejects this evidence of loss for several reasons. No representative from any of the banks provided testimony or evidence supporting the assertion that if the 2001 financial results had been calculated and disclosed as Geraghty asserted they should have been, the banks would have intervened or declared MCSi in breach of the credit agreement. The assertion is debatable in view of the fact that some of the amendments to the credit agreement include negotiated changes to the covenant governing the total debt to consolidated EBITDA ratio. (See Amendment 7, for example, dated as of February 4, 2000.) It is also highly debatable, as Geraghty assumes, that in early 2002, with financial markets still struggling with the fallout from

-19-

9/11 and the continuing effects of the "dot-com" implosion, the banks would have declared a breach or accelerated the note rather than seeking a forbearance agreement or some other accommodation with MCSi, as the banks did after Peppel and Stanley departed and Geraghty was in place as CFO.  (See Government Hearing Exhibit 20, MCSi Form 8-K filed April 4, 2003.)  And it is telling that when MCSi actually disclosed its 2001 results, a significant loss even with the Mercatum overstated revenue, MCSi's stock price dropped almost 40% (from $17.35 on February 25 to $10.40 on February 26, 2002).  But there is no evidence that the banks intervened or took any actions with respect to the security of their MCSi loans.  It is also not clear to the Court that Geraghty's recalculation of EBITDA is correct.  He admitted that any such calculation is based in large part on discretionary decisions on items that should or should not be included.  (Doc. 203, TR 143)  He included several non-cash charges taken by the company at year end 2001 that may not fall within the definition of "Consolidated EBIT" in the credit agreement.

Peppel was not charged with bank fraud.  Prior to the evidentiary hearing, there was no suggestion in this case that the banks sustained losses that should be considered for purposes of the Guidelines loss calculation under Section 2B1.1. Geraghty's opinion places full responsibility for all of MCSi's ultimate financial woes and the decision (made while Geraghty was

CFO) to place the company in bankruptcy, on Peppel's fraud with respect to Mercatum.  This ignores all of the other market factors that affected MCSi's financial stability and its ability to repay its debts, as well as the possibility that negligent or simply ill-advised management decisions by Peppel and others at the company contributed to the company's failure.  For all of these reasons, the Court finds that the bank losses have not been established by a preponderance of the reliable evidence to have been caused by the fraudulent conduct, and they should not be included in the loss calculation under the Guidelines.

The Court concludes, based on the available evidence and data, that the approach taken by the pre-sentence report is a reasonable estimate of the actual loss in this case.  Comparing the share price difference over the one-day trading window identified in the pre-sentence report adequately excludes from the loss calculation the tangle of market forces that Peppel contends affected MCSi's stock price.  He points out that the continuing effects of the "dot-com" bust and the 9/11 stock market drop, the changing economic climate facing technology companies in the years after 2000, the loss of MCSi's major customers like Global Crossing, and the shareholder lawsuits filed against the company in early 2003, all affected the stock price; MCSi stock had lost almost 85% of its 2001 IPO value by February 14, 2003, when the SEC investigation became public

-21-

knowledge.  But the approach utilized by the pre-sentence report eliminates as much as possible the price effects of all of these other factors.  MCSi's closing price on February 14, 2003 reflects all of that market information, as the efficient market theory assumes.  The closing price on the next trading day isolates the market's response to and the price effect of the SEC announcement.  The volume of shares traded on February 18 jumped precipitously (almost a ten-fold increase) from the prior day's volume, which the Court finds is further evidence of high investor concern about the announcement and its potential ramifications.

Peppel is correct that there is no evidence that the fraudulent conduct alleged in the superceding indictment, including the Mercatum transaction, was **specifically** revealed to the public before February 18, 2003.  He argues that civil securities fraud plaintiffs must generally establish that the alleged fraud was disclosed to the market and that the stock thereafter lost value.  In the absence of a specific disclosure in this case, the Court finds that the announcement of the SEC investigation is an efficient and highly relevant proxy by which to measure the price effects of the fraudulent conduct.  And after February 18, MCSi stock never recovered; Peppel left on March 11, Stanley resigned on April 4, and NASDAQ delisted MCSi on April 11.  There was never another "event" that might close

the window on measuring the price effects of the announcement of the SEC investigation. Moreover, determining loss in this scenario does not require the absolute exclusion of any other factor that contributed to the price drop on the trading day in question. For example, in United States v. Kumar, 617 F.3d 612 (2d Cir. 2010), the court reviewed the district court's calculation of loss caused by defendant's deceptive practice of using a 35-day month to calculate company revenues, which permitted him to overstate actual revenue for any given quarter. When the scheme was disclosed, a significant drop in share price occurred. The court noted that even if the losses over the narrow two-day trading period in which the scheme was disclosed (which the district court had used as the time window to calculate loss) were not caused solely by the fraudulent scheme, but also by general investor concern over potential criminal and regulatory investigations, "... financial loss caused by speculation that stems from the fraudulent practice and a loss of confidence in management is properly included in the loss calculation...". Id. at 634. That situation closely resembles what apparently happened to MCSi following the announcement of the SEC investigation.

The Court recognizes that this calculation of loss will not directly correlate to any actual economic losses sustained by individual MCSi shareholders who held shares prior to 2002 and

-23-

continued to hold them on February 14, 2003.  No doubt the real losses incurred by many shareholders, which would be based on their actual purchase price, was greater than 87 cents per share. Nevertheless, the court believes that the method used will as much as possible, effectively isolate the effects of the fraud on share price, which is the goal of the calculation of loss for purposes of the Guidelines.

Relevant Conduct:  Peppel has argued throughout these proceedings that the only conduct for which he can be held accountable for purposes of Guidelines loss, or for any other sentencing factor, is the Mercatum transaction he specifically admitted to in his plea agreement.

Peppel was the CEO of MCSi, and Stanley was the company's CFO.  It is true that Stanley's plea agreement is broader than Peppel's, and Stanley admitted to responsibility for making fraudulent statements about MCSi's revenue and expenses concerning Mercatum, ClearOne, FedEx, Skytron, and two book entries labeled Major Projects and Major Projects 2.  According to the Funk report of August 15, 2006 (Government Hearing Ex. 46), the total overstatement of revenue from all of these transactions was approximately $52 million in 2001 and $28 million in 2002; the overstated revenue associated with the Mercatum transactions alone was $37.1 million, or 46% of the total misstated revenues.  Peppel contends that at the worst, if

-24-

the Court uses a market-based loss at all, he should be held responsible for only 46% of that loss.

Section 1B1.3 of the Guidelines, concerning "relevant conduct," states that for purposes of Chapters Two and Three base offense levels and enhancements, the calculations shall be determined on all acts by the defendant, and "(B) in the case of a jointly undertaken criminal activity ..., all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense...". As the probation officer noted, Peppel pled guilty to Count One of the indictment, charging a conspiracy among Peppel, Stanley, David White, and various MCSi officers and employees to commit securities, mail and wire fraud, a conspiracy that spanned the period January 1, 2000 through April 30, 2003. (Superceding Indictment at ¶124) It is almost inconceivable to the Court that Peppel, as the company's CEO and being, in his own words, an "overly aggressive" manager, was completely unaware of the other fraudulent transactions which are described in the Funk report and alleged in the superceding indictment.

Peppel has claimed that the Board of Directors had directed him to focus on external elements of MCSi's business, while

Stanley was ordered to focus on the internal elements, including the accounting and finances. But Peppel was clearly intimately familiar with the details of the company's business and its anticipated revenue projections; the Court does not accept the suggestion that he simply turned a blind eye to those details in 2000 and 2001, when those details in the company's financial statements were so critical to the markets in general, and to the success of any public stock offering in particular. Moreover, all of the fraudulent transactions and schemes – while they differ in particular details – share a common theme and a common goal, making it appear as though MCSi had more legitimate revenue than it actually had. The Court concludes that all of the transactions alleged in the superceding indictment are properly treated as relevant conduct under the Guidelines.

    <u>Number of Affected Shares</u>.

    Peppel argues that any shares that were purchased before February 26, 2002 must be excluded from the calculation of loss. He cites several cases holding that in a civil securities fraud action, there is no market loss to someone who buys prior to the fraudulent act and then holds the security thereafter, because the purchase price is not affected by the fraud. See, e.g., <u>Walck v. American Stock Exchange, Inc.</u>, 687 F.32 778, 790 (3d Cir. 1982), noting that both the security statute and Rule 10b-5 "authorize liability only for conduct occurring 'in connection

with the purchase or sale of any security.'"  The plaintiff, who alleged that the company induced him to retain his stock when it would have been prudent to sell, did not establish a compensable loss.

The Court rejects Peppel's argument.  As discussed above, the Court is persuaded that the <u>Dura</u> principles of loss causation applicable to a civil action do not strictly apply in the sentencing context.  As the Government has argued, criminal securities fraud does not include reliance as an element of the offense.  None of the offenses to which Peppel has pled guilty require proof of reliance by any shareholder upon a defendant's statements or omissions.  There is no doubt that investors who bought MCSi stock prior to February 26, 2002 sustained some loss in value caused by the offense conduct in this case; while that loss cannot be precisely quantified, it exists.  To exclude company shares that were purchased prior to February 26, 2002, which is the majority of the publicly-held shares, would understate the loss in this case.  As the Second Circuit observed in <u>United States v. Ebbers</u>, 458 F.3d 110, 127 (2d Cir. 2006), "... loss to investors who hold during the period of an ongoing fraud is not easily quantifiable because we cannot accurately assess what their conduct would have been had they known the truth.  However, some estimate must be made for Guidelines' purposes, or perpetrators of fraud would get a windfall."

Peppel also contends that shares held by the Mercatum principals should be excluded. There is no evidence before the Court about Jonathan Barry and an individual who is apparently David White's father. But David White was named as a co-defendant in the SEC's civil complaint filed in this district on May 2, 2006 (Case No. 3:06-cv-131), and is identified as an unindicted co-conspirator in this case. Out of an abundance of caution, and commensurate with the task of reaching a reasonable estimate of loss, the Court will exclude the shares held by these three individuals. According to the exhibit attached to Peppel's post-hearing memorandum, which is based upon Government Hearing Exhibits 39b and 39c, Jonathan Barry held 13,401 shares; David White held 83,451, and his father held 10,355, a total of 107,207 shares. These will be subtracted from the shares used to calculate loss.

Summary of Actual Loss.

According to MCSi's 10-Q for the quarter ending September 30, 2002 (Government Hearing Exhibit 18), MCSi had a total of 25,051,458 outstanding shares as of November 12, 2002:

Outstanding Shares:          25,051,458

 Shares held by Peppel:     (813,087)

 Shares held by Stanley:      (78,731)

   (The Peppel and Stanley holdings are reported

   in MCSi's April 26, 2002 proxy statement as

-28-

of April 12, 2002; Government Hearing Ex. 15)

Mercatum shareholders:     (107,207)

Treasury shares:           (2,828,564)

**Net Shares Affected:        21,223,869**

Applying a loss-per-share of $0.87 equals an actual loss for purposes of Section 2B1.1 of $18,466,506.

2.    <u>Number of Victims</u>.

Peppel objects to the pre-sentence report's application of a four-level enhancement under Section 2B1.1(b)(2)(B), based on the probation officer's conclusion that there are more than fifty victims of the fraudulent conduct.  According to Government Hearing Exhibit 39c, MCSi had 284 shareholders of record between January 15 and February 14, 2003.  Peppel notes that of those 284 holders, only 42 bought shares after February 26, 2002 and held them through February 14, 2003, as reflected on the chart attached to Peppel's post-hearing brief.

As was discussed above, the Court rejects Peppel's argument that shareholders who purchased stock prior to February 26, 2002 are not "victims" under the Guidelines.  Those shares sustained a loss caused by the fraudulent conduct, and to exclude them would understate the loss and result in a windfall to Peppel.  The Court will exclude the three Mercatum-related shareholders, but that reduction does not affect the application of the enhancement.  Peppel's objection is therefore overruled.

3.   Sophisticated Means Enhancement.

The pre-sentence report concludes that the two-level enhancement for use of sophisticated means under Section 2B1.1(b)(8) should apply.  The probation officer noted that the fraudulent conduct in this case involved sham transactions, the creation of false journal entries, and multiple violations of Generally Accepted Accounting Principles.  Peppel and Stanley also attempted to conceal the extent of the revenue overstatements from MCSI's external auditor, PriceWaterhouse Coopers.  (The firm withdrew from its representation of MCSi in the spring of 2003.)

Section 2B1.1(b)(8) states: "If (A) the defendant relocated, or participated in relocating, a fraudulent scheme to another jurisdiction to evade law enforcement or regulatory officials; (B) a substantial part of a fraudulent scheme was committed from outside the United States; or (C) the offense otherwise involved sophisticated means, increase by 2 levels."  Peppel argues that the canon of *ejusdem generis* applies to limit this enhancement to schemes that are similar in nature to the examples given in (A) and (B), those that involve conduct outside the United States or attempts to evade detection by moving the scheme out of the reach of U.S. authorities.  Peppel also objects to the testimony of Mr. Geraghty, who testified that he believed sophisticated means were used to hide the fraudulent Mercatum transactions.

-30-

Application Note 6(B) to Guidelines Section 2B1.1 defines sophisticated means as "... especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. ... Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means." The application of the enhancement has been affirmed in a wide variety of cases. In United States v. Crosgrove, 637 F.3d 646, 667 (6th Cir. 2011), the enhancement was properly applied to a defendant who did not personally participate in creating shell entities or offshore activity used in a fraudulent insurance scheme. But the defendant used a pseudonym, and created fraudulent insurance certificates and false correspondence with victims of the scheme, which the Court found was sufficient.

And in United States v. Knox, 624 F.3d 865 (7th Cir. 2010), affirming the enhancement in a real estate "flipping" scheme, the defendant used fraudulently inflated appraisals to induce purchasers and lenders to buy distressed properties which he bought at nominal prices. The court noted that the enhancement is proper when the offense conduct, taken as a whole, is notably more intricate than that of a garden-variety offense. The sophistication of defendant's overall scheme was made clear by the fact that he successfully deceived real estate buyers,

-31-

sellers, and mortgage lenders, which required a high degree of "precision and coordination" with his other participants.  Id. at 871.

United States v. Ghertler, 605 F.3d 1256 (11th Cir. 2010) involved a defendant who conducted extensive but surreptitious research on several large corporations and law firms, and then contacted these companies and fraudulently claimed to be a high ranking official in need of an urgent transfer of cash to resolve some fictitious claim against the company.  He even provided forged signatures on documents that authorized the transfers. The court recognized that it was a close question, but affirmed the district court's application of the sophisticated means enhancement, relying on defendant's detailed research to develop the inside information he needed to perpetrate the fraud; his use of innocent couriers to pick up money; and the extensive use of forged documents and third-party transfers of some of the funds in an attempt to conceal his identity.  The "totality of these activities carried out over an extended period of time" (between July 2006 and December 2007) was sufficient to affirm the district court's decision.  Id. at 1268.

And in United States v. Cox, 357 Fed. Appx. 629 (6th Cir., Dec. 16, 2008)(unpublished), the Sixth Circuit noted that the district court may rely on the entirety of a defendant's conduct when considering whether the enhancement should apply, because

"... the enhancement can be based on offense conduct which is on the whole sophisticated, even though the individual aspects of the conduct are not sophisticated." Id. at 634. While the court noted that the defendant in that case was not a very sophisticated investor, and he truthfully identified himself on each account he set up to further his fraudulent scheme (converting funds he solicited as an investment advisor), the court affirmed the enhancement based on his actions of creating several fictitious entities to hold the investors' funds during the period of his fraud.

This Court has no difficulty concluding that sophisticated means were used to commit and to conceal the false and fraudulent entries with respect to Mercatum and the other transactions the Court considers to be relevant conduct. With respect to Mercatum, the evidence shows that purchase orders were backdated in order to "push" the anticipated revenue from the transaction into fiscal year 2001. Peppel wrote a letter to David White and listed the facts about the transaction that he needed White to confirm, in order to convince MCSi's auditors that the transaction was a legitimate "buy and hold" transaction under GAAP. (See Government Hearing Exhibit 5) The facts concerning the transaction and its eventual unwinding show that those GAAP factors were not true, and Peppel admitted in his plea agreement that he falsified records in order to fabricate fraudulent

-33-

revenue. The Court therefore overrules Peppel's objection to the application of the sophisticated means enhancement.

4. <u>January 25, 2003 Guideline Amendments</u>.

Although not directly addressed at the evidentiary hearing, Peppel has objected to the probation officer's application of the January 2003 amendments to the Guidelines. Amendment 647 added a new subsection (13) to Section 2B1.1(b): "If the offense involved a violation of securities law and, at the time of the offense, the defendant was an officer or a director of a publicly traded company, increase by 4 levels." Amendment 647 implemented various portions of the Sarbanes-Oxley Act of 2002. The new enhancement subsection was formally printed as part of the text of Section 2B1.1 in the November 1, 2003 Guidelines Manual, and the entire amendment is published in Guidelines Manual Appendix C, Volume II, which contains cumulative amendments from November 1, 1998 through November 5, 2003. Appendix C states that the amendment's effective date was January 25, 2003.

Peppel's plea agreement contains several binding stipulations entered into between Peppel and the United States pursuant to Fed. R. Crim. Proc. 11(C)(1)(c), including paragraph 5(a): "the Sentencing Guidelines Manual dated November 1, 2002 will be used exclusively to calculate all advisory sentencing guidelines relevant to this case." The plea agreement states that it shall be null and void if the Court does not utilize the

-34-

November 1, 2002 Manual to calculate the advisory Guidelines sentencing range.

Based on these facts, the Court must conclude that it was not within the contemplation of the parties at the time the plea agreement was negotiated that later amendments to the November 1, 2002 Manual would be used by the Court.  The probation officer states that Amendment 647 was an emergency amendment that went into effect on January 25, 2003, but that it should be considered a part of the 2002 manual.  This might be a perfectly appropriate conclusion in other cases; but in this case, given the specific statement in the plea agreement and Peppel's arguments, the Court will not utilize that amendment in calculating the Guidelines sentence.  Peppel's objection to the four-level enhancement is therefore sustained.

5. <u>Summary</u>.

Based upon the findings contained in this Order, the advisory Guidelines calculation of Peppel's offense level is as follows:

    Base Offense Level: 6

    Actual Loss Enhancement: +20

    More than 50 Victims:     +4

    Sophisticated Means:      +2

    Money Laundering Enhancement: +1 (Section 2S1.1(b)(2)(A))

    Acceptance of Responsibility: -3

-35-

Adjusted Offense Level:  30

Criminal History Category:     I

Sentencing Range:   97 - 121 Months

     Any arguments of either party concerning a possible departure or variance, including but not limited to the disparity of loss amounts between Peppel and Stanley (or other similarly-situated defendants), the imperfections inherent in any market-equity approach to loss, or any other basis for a departure or variance, may be raised and will be considered at the final sentencing hearing.  The Courtroom Deputy will establish a schedule for filing of final sentencing memoranda or departure motions, and will set a date for the final sentencing hearing.

     SO ORDERED.

DATED: August 16, 2011       s/Sandra S. Beckwith
                                     Sandra S. Beckwith
                                     Senior United States District Judge