UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| UNITED STATES OF AMERICA | : | Case No.: 3:06-cr-00196-SSB |
| | : | |
| v. | : | Judge Sandra S. Beckwith |
| | : | |
| MICHAEL E. PEPPEL, | : | |
| | : | SENTENCING MEMORANDUM |
| Defendant. | : | |

## I.  INTRODUCTION

Michael E. Peppel ("Mr. Peppel") respectfully requests that this Court consider this Memorandum in determining the sentence to be imposed against him.  Mr. Peppel is a non-violent, first-time offender, a primary caregiver to his five children, the primary support network for his ailing mother and brother, and has already suffered considerably for his actions through an SEC disbarment and forfeiture of assets.  He is also assisting in the growth and development of an online pharmaceutical company that offers reduced-cost pharmaceuticals to over 200,000 thousand active customers and is creating much-needed jobs in the Cincinnati area.  Evaluation of these factors under 18 U.S.C. § 3553(a) demonstrate that the recommended United States Sentencing Guidelines ("USSG" or "Guidelines") range is unreasonable and a sentence well below the guideline range consisting of probation and/or home confinement is more than sufficient to achieve the statutory sentencing goals.

## II.  DISCUSSION

This Court has concluded that Mr. Peppel's proper sentencing range pursuant to the USSG is 97-121 months.  *See* Order of Aug. 16, 2011 ("Guidelines Order") (Doc.

206).  Though his conduct is admittedly regrettable, Mr. Peppel simply does not deserve

to spend the next eight to ten years in prison.  The USSG range is advisory only; the

ultimate sentence imposed upon Mr. Peppel is within the sole discretion of the Court.

*United States v. Booker*, 543 U.S. 220 (2005).  The Court "may not presume that the

Guidelines range is reasonable."  *Gall v. United States*, 552 U.S. 38, 50 (2007).  Rather,

the Court "must make an individualized assessment based on the facts presented."  *Id.*

It is respectfully submitted that an individualized assessment of the facts in this

case, as they pertain to Mr. Peppel, should cause this Court to impose a sentence

significantly less severe than called for by a rote application of the Guidelines.  When

determining an appropriate sentence, the Court must consider the factors listed in

Section 3553(a) to impose a sentence that is "sufficient but not greater than necessary."

18 U.S.C. § 3553(a) (2011); *United States v. Grossman*, 513 F.3d 592, 594 (6th Cir.

2008).  When these factors are considered, it becomes apparent that a sufficient

sentence for Mr. Peppel falls well below 97-121 months and properly includes a term of

probation and/or home confinement.

The United States Court of Appeals for the Sixth Circuit has held that the Court's

duty at this stage is "to impose a sentence 'sufficient but not greater than necessary' to

comply with the § 3553(a) factors."  *Grossman*, 513 F.3d at 594.  This Court's

sentencing determination "involves an exercise of judgment, not a mathematical proof."

*Id.* at 596.  Section 3553(a) sets forth the several factors to be considered by this Court:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed--
>     (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [by the USSG];

(5) any pertinent policy statement [from the U.S. Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

Mr. Peppel respectfully submits that consideration of these factors weigh heavily in favor of a sentence significantly below the recommended Guidelines range and including a term of probation and/or home confinement.

1.    **Nature/circumstances of offense and history/characteristics of defendant**

Mr. Peppel is a devoted husband and father.  He is a primary caregiver to his five children and the primary support network, both financially and emotionally, for his mother Lynn and brother Mark.  Mr. Peppel's obligations to his family and the support they require from him cannot be understated.  In addition to being a primary caregiver and *the* primary financial provider for his five children (ranging in age from 2 months to 18 years), Mr. Peppel is the only family member available to care for his ailing mother and brother.  Mr. Peppel's mother Lynn is suffering from a host of serious medical conditions, including diabetic retinopathy that is causing deteriorating vision.  Mark Peppel is suffering from an acute case of Multiple Sclerosis that has rendered him bed-ridden.  As their letters to the Court demonstrate, Mr. Peppel plays a critical supporting

role to his mother and brother and, as their conditions worsen, the support they require from Mr. Peppel will only increase.

Mr. Peppel is also a hard-working businessman who throughout his career has achieved many notable successes, including his most recent business endeavor, advising and mentoring the management team at HealthWarehouse.com. While Mr. Peppel has not been able to function as an executive at the company in order to comply with his SEC director and officer bar, he remains a tremendously important mentor and advisor to the management team at HealthWarehouse, one of the rare local public companies that is currently growing and adding jobs to the local economy. In the past two years, HealthWarehouse has added 54 jobs to the local economy, and the company's founder and CEO estimates that the company will add another roughly 150 jobs in the next two years. Mr. Peppel's role has been primarily to provide high level strategic advice to the company's management team (for example, on major undertakings such as financings and acquisitions) and to provide mentoring to promising employees throughout the organization. As evidenced by the company's spotless compliance record in a heavily regulated industry,[1] a vital part of Mr. Peppel's message in both capacities is that all of the company's activities must be conducted with the utmost respect for the law. HealthWarehouse's executive team regards Mr. Peppel's wisdom and guidance, on both business and compliance matters, as a vital element of the company's current success and believes that the company will face

---

[1] For example, HealthWarehouse is the only internet pharmacy that meets Google's vigorous compliance standards, so it is the only internet pharmacy currently permitted to advertise on Google.

serious challenges - - and may not be able to add the jobs it currently projects - - if it is deprived of his guidance for a significant period of time.

Despite his success, Mr. Peppel has never forgotten the humble roots from which he came or the significant obstacles he faced in seeking to build a better life for him and his family. During the course of his career, he has demonstrated a dedication to helping those less fortunate, most notably young individuals and professionals seeking to improve their lives through education. The letters this Court is receiving from Mr. Peppel's family, friends and acquaintances highlight the positive impact Mr. Peppel has had on these individuals and the communities in which he has lived and worked.

Mr. Peppel was born into a family of extremely limited means in one of the poorest counties in America. His parents divorced early, and his mother was forced to work significant hours outside the home to provide for her two children. Mr. Peppel recognized that the only way he could better his life and that of his family was through hard work and education.[2] His first goal and most notable early achievement was to gain admittance to the University of Notre Dame, as a transfer student after he was not admitted as a high school senior. The drive and commitment Mr. Peppel demonstrated in gaining admittance to Notre Dame, a university many including his guidance counselors believed was unachievable, is indicative of the positive can-do spirit Mr. Peppel has carried throughout his life. That approach to life, that anything is possible with enough hard work, commitment and creativity, remains a guiding force in Mr. Peppel's life today as he continues in the face of significant obstacles to care for his family and assist in the creation of a new and growing business enterprise.

---

[2] A detailed overview of Mr. Peppel's history is attached to the final pre-sentence report.

The achievements Mr. Peppel obtained in business and his commitment and devotion to his immediate family are well-documented.  What may be less clear from the record is the lifelong commitment Mr. Peppel has made to assist those less fortunate than himself.  Throughout his career, much of Mr. Peppel's charitable work was done quietly, in many cases anonymously, for the sole purpose of helping those in need.  From an early age, Mr. Peppel's mother encouraged her sons to assist those less fortunate.  The family made frequent visits to nursing homes, and Mr. Peppel did what he could within his limited means to help others, including providing free babysitting, lawn care services, and tutoring to families in his community.  As his personal financial situation improved, Mr. Peppel's charitable endeavors broadened.  This Court is receiving many letters documenting the wide-ranging assistance Mr. Peppel has provided to individuals and communities.  Following are just a sample of the charitable works Mr. Peppel engaged in prior to his indictment:

- Established an endowed scholarship at the University of Notre Dame in 2000 open to any student living in Columbiana County, the county in Appalachia in which Mr. Peppel grew up, or neighboring counties. Donated equipment and served as a frequent guest lecturer to the university's business school.

- Provided significant financial support to schools in the Dayton area for special projects, school uniforms, books, scholarship funds and athletic equipment.  Most of these contributions were made anonymously.

- Served as a frequent guest lecturer at the University of Dayton business school.

- Provided funds for charities aimed at assisting youth, including making significant financial contributions to Daybreak, a shelter for abused children in Dayton, Ohio (post-indictment).

- Provided financial assistance to numerous employees of MCSi and its predecessor Diversified Data Products who were in need, including (i) paying funeral expenses for an employee who committed suicide and

anonymously setting up a scholarship fund for his two young children; (ii) paying for two employees to complete their degrees at Eastern Michigan University; (iii) loaning funds to employees seeking to avoid bankruptcy or in urgent need of funds for school or other expenses; (iii) agreeing to co-sign car loans; and (iv) generally financially assisting employees who came to him in crisis.

- Engaged in charitable outreach in Costa Rica and India for over a decade.

It is clear from these examples that Mr. Peppel has been generous with not only his money, but also with that more precious commodity for a busy entrepreneur, his time. Moreover the substantial number of charitable acts done anonymously or in far-off parts of the world makes clear that these acts are the products of genuine compassion and not merely for public relations.

Perhaps the charitable deed that most reflects Mr. Peppel's compassion and love of children involved a young boy who was dying of cancer. In 2001 Mr. Peppel came to learn of the boy's medical condition from a local doctor. The physician informed Mr. Peppel that the boy's lifelong dream was to attend a Notre Dame football game. Anonymously Mr. Peppel arranged for the boy and his family to be flown to South Bend by medical transport to spend a weekend attending a game and spending time with the coach and team. The boy died a few months later never knowing the identity of his benefactor. He was buried in his Notre Dame jersey.

As the Court can plainly see, Mr. Peppel is not the miscreant the Department of Justice portrays him to be.

This desire to succeed and to provide for those around him has been a guiding force in Mr. Peppel's life. It was _this desire_ that led Mr. Peppel to engage in what he now realizes was a misguided effort to weather a significant financial downturn in the audiovisual industry and shore up the company's financials until the industry improved.

As demonstrated by Mr. Peppel's significant investments (and ultimate losses) in MCSi, and contrary to the claims of the government, Mr. Peppel was <u>not</u> motivated by greed in engaging in this conduct. Rather, his motivation was to weather the economic storm, protect and preserve the jobs of thousands of employees and keep the company from bankruptcy.

The crime to which Mr. Peppel pled is serious, and he in no way seeks to minimize the gravity of his conduct or the impact it caused upon MCSi and the Dayton community. But as demonstrated by his conduct over the past several years, Mr. Peppel has learned from his mistakes, has proven himself to remain devoted to his family and a positive contributing member of society, and, though faced with many obstacles, has served as an integral contributing member to a business venture that is bringing much need employment to the Cincinnati community.

**2. A below-Guidelines sentence of probation and/or home confinement rather than a prison term, coupled with the SEC's prohibition on Mr. Peppel's service as a director or officer, would adequately deter this type of conduct among other executives and protect the public.**

Section 3553(a)(2) is specifically concerned with the deterrence effect of a sentence, as well as the protection it offers to the public. Here, Mr. Peppel's indictment and the proceedings which have followed have been well-publicized. Mr. Peppel has forfeited substantial personal assets, vastly changing his lifestyle and that of his family. The SEC has barred Mr. Peppel from ever again serving as a director or officer of a public company, effectively limiting his own future success and income stream. He has been publicly humiliated and portrayed in the media as the sole cause of MCSI's demise, a portrait this Court's loss calculation makes clear is unfair and inaccurate. The

public stigma of the indictment and the nearly five years of litigation,[3] coupled with the loss of lifestyle, reputation, and livelihood, are all substantial punishments that Mr. Peppel has already suffered and will continue to suffer for the rest of his life.

Both courts and scholars have recognized that these factors are particularly acute and severe forms of punishment for white-collar offenders such as Mr. Peppel. *See, e.g., United States v. Coughlin*, 2008 WL 313099, *5 (W.D. Ark. February 1, 2008) (for white collar crime, probation and home detention more effectively accomplish the goals of Section 3553(a)(2) than imprisonment). In upholding a deviation from the Guidelines where a district court imposed probation instead of jail time, the Supreme Court recognized that "[o]ffenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty." *Gall*, 552 U.S. at 48 (listing restrictions imposed on probationers, and quoting the Advisory Council of Judges of National Council on Crime and Deliquency, Guides for Sentencing 13-14 (1957) ("Probation is not granted out of a spirit of leniency…probation is not merely letting an offender off easily" (internal citations omitted)); *see also Coughlin*, 2008 WL 313099 at *5 ("Home detention and probation can be severe punishments, hugely restrictive of liberty, highly effective in the determent of crime and amply retributive"). For many, these penalties are as damaging as a custodial sentence and achieve the goals of Section 3553(a)(2). *See Coughlin*, 2008 WL 313099 at *6 ("the severely punitive quality

---

[3] This case has consistently been delayed by a litany of broken promises by the Government, and by the Government's aggressive "punishment at all costs" approach to Mr. Peppel. For example, in an attempt to deprive Mr. Peppel of his right to select counsel, the Government took the extraordinary step of threatening to seize funds out of Mr. Peppel's former lawyers' trust accounts, which resulted in a protracted dispute before Judge Rice. As another example, the Government first agreed to release various pieces of Mr. Peppel's real estate, but then reneged on its promise, again resulting in a lengthy legal dispute.

of probation [is] capable of deterring corporate executives" from engaging in similar conduct again).  Moreover, because Mr. Peppel's case has been highly publicized, these penalties go a long way to promoting respect for the law and affording adequate deterrence to criminal conduct.  With or without a prison term, Mr. Peppel's case is already an object lesson to any public company executive.

Moreover, Mr. Peppel poses no threat whatsoever to the public.  As a non-violent offender, the absence of a jail sentence for Mr. Peppel would not risk public safety. Further, Mr. Peppel literally cannot engage in this type of wrongful conduct again.  His SEC lifetime director and officer bar is a tremendously potent penalty.  It simultaneously addresses, and addresses very effectively, a number of the primary purposes of punishment identified in Section 3553(a)(2).  Indeed, it is a perfect, permanent, and self-effectuating solution to the question of how to prevent Mr. Peppel from committing a similar fraud in the future.  He is simply prohibited by law from ever serving as a director or officer of a public company for the rest of his life.  He will never be able to hold the sort of position in which he could engage in the offense conduct.

A term of incarceration would have the seriously negative impact of precluding Mr. Peppel from providing for the numerous family members who rely upon him, and would also have a disastrous effect on the growth and development of HealthWarehouse, a growing source of jobs in a down economy and a prime source of low-cost prescriptions for over 200,000 active customers.

**3.    The likely sentence of co-conspirator Ira Stanley and numerous sentences of similarly situated defendants are substantially less than the Guidelines range of Mr. Peppel.**

When the types of sentences available, national trends in sentencing, the likely sentence of a co-conspirator, and the loss calculation used to determine the USSG range[4] are examined, it becomes clear that imprisoning Mr. Peppel for between eight and ten years would be vastly excessive.

Again, Mr. Peppel has already forfeited essentially all of his personal assets and a lifetime director and officer bar has been imposed against him. In addition to the director and officer bar, this Court has a variety of sentences available to it that would meet the standard of Section 3553. Home confinement, probation, and community service all have substantial punitive effects, eliminate the expense of incarcerating a first-time offender who is literally barred from holding executive positions necessary to committing the types of offenses to which he has pled, and would benefit his family and the community by allowing Mr. Peppel to continue to work and serve this community. Alternatively, the Court could very reasonably fashion a sentencing package which included a short, below-Guidelines prison term,[5] along with meaningful periods of home confinement, probation and community service, all of which would effectively deprive

---

[4] Mr. Peppel understands that this Court has made a ruling on the loss calculation, and is merely accepting the Court's invitation to discuss the "imperfections inherent in any market-equity approach to loss." *See* Guidelines Order, p. 36 (Doc. 206).

[5] Even well-known egregious securities fraud offenders have received below Guidelines sentences. For example, Bernard Ebbers of WorldCom faced a Guidelines range of 30 years to life in prison, but was sentenced below that range to 25 years in prison. *See, e.g., United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006).

him of his liberty.  Indeed, between 2003 and 2007 (a period in which many defendants were likely sentenced under the 2002 USSG applicable to Mr. Peppel), [6] the average sentence for economic offenders was approximately 2 years, between 22.4 and 26.9 months, well below Mr. Peppel's Guidelines range.  Mark D. Harris, Anna G. Kaminska, *Defending the White-Collar Case at Sentencing*, Federal Sentencing Reporter, Vol. 20, No. 3 (Feb. 2008), p. 214, Fig. E.

Moreover, courts have recognized that a deviation from the Guidelines is appropriate where empirical data does not support the Guidelines range.  *United States v. Herrera-Zuniga*, 571 F.3d 568 (6th Cir. 2009) (recognizing that under the Supreme Court's holdings in *Kimbrough v. United States*, 552 U.S. 85 (2007) and *Spears v. United States*, 555 U.S. 261 (2009), courts can reject Guidelines based on the absence of empirical data analyzed by the Sentencing Commission).  Such is the case with Guidelines for white collar crimes.  *U.S. v. Lenagh*, 2009 WL 296999 (D. Neb. Feb. 6, 2009).  In *Lenagh*, the court recognized that "[f]or policy reasons, the [Sentencing] Commission did not employ its characteristic empirical approach when setting the Guidelines for white-collar crimes."  *Id.* at *3 (citing the United States Sentencing Commission, Fifteen Years of Guidelines Sentencing (Nov. 2004)).  Rather, the

---

[6] The Court properly applied the November 1, 2002 Guidelines and rejected the pre-sentence report's application of the January 2003 amendments to the Guidelines (which included various enhancements under the Sarbanes-Oxley Act of 2002).  Guidelines Order, p. 34.  As the Court recognized, Mr. Peppel's Plea Agreement clearly contemplated that the January 2003 amendments would not apply.  Guidelines Order, p. 35.  As an example of Government counsel's disdain for Mr. Peppel and "punishment at all costs" attitude, the Government inexplicably supported the pre-sentence report's application of the January 2003 amendments despite numerous conversations with defense counsel during which Government counsel agreed that the enhancements would not apply.  *See* PSIR, p. 54; *see also* Transcript of Change of Plea Hearing held August 11, 2010 (Doc. 181), p. 19:18-23.

Guidelines were written to increase penalties and jail time for white collar crimes to correct a perceived under-punishment of economic crimes.  *Id.*  In other words, the Guidelines range tends to be higher for white collar crimes based on a belief by the Commission that those sentences should be higher, rather than empirical data supporting those Guidelines ranges.  Here, the Court should deviate from the Guidelines calculations for Mr. Peppel, because they lack an empirical foundation.  *See id.* ("the court has considered the sentencing range established by the Guidelines, but, because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court affords them less deference than it would to empirically-grounded Guidelines." (citing *Kimbrough*, 552 U.S. at 109-10)).

Imposition of an alternative, below-Guidelines sentence available to this Court would be consistent with numerous other courts that have implicitly recognized that alternatives to prison and below-Guidelines prison terms can be very successful ways of deterring white collar crime, penalizing offenders, and protecting the public.  For example, in *United States v. Ovid*, No. 09-CR-216 (E.D.N.Y. 2010), Isaac Ovid was convicted of conspiracy to commit securities fraud.  The Guidelines range for Ovid was **210-262 months** imprisonment – well in excess of Mr. Peppel's range of 97-121 months.  Mr. Ovid received upward enhancements of 20 levels for a loss greater than $7 million, 4 levels for more than 50 victims, 4 levels for being associated with a registered broker, 2 levels for preying on vulnerable victims, and 4 levels for his leadership role in the offense.  Ovid was sentenced to **60 months** imprisonment, 72% lower than the low end of his Guidelines range, with three years of supervised release.

For the Court's reference, a similar reduction from Mr. Peppel's Guidelines sentence would result in a prison term of about 27 months, much closer to the average sentence of fraud offenders. However, for the reasons stated herein, Mr. Peppel should benefit from an even greater deviation in his case.

In *United States v. Olis*, 2006 WL 2716048 (S.D. Tex. Sept. 22, 2004), the defendant was convicted of conspiracy to commit mail, wire, and securities fraud, securities fraud, and wire fraud. The court determined that the intended loss was $79 million, resulting in a Guidelines range of 151 to 188 months. The district court imposed a sentence of 72 months imprisonment, less than half of the sentence at the bottom of the defendant's Guidelines range or, in Mr. Peppel's case, 47 months. In *United States v. Parris,* 573 F.Supp.2d 744 (E.D.N.Y. 2008), Lennox and Lester Parris were convicted of securities fraud, conspiracy to commit securities fraud, witness tampering, and conspiracy to commit witness tampering. The court determined the actual loss was not reasonably estimable and relied on the measure of gain to the defendants, which was at least $2.56 million. The applicable sentencing range under the Guidelines was **30 years to life** imprisonment. Citing the range as "unrealistic," the court asked the parties to compile a list of comparable securities fraud sentences to serve as a guide. That list showed that those defendants who did not or could not cooperate with the government and caused $100 million or more in loss generally received double-digit sentences (in terms of years), and those who cooperated and caused less than $100 million in loss received single-digit sentences. The court imposed a sentence of **five years** imprisonment, only one-sixth of the Guidelines prison term. In Mr. Peppel's case, that would mean a 16-month sentence.

In each of these cases, the Guidelines range was significantly higher than Mr. Peppel's, yet the ultimate prison term imposed for each of the defendants was well below the range for Mr. Peppel of eight to ten years. A comparable downward departure for Mr. Peppel would yield a significantly lower prison term, between 16 and 47 months. And, in light of the fact that (i) Mr. Peppel is a first-time offender who has already suffered the forfeiture of substantial assets, the negative publicity of drawn-out criminal litigation and, most significantly, a lifetime bar from holding a position as a director or officer, (ii) Mr. Peppel is a primary caregiver to numerous family members, including an ailing mother and brother, and (iii) since the indictment was filed, Mr. Peppel has proven himself to be a law-abiding and contributing member of society, a sentence well below the recommended Guidelines range consisting of a term of probation and/or home confinement would be more than sufficient to satisfy the Section 3553(a) statutory sentencing goals.

Moreover, co-conspirator Ira Stanley is likely to be sentenced to a much shorter prison term than Mr. Peppel, despite pleading to more acts of criminal conduct than Mr. Peppel. Pursuant to the Plea Agreement ("Plea") and accompanying Statement of Facts, Mr. Peppel pled guilty to conspiring with other executives at MCSi, Inc. to overstate MCSi's earnings, thereby resulting in an inflated stock price.[7] One of the key factors in determining the USSG range in such a case is the amount of loss caused by the defendant's conduct. *See* U.S.S.G. § 2B1.1. Under the Court's calculation of the

---

[7] The precise charges to which Mr. Peppel pled guilty are as follows: (1) one count of Conspiracy to Commit Securities, Mail, and Wire Fraud in violation of 18 U.S.C. §§ 371 and 1349; (2) one count of Willful False Certification of a Financial Report by a Corporate Officer in violation of 18 U.S.C. § 1350; and (3) one count of Money Laundering in violation of 18 U.S.C. § 1957.

USSG range, Mr. Peppel has an adjusted offense level of thirty, which results in a sentencing range of 97-121 months.

The "actual loss enhancement," which is based on a calculation of the loss caused by conduct which Mr. Peppel participated in, accounts for two-thirds (twenty points) of Mr. Peppel's offense level.  Applying the approach suggested by the Presentence Investigation Report ("PSIR") (the difference in market price for MCSi stock on the trading day before and immediately after the announcement of the SEC investigation into MCSi), the Court determined a "reasonable estimate" of the loss caused by Mr. Peppel at $18,466,506.  *See* Guidelines Order, p.29.  Given the complicated nature of the transactions at issue in this case, along with the difficulty in accounting for the effect of a volatile economy, the amount of shareholder loss caused by Mr. Peppel's conduct simply cannot be reasonably calculated.  Because there are significant inherent flaws in the method used to calculate loss in this case, Mr. Peppel's USSG range is artificially inflated.

Moreover, due to the loss calculation, Mr. Peppel's USSG range is exponentially higher than that of his co-conspirator, Ira Stanley.  Mr. Stanley also entered into a Plea Agreement.[8]  However, unlike in Mr. Peppel's case where the Government argued for a loss calculation of $300 million,[9] Mr. Stanley's Plea Agreement set the amount of loss

---

[8] The precise charges to which Mr. Stanley pled guilty are as follows: (1) one count of Conspiracy to Commit Securities, Mail, and Wire Fraud in violation of 18 U.S.C. §§ 371; (2) one count of Willful False Certification of a Financial Report by a Corporate Officer in violation of 18 U.S.C. § 1350; and (3) one count of Mail Fraud in violation of 18 U.S.C. § 1341.

[9] Government counsel repeatedly assured defense counsel that the Government would not argue for a $300 million loss calculation.  Despite these repeated assurances, the obvious flaws in such a calculation, and the significantly lower loss calculations

attributable to Mr. Stanley's conduct at between $400,000 and $1,000,000.[10] Mr. Stanley's loss enhancement, then, will be only 14 points to Mr. Peppel's 20 points. If Mr. Stanley's loss amount had been used for Mr. Peppel, Mr. Peppel would have had an adjusted offense level of 24 and a Guidelines range of 51 to 63 months.

The disparity in loss amounts between Mr. Peppel and Mr. Stanley reflects the inherent and well-known flaws in the USSG generally, as well as the arbitrary nature of the government's approach to its case against Mr. Peppel. While the government charged Mr. Peppel and Mr. Stanley with essentially the same conduct, and they were similarly situated as senior executive officers of the company, both of whom had responsibility for the company's SEC filings, the grossly different amounts of loss attributed to this conduct in Mr. Stanley's plea and in the government's assertions regarding Mr. Peppel before this Court suggest two very different, in fact two entirely incomparable, levels of conduct and culpability. The $300 million loss figure asserted by the government in this case as late as the hearing on loss, is between 300 and 750 times the amount of loss included in Mr. Stanley's plea.

The Government's own assertions and the record before this Court make very clear that Mr. Peppel's level of culpability is materially lower than Mr. Stanley's.[11]

_____

championed by its own experts, the Government ridiculously asserted that the appropriate loss figure was nearly $298 million. *See* PSIR, p. 48.

[10] The Government has attempted to explain the disparity between Mr. Stanley's loss amount ($400,000 - $1,000,000) and the loss amount allegedly attributable to Mr. Peppel ($300 million) by claiming that the loss amounts attributed to Ira Stanley were based on information known at the time of Mr. Stanley's Plea Agreement (July 11, 2007). However, such an explanation is clearly unsupported by the record.

[11] Defendant understands that Stanley will receive some manner of accommodation for his purported cooperation with the government. A 750 times reduction in the loss

However, even assuming he is equally culpable as Mr. Stanley, there is no justification for this tremendous disparity in the loss amounts asserted by the Government.  This disparity suggests serious flaws in the government's and the Guidelines' analyses and threatens to produce an unreasonable difference in the resulting potential sentences, even <u>before</u> giving effect to any downward departure given to Mr. Stanley in exchange for his testimony. While it would appear that both figures are technically defensible under the Guidelines, losses that differ by a factor of forty-five for comparable conduct cannot both be reasonable.

Moreover, Mr. Stanley's conduct was actually far more culpable than Mr. Peppel's.  Even a cursory review of Mr. Peppel's Superseding Indictment, which was drafted and filed <u>after</u> the government had the benefit of Mr. Stanley's testimony, reveals precious few allegations that Mr. Peppel took anything resembling an active part in the vast majority of the frauds alleged. Mr. Stanley's plea, on the other hand, which was intended to reflect a favorable deal for a cooperating witness, and which presumably was heavily negotiated by Mr. Stanley and his counsel, still includes overt acts tied to every one of the frauds alleged in the superseding indictment.  Mr. Stanley has admitted conduct that is fundamentally different in kind, and far more pernicious and culpable than Mr. Peppel.  In each case, the government did not even <u>charge</u> Mr. Peppel with the types of conduct Mr. Stanley <u>admitted</u>.  In the first place, Mr. Stanley

---

amount seems profoundly excessive, particularly in light of the nature of the allegations against Mr. Peppel and the fact that this case did not go to trial.  Perhaps Mr. Stanley would be entitled to such a generous accommodation if he had done something to significantly aid the war on terror, or otherwise protected society from grievous harm, but certainly not a garden variety white-collar offender.  Moreover, Defendant contends that a downward departure under Section 5(k) for Mr. Stanley, not a cynical manipulation of the loss amount, would be the appropriate way to reward Mr. Stanley for his expected testimony.

admitted in his plea that he committed his frauds in order to obtain "performance based loans, bonuses and salaries" and otherwise to enrich himself. *See* Stanley Plea Agreement at 9. Unlike Mr. Peppel, who engaged in the Mercatum transaction to help stave off the company's demise, Mr. Stanley acted with venal goals and base purposes. Indeed, his actions were not different in kind from a Bernie Madoff or a Bernie Ebbers. Given Mr. Stanley's tainted, wholly selfish motives, a charge-bargain and a sentencing mechanism that suggest a lesser, rather than greater penalty for Stanley must be seriously flawed.

Second, unlike Mr. Peppel, who the record makes clear informed the company's board and auditors about every detail of the Mercatum transaction, Mr. Stanley has admitted to actively lying to and concealing facts from the company's auditors. *Id.* Because auditors have a unique and vital role as gatekeepers at public companies, the SEC regards deception of auditors as a particularly serious pernicious act. Accordingly, despite a loss calculation which suggests that Mr. Stanley's conduct was trivial and far less culpable when compared to Mr. Peppel's, Mr. Stanley's own admissions and the record before this Court show that his behavior was in fact vastly more culpable than Mr. Peppel's.

The Defendant acknowledges the Court's skepticism that Mr. Peppel was entirely unaware of Mr. Stanley's misconduct and its concern that Mr. Peppel's demanding management style might have driven Mr. Stanley to commit some of his misconduct. Mr. Peppel deeply regrets any misconduct his loose words or imprecise instructions might have inspired in Mr. Stanley and agrees that, in retrospect, he should have kept a closer watch on Mr. Stanley. However, Mr. Peppel believes that it is not plausible to

assert that Mr. Stanley's conduct could have been inspired, much less ordered, by Mr. Peppel. In the first place, the record does not indicate that even Mr. Stanley himself, despite the opportunity to do so before a sympathetic prosecutor and presumably with the prospect of a downward departure for substantial assistance before him, has asserted than Mr. Peppel instructed him to break the law. Secondly, the most pernicious aspects of Mr. Stanley's conduct, his self-enrichment and his deception of the company's auditors, are vastly different in kind from Mr. Peppel's own misconduct and, indeed, at cross-purposes to what Mr. Peppel was attempting to achieve with the Mercatum transaction. Finally, Mr. Peppel respectfully observes that most working Americans have had demanding bosses at one point or another, and the vast majority of these people have not taken it upon themselves to commit felonies to please them.

4. **The imperfections in the market-equity approach to loss and in the guidelines approach to securities fraud defendants**

As suggested above, it is well known that judges, academics, the American Bar Association, and even the Department of Justice and Federal Sentencing Commission themselves, have recognized that the Federal Sentencing Guidelines for white-collar offenders in situations like Mr. Peppel's are very deeply flawed. Indeed, there appears to be very little respect for, and adherence to, the guidelines applicable to white-collar offenders among the attorneys and judges who have to live with their practical implications on a day-to-day basis.[12]

---

[12] Defendant has voiced his objections to the technical aspects of the loss calculation used in this case in previous filings with this court and with the Probation Office. He does not repeat them here. Rather, at the court's suggestion, this discussion addresses additional reasons the Guidelines' loss calculation and the resulting Guidelines offense level calculation will not result in a just sentence under 18 U.S.C. §3553(a).

For example, in its recent annual report to the Sentencing Commission, the Department of Justice, which has strong institutional interests in supporting the Guidelines and the substantial white-collar sentences they often produce, admitted that the Federal Sentencing Guidelines for frauds similar to Mr. Peppel's "have lost the respect of a large number of judges" and that these judges have, as a result, been disregarding the Guidelines entirely "with increasing frequency." Accordingly, even the Department of Justice itself has called for the Commission to review and consider amending these Guidelines.[13] Examples of judges' frustration with the excessive sentences produced by the Guidelines abound. Speaking for many of his frustrated and outraged colleagues, Judge Rakoff described the Guidelines applicable to a CEO in a public company accounting fraud case as "patently absurd on their face. *United States v. Adelson*, 441 F.Supp.2d 506, 515 (S.D.N.Y. 2006). A long list of other federal judges have expressed similar frustration and, as Judge Rakoff did in *Adelson*, abandoned the calculation.[14]

Similarly, the American Bar Association has called for comprehensive reform of the Guidelines applicable to white-collar offenders, noting that the combination of the loss enhancement and many related specific offense characteristics "tend to overstate

---

[13] June 28, 2010 letter to Hon. William K. Sessions II, Chair of the Sentencing Commission from Jonathan Wrobleski, Director, Office of Policy and Legislation, pp. 2, 4.

[14] *See, e.g., Parris*, 573 F.Supp.2d 744; *United States v. Watt*, 707 F. Supp.2d 149, 151 (D. Mass. 2010**);** *United States v. Ferguson*, No. 3:06-cr-00137-CFD (D. Conn. 2009); *United States v. Stinn*, 379 Fed. Appx. 19, 2010 WL 2094259 (2d Cir. 2010); and *United States v. Turkan*, No.4:08-CR-428 DJS (E.D. Mo. 2009); *see also* Frank O Bowman III, Sentencing High Loss Corporate Insider Frauds After *Booker*, 20 Federal Sentencing Reporter 167, 169 (2008) ("Since *Booker*, virtually every judge faced with a top-level corporate defendant in a very large fraud has included sentences called for by the guidelines were too high.")

the seriousness of some offenses" and calling for new Guidelines that "place greater emphasis on," among other things "*mens rea* and motive in relation to an offense, the defendant's role in the offense [and] whether and to what extent the defendant received a monetary gain from the offense."[15] Likewise, the academic community is similarly critical of the guidelines for white collar offenders and the loss calculation in particular.[16]

The profound, apparently universal, hostility to the guidelines as applied to white-collar offenders arises from a number of very serious practical flaws and injustices, particularly in cases that involve companies with publicly traded securities.[17]

First, neither Congress nor the Sentencing Commission has given any guidance on how to calculate loss, leaving courts to struggle with an elastic "reasonability" standard that gives courts much leeway but little practical help.[18] The lack of any

---

[15] Testimony of James E. Felman on behalf of the American Bar Association before the United States Sentencing Commission for the hearing on proposed amendments to the Federal Sentencing Guidelines, February 16, 2011, page 3.

[16] *See, e.g.* Derick R. Vollrath, *Losing The Loss Calculation: Toward A More Just Sentencing Regime In White-Collar Criminal Cases*, 59 Duke L.J. 1001, 1020 (2009) ("The sentencing of federal white-collar criminal defendants is deeply flawed. The guidelines recommend sentences that are generally too harsh. Moreover, the guidelines place undue emphasis on the loss calculation, and imprecise measure that fails to accurately correlate with the defendant's culpability.")

[17] *See, e.g.,* Peter J Henning, *White-Collar Crime Sentences After Booker: Was The Sentencing of Bernie Ebbers Too Harsh?*, 37 McGeorge Law Review 757, 763 (2006) ("[T]he loss calculation is a notoriously slippery determination, particularly for companies whose stock is publicly traded so that market perceptions can aggregate the effects of any accounting misconduct."); *see also Adelson*, 441 F.Supp.2d at 509 ("Since successful public companies typically issue millions of publicly traded shares—in Impath's case, there were 16.6 million shares of common stock outstanding as of 2003—the precipitous decline in stock price that typically accompanies a revelation of fraud generates a multiplier effect that may lead to guideline offense levels that are, quite literally, off the chart.")

[18] *See. e.g., Watt,* 707 F. Supp.2d at 151 ("The Guidelines were of no help".)

meaningful practical standard for calculating loss creates great disparities among defendants in different courts and leaves tremendous room for arbitrariness by prosecutors. In Mr. Peppel's case, the lack of positive standards of calculated loss has resulted in a tremendous, and tremendously contradictory, range of losses even on the government side.[19]

Secondly, notwithstanding the Guidelines' aspiration that the loss calculation would serve as an accurate proxy for the defendant's level of culpability,[20] as a practical matter, for public company securities fraud cases, there is absolutely no connection between the culpability or bad intent of the defendant and the resulting loss calculation. The courts have bristled at the obvious and unjust disjunction between the loss calculation and the defendant's apparent level of culpability in many cases.  For example, in *United States v. Ranum*, 353 F.Supp.2d 984, 990 (E.D. Wis. 2005), the court complained that "one of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level.  For example, the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child."  While the court acknowledged that a victim may care little about defendant's motivation in his or her crime, "from the standpoint of personal culpability, there is a

---

[19] For example, as discussed in Section II.3., above, and in previous filings before this Court, the United States has asserted a significant number of different loss amounts for Mr. Peppel and his co-conspirator, ranging from $400,000 to nearly $300 million.  The Probation Office, upon whose work the Court's final loss calculation is based, originally found a loss of approximately $300 million as well, more than ten times its final loss amount of $18.4 million. Surely such vastly different calculations suggest that something is seriously wrong with the loss calculation.

[20]  *See, e.g.*, USSG 2B1.1.

significant difference."  Likewise, in *United States v. Emmenegger*, 329 F.Supp.2d 416,

427 (S.D.N.Y. 2004), the court complained that "the guidelines' provisions for theft and

fraud place excessive weight on this single factor" and noted that the amount of loss is

often "a relatively weak indicator of the moral seriousness of the offense or the need for

deterrence."[21]  Scholars have also noted this flaw in the Guidelines.[22]

Courts and commentators have also noted a number of other flaws in the

Guidelines that result in unreasonably high sentences.  For example, as the Sentencing

Commission itself has recognized, the loss enhancement, combined with related

enhancements such as number of victims and "sophisticated means," address

essentially the same aspects of a defendant's conduct and so can have an unfair

cumulative effect that produces excessively high sentences.[23] Similarly, the

"logarithmic" effect of the loss tables produces astronomically high sentences and

results in no meaningful distinction in sentences between offenders with vastly different

---

[21] *See also Adelson*, 441 F.Supp.2d at 509; *Parris*, 573 F.Supp.2d 744.

[22] For example, Professor Podgor laments that "The individual's motive in committing the crime may also be overlooked in the federal sentencing process… As such, the accused that causes an astronomical loss to the public but gains no individual profit may be treated in a similar manner to the individual who might be purchasing costly shower curtains for his home in the profits of his or her corporate fraud." Ellen S. Podgor, *The Challenge Of White-Collar Sentencing*, 97 Journal of Criminal Law and Criminology, 731, 748, 2007.

[23]  As Professor Bowman notes, "[t]he Sentencing Commission itself has recognized this phenomenon. In the Commission's 15 year report on the operation of the guidelines between 1987 and 2002, the Commission acknowledged the deleterious effects of what it called "factor creep" and observed that "as more and more adjustments are added to the sentencing rules, it is increasingly difficult to ensure that the interactions among them, and their cumulative effect, properly track offense seriousness." Bowman at 170.

loss amounts.[24] Finally, the Guidelines for white collar offenders, in their form applicable to Mr. Peppel, are the product of political pressure, not the empirical study that produced most other Guidelines.  As such, they have changed so much over the relatively short life of the Guidelines that scholars have called into question the integrity and usefulness of *any* iteration of the Guidelines applicable to white-collar offenders. Indeed, considering Mr. Peppel's case under just one earlier iteration of the guidelines supports this conclusion: under the 1998 guidelines Mr. Peppel's sentencing range would have been 37 to 63 months, approximately *half* of the Guidelines calculation before this Court, and it would have been still lower under previous iterations of the Guidelines.

### III.     CONCLUSION

Mr. Peppel respectfully requests that this Court consider this Memorandum when determining his sentence in this case.  It is respectfully submitted that the Court consider a sentence below that recommended under the Sentencing Guidelines that includes probation/home confinement, or, at worst, a short term of imprisonment.

---

[24] *Adelson*, 441 F.Supp.2d at 512 (recognizing the "travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense.").

Respectfully submitted,

/s/ *Ralph W. Kohnen*
Ralph W. Kohnen (0034418)
Jeanne M. Cors (0070660)
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202-3957
(513) 381-2838
(513) 381-0205 (facsimile)
kohnen@taftlaw.com
cors@taftlaw.com

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and accurate copy of the foregoing was served electronically upon counsel of record via the Court's CM/ECF system, this 19th day of September, 2011.

/s/ *Ralph W. Kohnen*
Ralph W. Kohnen