```
              UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF OHIO
                WESTERN DIVISION AT DAYTON
```

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | : Case No.: 3:06CR196SSB |
| | : |
| **Plaintiff,** | : **UNITED STATES'S SUPPLEMENTAL** |
| | : **SENTENCING MEMORANDUM** |
| vs. | : |
| | : |
| **MICHAEL E. PEPPEL,** | : |
| | : |
| **Defendant.** | : |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney's Office for the Southern District of Ohio, hereby files the attached supplemental sentencing memorandum.  This brief is based upon the attached memorandum of points and authorities, the files and records in this case, and any further evidence or argument as may be presented at this defendant's sentencing hearing.

DATED: May 6, 2013         Respectfully submitted,

                            CARTER M. STEWART
                            UNITED STATES ATTORNEY

                            <u>s/Dwight Keller & Brent G. Tabacchi</u>
                            DWIGHT KELLER
                            BRENT G. TABACCHI (6276029 IL)
                            Assistant United States Attorneys
                            Attorneys for Plaintiff
                            602 Federal Building
                            200 West Second Street
                            Dayton, OH   45402
                            Telephone: (937) 225-2910
                            Fax: (937) 225-2564

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I**

**INTRODUCTION**

Through his position as the Chief Executive Officer of MCSi, Inc. ("MCSI"), defendant Michael Peppel engaged in a deliberate scheme to defraud millions of dollars from investors in this company. Rather than acknowledging MCSI's financial difficulties and inadequate sales performance during the early 2000s, Mr. Peppel concealed these facts from investors, lying to them (as well as the Securities and Exchange Commission ("SEC")) concerning the state of his company's health. By fraudulently blinding the marketplace to the true financial situation of his company, Mr. Peppel necessarily ensured that the value of MCSI stock remained artificially high. Seizing on this fraudulently-inflated price, Mr. Peppel sold 300,000 personal shares of MCSI stock for millions of dollars – all the while encouraging, if not mandating, his employees to keep their own investments in this company. Through his calculated conduct, Mr. Peppel undermined the core principle upon which American equity markets and investors rely – the need for complete, accurate and truthful information.

Although these facts, standing alone, warrant a sentence within the advisory Guideline range, Mr. Peppel's conduct since leaving MSCI reinforces the need to impose a significant term of imprisonment upon this defendant. Rather than strictly complying

1

with the law, Mr. Peppel, at best, has continued to operate in legally gray areas. For instance, since his original sentencing hearing, he exploited the lax corporate atmosphere of his most recent publicly-traded employer to take in excess of $300,000 from that company. To this day, Mr. Peppel remains undeterred and largely indifferent to any rules that govern his conduct.

As detailed more fully below, these and other circumstances – when considered in light of the section 3553(a) factors – underscore the necessity of a lengthy term of imprisonment for this defendant. Consequently, the United States respectfully requests that the Court sentence Mr. Peppel to 120 months of imprisonment for his role in defrauding millions from investors.

**II.**

**ARGUMENT**

A.  **The Legal Framework For the Sentencing Proceeding**

Under Booker and its progeny, although the Sentencing Guidelines remain a touchstone in federal sentencing proceedings,[1] this Court may "tailor the sentence in light of other statutory concerns [set forth in 18 U.S.C. § 3553(a)] as well." United States v. Booker, 543 U.S. 220, 264-65 (2005). To that end, any sentence that the Court imposes must reflect, among other things: the nature and circumstances of the offense, including its seriousness; the history and characteristics of the

---

[1] The Sixth Circuit affirmed this Court's Guideline calculation, which established an advisory sentencing range 97 to 121 months of imprisonment.

2

defendant; the need to promote respect for the law, to provide just punishment and to provide adequate deterrence, including the necessity of protecting the public from this defendant; the avoidance of unwarranted sentencing disparities; and any need to provide proper vocational and educational training for the offender.  See id.; see also 18 U.S.C. § 3553(a)(1)-(2)(A)-(D).  In all events, a sentence should be sufficient, but not greater than necessary, to achieve the goals of section 3553(a).  See Booker, 543 U.S. at 264-65.

When addressing these factors – particularly, the history and characteristics of the defendant – the Court may consider Mr. Peppel's conduct during the pendency of his re-sentencing proceedings.  More precisely, "when a defendant's sentence has been set aside on appeal and his case remanded for resentencing, a district court may consider evidence of a defendant's [activities] since his prior sentencing and that such evidence may, in appropriate cases, support a [] variance from the advisory Guidelines range."  Pepper v. United States, -- U.S. --, 131 S. Ct. 1229, 1241 (2011).  While the Court has discretion to consider such information, post-sentencing conduct need not be afforded any special weight in the sentencing calculus.  See, e.g., United States v. Butler,  443 Fed. Appx. 147, 151 (6th Cir. 2011).

Finally, at the sentencing hearing, the Court may "consider all relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that

3

the information has sufficient indicia of reliability to support its probable accuracy." United States v. Silverman, 976 F.2d 1502, 1504 (6th Cir. 1992) (en banc) (reliability standard satisfies mandates of due process). This minimum-indicia-of-reliability standard imposes "a relatively low hurdle" that requires "some evidentiary basis beyond mere allegation." United States v. Moncivais, 492 F.3d 652, 657 (6th Cir. 2007). Consistent with this rule, a court may rely upon summaries of proffer statements that cooperating witnesses have made to law enforcement officers so long as the proffer statements bear some indicia of reliability. See, e.g., Moncivais, 492 F.3d at 657 (court properly relied upon witness's proffer statement in crafting defendant's sentence as proffer was against penal interest thereby demonstrating its reliability); United States v. Hunt, 487 F.3d 347, 352-53 (6th Cir. 2007) (court properly relied on coconspirators' hearsay statements to sentence defendant even though witnesses hoped to obtain favorable treatment through cooperation with government); cf. United States v. Swanberg, 370 F.3d 622, 625 (6th Cir. 2004) ("[T]estimonial evidence from a coconspirator may be sufficient to determine the amount of drugs for which another coconspirator should be held accountable.") Nor are courts prohibited from considering the hearsay statements of a cooperating witness merely because he provided information due to an "explicit or implicit desire to secure favorable treatment from the police." Hunt, 487 F.3d at 352 (court

//

4

properly relied on co-conspirator statements to sentence defendant where statements corroborated one another and hence bore sufficient indicia of reliability).

**B.    The Section 3553(a) Factors Warrant Imposition of a Sentence within the Advisory Sentencing Guideline Range.**

Against this legal framework, when considered collectively in this case, the section 3553(a) factors compel imposition of a sentence within the advisory Sentencing Guideline range.

1.   **The Nature, Circumstances, and Seriousness of the Offenses.**

Mr. Peppel perpetrated a complex, lengthy scheme that, even now, continues to impact his victims.  Although the well-documented circumstances of this case warrant a sentence within the advisory Sentencing Guideline range, several aspects of the fraud underscore the need to impose a significant term of imprisonment upon this defendant.

First, rather than constituting an isolated incident, Mr. Peppel's fraud scheme spanned years.  From the doctored 2001 Mercatum transaction to the 2003 corporate press release that falsely denied any corporate wrongdoing, Mr. Peppel's scheme did not unfold in moments and then abruptly end.  To the contrary, this defendant worked for years to perpetrate this fraud on, and conceal it from, MCSI's investors and the SEC.

Second, to sustain this fraud over several years required significant sophistication.  Mr. Peppel and his confederates fraudulently created millions of dollars in sales to ensure that

5

MSCI consistently met all of its projections. They structured the transactions in such a way that experienced, seasoned auditors could not detect it.

Third, Mr. Peppel personally profited from the fraud. Whatever his ultimate motivation for attempting to fraudulently extend the life of MSCI, Mr. Peppel seized upon the necessarily inflated stock price, selling 300,000 personal shares in the company. In doing so, this defendant realized over $6 million, which he then funneled through a series of personal domestic and off-shore accounts, and investments. Nor can Mr. Peppel legitimately dispute that his sale of stock is inextricably intertwined with his fraudulent conduct. The sale and the ensuing financial transactions that flowed from it constitute the factual predicate for the money laundering charge to which he pleaded guilty.

Fourth, the profits that Mr. Peppel reaped from his fraud stand in stark contrast to the millions that the victim-investors lost. While Mr. Peppel purchased property and other stocks with his windfall, his investors lost retirements. To be sure, during his original sentencing hearing, one of Mr. Peppel's current business associates tacitly dismissed such losses as the potential cost of investing. The ordinary investor is not so fortunate to view in such a cavalier fashion losses attributable to fraud. For instance, in a letter to this Court, a former MCSI shareholder noted the impact that Mr. Peppel's actions still have on her life; she invested in MSCI stock the few extra dollars

that she managed to save during her twenty years of employment. With that investment wiped out, she represented in her letter that she now even lacks the money for the bus fare necessary to attend Mr. Peppel's sentencing hearing.

Fifth, hundreds, if not thousands, of MCSI employees lost their jobs in the wake of Mr. Peppel's scheme.  Admittedly, the company's poor (yet undisclosed) financial health may have ultimately contributed to similar results.  Yet, in hiding MCSI's weakness, Mr. Peppel deprived his employees of the opportunity to make informed choices for themselves and their families concerning whether: to remain with a financially struggling company; or to continue to invest in their employer's stock. Additionally, Mr. Peppel's fraudulent conduct dimmed his company's already fading chances of survival.  Having saddled MCSI with false earnings and an ongoing fraud investigation, Mr. Peppel effectively ensured that his company would not survive long after his termination as its CEO.

Finally, Mr. Peppel's offenses are serious.  His well-planned and deliberate actions cost investors not only millions but also hundreds, if not thousands, of jobs for people in Ohio. His conduct struck at the foundation upon which individuals invest – the need for complete, accurate, timely and truthful information from publicly traded companies.  The nature, circumstances and seriousness of this offense warrant imposition of a Guideline sentence.

7

2. **The History and Characteristics of this Defendant.**

Mr. Peppel's history and characteristics do not warrant a downward variance, but rather strongly support imposition of a Guideline sentence upon him. Indeed, this defendant's conduct since his initial sentencing hearing raises continued questions concerning his ability or willingness to conform his conduct to the law.

Although Mr. Peppel previously presented testimonials concerning his charitable works as well his supporting role in his family, "there is nothing to indicate that the support provided by [him] to his family, friends, business associates, and the community is any way unique or more substantial than any other defendant who faces a custodial sentence." United States v. Peppel, 706 F.3d 627, 641 (6th Cir. 2013). Indeed, for most defendants, their incarceration works an unfortunate hardship upon their family and friends. Mr. Peppel's situation proves no different. See Id.

One aspect of Mr. Peppel's history, however, does differentiate him from many defendants that appear before this Court; he engaged in criminal conduct despite the significant opportunities and advantages made available to him. He attended a prestigious university, earning a degree from it. He possessed an extensive network of friends and family. He held a job in which he earned hundreds of thousands of dollars a year. It is well-established that, absent unusual circumstances, a

8

defendant's educational background, profession, or skills will not warrant a significant downward variance from the advisory Guideline range.  See United States v. Christman, 607 F.3d 1110, 1119 (6th Cir. 2010).  While the positive aspects of his personal history should not result in greater punishment for him, the fact that these bounties proved insufficient to satisfy his ambition not only to succeed, but also to earn ever more money, should provide substantial pause to this Court.

Nor does this defendant's lack of a criminal history mitigate against imposition of a significant sentence.  The advisory Guideline range already reflects Mr. Peppel's limited criminal history, placing him in lowest possible criminal history category.  Given that the Guidelines already have accounted for, and hence mitigated his sentence based on, this factor, no further variance should be granted based on his lack of criminal history.

Moreover, although a defendant's criminal history (or lack thereof) often functions as a proxy of a defendant's character, it cannot adequately serve such a role in this case.  Despite his dearth of criminal convictions, Mr. Peppel appears either unwilling or unable to conform his conduct to the law.  Since his original sentencing hearing, his actions – which, at best, have repeatedly ventured into ethical and legal gray areas – reveal this defendant's true nature.  At the sentencing hearing, the United States anticipates that the evidence will demonstrate:

9

- Mr. Peppel charged to his Healthwarehouse.com corporate credit card over $300,000 in personal expenses – expenses for which he then improperly sought and received reimbursement from the company.  Under pressure for his actions, he allegedly resigned from Healthwarehouse.com, which reported the incident to the SEC.  Whether Mr. Peppel's conduct ultimately constituted theft or merely exploitation of a lax corporate atmosphere, this credit card scheme reflects a continued willingness to severely test, if not break, rules that apply him.

- Mr. Peppel continues to understate his role in Cape Bear Partners, LLC ("Cape Bear").  Nominally managed by Mr. Peppel's mother,[2] Cape Bear effectively owned/controlled at one time as much as ten percent of Healthwarehouse.com's shares.  Rather than fully explaining his involvement with Cape Bear, Mr. Peppel continues to artificially distance himself from this entity – an entity over which he maintained de facto control.  Additionally, it appears that, in selling stock, Cape Bear may have exploited inside information concerning Healthwarehouse.com.  Cape Bear, for instance, sold shares of Healthwarehouse.com stock

---

[2]  When served with a subpoena to produce at the sentencing hearing any and all records that she held concerning Cape Bear, Mr. Peppel's mother indicated that she had none.

10

shortly before Mr. Peppel's credit card scheme was disclosed to the SEC. Notably, the proceeds from this sale were used to pay down a significant portion of the $300,000 Mr. Peppel owed Healthwarehouse.com.

- Mr. Peppel has attempted to evade conditions of his supervised release. Despite requiring the permission of the Probation Office to obtain or open new lines of credit, he brazenly ignored this condition. Similarly, though barred from serving as a de jure or de facto officer of any corporation, Mr. Peppel's conduct at Healthwarehouse.com calls into question his compliance with that condition. At the sentencing hearing, the evidence will establish that, rather than strictly complying with the instructions of this Court, Mr. Peppel again elected to venture into, at best, a gray area.

- Whatever his role at Healthwarehouse.com, Mr. Peppel exploited it to the benefit of his interests and to the detriment of that company and its shareholders. For instance, Mr. Peppel permitted Healthwarehouse.com to pay for his cellular telephone service and that of his family well after his alleged "resignation" from the company. Without the prior approval or knowledge of the Board of Directors, he arranged for products from his wife's company to be sold through Healthwarehouse.com's website at cost (_i.e._, at the

11

> price Healthwarehouse.com paid for the product). While this arrangement undoubtedly advanced his own interests and that of his wife, it made little business sense for Healthwarehouse.com. When finally advised of this questionable arrangement, the Board of Directors immediately ordered its termination.

Mr. Peppel's history and characteristics prove insufficient to deviate from the advisory Guideline range. To the contrary, this factor – particularly, his activities following his original sentencing hearing – cast continued doubt upon his willingness or ability to conform his conduct to the law.

### 3. **The Need to Promote Respect for the Law, to Promote Just Punishment, and to Provide Adequate Deterrents, Including the Ensuring Protection of the Public.**

To provide adequate general and specific deterrents, to promote respect for the law, and to ensure just punishment, Mr. Peppel should be sentenced within the advisory Guideline range.

A significant sentence in this case would prove a general deterrent to other individuals contemplating the commission of similar financial crimes. As in this case, most white-collar offenses are the product of thoughtful, careful deliberation. Their prolonged nature often presents a defendant with multiple opportunities to cease his or her conduct. "Because economic and fraud-based crimes are more rational, cool, and calculated than

//

//

sudden crimes of passion or opportunity, these [offenses] are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1241 (11th Cir. 2006).

Phrased differently, "[d]efendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." Id. Where a court declines to impose a significant sentence upon a white-collar offender, "the message . . . is [sent] that would-be white-collar criminals stand to lose little more than a portion of their ill-gotten gains and practically none of their liberty." Id. Indeed, even if the individual defendant himself poses little danger of re-offending, he should not receive a minimal sentence; "such a sentence" would be "grossly inappropriate" where, as here, a lengthy term of imprisonment will "carry[] substantial deterrent or punitive impact." Id. Given the deliberate, planned nature of this offense, a significant sentence upon Mr. Peppel would promote general deterrents for other would-be white-collar criminals.

Additionally, this defendant is a prime candidate for specific deterrents as he continues to pose an economic danger to the community at-large. Mr. Peppel's lack of criminal history belies his risk of recidivism. As the United States will detail at the sentencing hearing, Mr. Peppel has continued to engage in questionable business and financial practices since leaving MCSI.
//
//

13

A minimal sentence would neither protect the public from this defendant nor adequately discourage him from engaging in future fraudulent activity.

Finally, Mr. Peppel should be punished for the complicated and lengthy fraud scheme that he executed in this case. While personally earning millions from his crimes, he decimated retirements, effectively stealing from MCSI's investors. To this day, the victims of his fraud continue to live with the consequences of his actions. Just punishment in this case requires a lengthy prison sentence.

### 4. The Need To Avoid Unwarranted Sentencing Disparities

To avoid national sentencing disparities, the Court should impose upon Mr. Peppel a sentence within the advisory Guideline range. Rather than seeking to prevent divergent sentences among co-defendants, this section 3553(a) factor reflects a desire to avoid national sentencing disparities among similarly situated defendants.[3] See United States v. Simmons, 501 F.3d 620, 623-24 (6th Cir. 2007). As the Sixth Circuit has observed, "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes." United States v. Davis, 537 F.3d 611, 617 (6th Cir. 2008). Although this fact does not compel this Court to

---

[3] The United States recognizes that the Court has discretion to consider sentencing disparities among co-defendants.

sentence a defendant within or near the advisory Guidelines, it counsels against significant variances absent substantial justification. See Peppel, 707 F.3d at 640.

Here, any defendant in this country who engaged in conduct similar to Mr. Peppel – namely, the theft of millions of dollars from hundreds of victims through a complex scheme – confronts an advisory Guideline range of 97 to 121 months imprisonment. There is nothing particularly unique or compelling concerning Mr. Peppel's case that warrants a deviation from this national standard. To ensure equal treatment of similarly situated defendants on a national scale, a Guideline sentence remains appropriate.

### 5. The Need To Provide the Defendant with Vocational or Educational Training

Finally, there is little need to provide the defendant with any further educational or vocational training. He already holds a degree from a prestigious university. He has identified no other necessary training that warrants mitigation of his sentence.

**III.**

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court sentence Mr. Peppel to 120 months imprisonment.

DATED: May 6, 2013                    Respectfully submitted,

                                              CARTER M. STEWART
                                              UNITED STATES ATTORNEY

                                              <u>s/Dwight Keller & Brent G. Tabacchi</u>
                                              DWIGHT KELLER
                                              BRENT G. TABACCHI (6276029 IL)
                                              Assistant United States Attorneys
                                              Attorneys for Plaintiff
                                              602 Federal Building
                                              200 West Second Street
                                              Dayton, OH   45402
                                              Telephone: (937) 225-2910
                                              Fax: (937) 225-2564

CERTIFICATE OF SERVICE

    I hereby certify that a copy of the foregoing was served on defendant's counsel this 6th day of May 2013 via the Court's ECF System.

                                     s/Brent G. Tabacchi
                                     BRENT G. TABACCHI
                                     Assistant United States Attorney